1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )  Case No. 3:16-CR-0051-BR
4            Plaintiff,              )
                                     )
5   v.                               )  March 9, 2016
                                     )
6   AMMON BUNDY (1),                 )
    JON RITZHEIMER (2),              )
7   JOSEPH O'SHAUGHNESSY (3),        )
    RYAN PAYNE (4),                  )
8   RYAN BUNDY (5),                  )
    BRIAN CAVALIER (6),              )
9   SHAWNA COX (7),                  )
    PETER SANTILLI (8),              )
10  JASON PATRICK (9),               )
    DUANE LEO EHMER (10),            )
11  DYLAN ANDERSON (11),             )
    SEAN ANDERSON (12),              )
12  DAVID LEE FRY (13),              )
    JEFF WAYNE BANTA (14),           )
13  SANDRA LYNN ANDERSON (15),       )
    KENNETH MEDENBACH (16),          )
14  BLAINE COOPER (17),              )
    WESLEY KJAR (18),                )
15  COREY LEQUIEU (19),              )
    NEIL WAMPLER (20),               )
16  JASON CHARLES BLOMGREN (21),     )
    DARRYL WILLIAM THORN (22),       )
17  GEOFFREY STANEK (23),            )
    ERIC LEE FLORES (25),            )
18                                   )
             Defendants.             )
19  _____)  Portland, Oregon

20

            TRANSCRIPT OF PROCEEDINGS
21                (Status Conference)

22      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

23

24

25

```
1    COURT REPORTER:              AMANDA M. LeGORE
                                  CSR, RDR, FCRR, CRR, CE
2                                 U.S. Courthouse
                                  1000 SW Third Avenue Suite 301
3                                 Portland, OR   97204
                                  (503)326-8184
4

5    APPEARANCES:
     FOR THE PLAINTIFF:           CRAIG GABRIEL
6                                 GEOFFREY BARROW
                                  ETHAN KNIGHT
7                                 Assistant U.S. Attorneys
                                  U.S. Attorney's Office
8                                 1000 SW Third Avenue
                                  Portland, OR   97204
9                                 (503)727-1000

10   FOR DEFENDANT AMMON
     BUNDY:                       LISSA CASEY
11                                MICHAEL ARNOLD
                                  Arnold Law Office, LLC
12                                401 E 10th Avenue, Suite 400
                                  Eugene, OR   97401
13                                (541)338-9111

14
     FOR DEFENDANT JON
15   RITZHEIMER:                  TERRI WOOD
                                  730 Van Buren Street
16                                Eugene, OR 97402
                                  (541)484-4171
17
     FOR DEFENDANT JOSEPH
18   O'SHAUGHNESSY:               AMY BAGGIO
     (defendant not present)      621 SW Morrison, Suite 1025
19                                Portland, OR   97205
                                  (503)222-9830
20

21   FOR DEFENDANT RYAN
     PAYNE:                       LISA HAY
22                                Assistant Federal Defender
                                  101 SW Main Street, Suite 1700
23                                Portland, OR   97204
                                  (503)326-2123
24

25
```

```
 1   FOR DEFENDANT RYAN
     BUNDY:                    ANDREW BATES
 2                             1001 SW Fifth Avenue, Suite 1400
                               Portland, OR  97204
 3                             (503)228-3608

 4
     FOR DEFENDANT BRIAN
 5   CAVALIER:                 TODD BOFFERDING
                               1215 B Street
 6                             PO Box 539
                               Hood River, OR 97031
 7                             (541)490-9012

 8
     FOR DEFENDANT SHAWNA
 9   COX:                      TIFFANY HARRIS
     (defendant present        121 SW Salmon Street, Suite 1420
10   telephonically)           Portland, OR  97204
                               (503)546-2927
11

12   FOR DEFENDANT PETER
     SANTILLI:                 THOMAS COAN
13                             1000 SW Fifth Avenue, Suite 1400
                               Portland, OR  97204
14                             (503)221-8736

15
     FOR DEFENDANT JASON
16   PATRICK:                  ANDREW KOHLMETZ
                               Raivio, Kohlmetz & Steen, PC
17                             741 SW Lincoln Street
                               Portland, OR  97201
18                             (503)224-1104

19   FOR DEFENDANT DUANE
     EHMER:                    DAVID AUDET
20                             249 NE Lincoln
                               Hillsboro, OR  97124
21                             (503)648-3020

22   FOR DEFENDANT DYLAN
     ANDERSON:                 JAMIE KILBERG
23                             Kauffman Kilberg, LLC
                               1001 SW 5th Avenue, Suite 1414
24                             Portland, OR  97204
                               (503)224-2595

25
```

```
 1   APPEARANCES:  (continuing)
     FOR DEFENDANT SEAN
 2   ANDERSON:                MATTHEW McHENRY
                              Levine & McHenry, LLC
 3                            1001 SW Fifth Avenue, Suite 1414
                              Portland, OR  97204
 4                            (503)546-3927

 5   FOR DEFENDANT DAVID
     FRY:                     PER OLSON
 6                            Hoevet Olson Howes, PC
                              1000 SW Broadway, Suite 1500
 7                            Portland, OR  97205
                              (503)228-0497
 8
     FOR DEFENDANT JEFF
 9   BANTA:                   MATTHEW SCHINDLER
     (defendant not present)  (for Mr. Salisbury)
10                            501 4th Street #324
                              Lake Oswego, OR  97034
11                            (503)699-7333

12
     FOR DEFENDANT SANDRA
13   ANDERSON:                TYL BAKKER
     (defendant not present)  621 SW Alder Street, Suite 621
14                            Portland, OR  97205
                              (503)721-0140
15
     FOR DEFENDANT
16   KENNETH MEDENBACH:       MATTHEW SCHINDLER
                              501 4th Street #324
17                            Lake Oswego, OR  97034
                              (503)699-7333
18
     FOR DEFENDANT BLAINE
19   COOPER:                  KRISTA SHIPSEY
20                            820 SW 2nd Avenue, Suite 275
                              Portland, OR  97204
21                            (503)309-9024

22
     FOR DEFENDANT WESLEY
23   KJAR:                    JAMES HALLEY
     (defendant not present)  735 SW First Avenue, 2nd Floor
24                            Portland, OR  97204
                              (503)295-0301
25
```

```
 1  APPEARANCES:  (continuing)
    FOR DEFENDANT COREY
 2  LEQUIEU:                     RAMON PAGAN
                                 121 SW Salmon Street, 11th Floor
 3                               PMB #1195
                                 Portland, OR  97204
 4                               (971)270-0421

 5  FOR DEFENDANT NEIL
    WAMPLER:                     LISA MAXFIELD
 6  (defendant not present)      Pacific Northwest Law, LLP
                                 1420 World Trade Center
 7                               121 SW Salmon
                                 Portland, OR  97204
 8                               (503)222-2661

 9  FOR DEFENDANT JASON
    BLOMGREN:                    ROBERT RAINWATER
10                               Rainwater Law Group
                                 1327 SE Tacoma, Suite 239
11                               Portland, OR  97202
                                 (971)271-7566
12
    FOR DEFENDANT DARRYL
13  THORN:                       LAURIE SHERTZ
                                 121 SW Salmon Street, 11th Floor
14                               Portland, OR  97204
                                 (503)406-2136
15
    FOR DEFENDANT GEOFFREY
16  STANEK:                      BEN ANDERSEN
                                 101 SW Madison Street, #9068
17                               Portland, OR  97207
                                 (503)860-2531
18
    FOR DEFENDANT ERIC
19  FLORES:                      ERNEST WARREN JR.
    (defendant not present)      Warren & Sugarman
20                               838 SW First Avenue, Suite 500
                                 Portland, OR  97204
21                               (503)228-6655

22

23

24

25
```

 1                    (March 9, 2016; 9:18 a.m.)

 2

 3                         P R O C E E D I N G S

 4

 5              THE COURT:  Good morning, everyone.  Please be

 6    seated.

 7              THE AUDIENCE:  Good morning.

 8              THE COURT:  Mr. Knight.

 9              MR. KNIGHT:  Good morning, your Honor.  We're present

10    in the matter of the United States versus Ammon Bundy, et al.

11    This is Case No. 16-CR-0051.  Ethan Knight, Jeff Barrow, and

12    Craig Gabriel are appearing on behalf of the United States,

13    your Honor.

14              We're here today for an arraignment on a Superseding

15    Indictment and a status conference.  The Government is also

16    prepared at this time to announce the presence and

17    representation of the parties listed in the Indictment.

18              THE COURT:  Yes.  Before you do that, I want to note

19    that I received this morning and have granted a motion to lift

20    the seal on the Indictment in the form indicated.  So please

21    proceed.

22              MR. KNIGHT:  Thank you, your Honor.

23              Proceeding in the order in the Indictment, announcing

24    the presence of the parties at today's hearing, your Honor,

25    Defendant Ammon Bundy is present with counsel, Lissa Casey and

1    Michael Arnold, in custody.

2            Defendant John Ritzheimer is present with counsel

3    Terri Wood, in custody.

4            Defendant Joseph O'Shaughnessy has waived his

5    appearance before this Court.  Counsel for Mr. O'Shaughnessy,

6    Amy Baggio, is present.

7            Defendant Ryan Payne is present with counsel Lisa

8    Hay, and is in custody.

9            Defendant Ryan Bundy is present with counsel Andrew

10   Bates, and is in custody.

11           Defendant Brian Cavalier is present with counsel Todd

12   Bofferding, and is in custody.

13           Defendant Shawna Cox has waived her personal

14   appearance.  Is appearing today by phone.  Her counsel, Tiffany

15   Harris, is present in the courtroom.

16           THE COURT:  And where is she located?

17           MS. HARRIS:  (Standing.) Good morning.  Your Honor.

18           THE COURT:  Oh, there you are.  Good morning.

19           Go ahead.

20           MR. KNIGHT:  Your Honor, Peter Santilli is present in

21   custody with counsel Thomas Coan.

22           MR. COAN:  Good morning, your Honor.

23           THE COURT:  Good morning.

24           MR. KNIGHT:  Defendant Jason Patrick is present, in

25   custody, with counsel Andrew Kohlmetz.

1            MR. KOHLMETZ:  Good morning, your Honor.

2            DEFENDANT PATRICK:  Good morning.

3            MR. KNIGHT:  Defendant Duane Ehmer is present, out of

4   custody, with counsel Dave Audet.

5            Defendant Dylan Anderson is present with counsel

6   Jamie Kilberg.

7            David Sean Anderson is present with counsel, Matthew

8   McHenry, in the courtroom.

9            Defendant David Fry is present with counsel Per

10  Olson, and is appearing in custody.

11           Defendant Jeff Banta has waived his personal

12  appearance today.  Appearing on behalf of counsel-of-record

13  Robert Salisbury is Matthew Schindler.

14           MR. SCHINDLER:  Good morning, your Honor.

15           THE COURT:  Where are you?

16           MR. SCHINDLER:  Right here (raising hand).

17           THE COURT:  There you are.  Okay.  Thank you.

18           MR. KNIGHT:  Defendant Sandra Anderson has waived her

19  appearance today.

20           Counsel of record, Tyl Bakker, is present.

21           MR. BAKKER:  Good morning, your Honor.

22           THE COURT:  Good morning.

23           MR. KNIGHT:  Defendant Kenneth Medenbach is present

24  with counsel Matthew Schindler.  He is in custody.

25           Defendant Blaine Cooper is present --

1           THE DEFENDANT:  Good morning, your Honor.

2           THE COURT:  -- present in custody, with counsel

3    Krista Shipsey.

4           Defendant Wesley Kjar has waived his appearance at

5    today's hearing.  Counsel of record, James Halley, is present.

6           MR. HALLEY:  Good morning, your Honor.

7           THE COURT:  Good morning.

8           MR. KNIGHT:  Defendant Corey Lequieu is present in

9    custody with counsel Ramon Pagan.

10          MR. PAGAN:  Good morning, your Honor.

11          DEFENDANT LEQUIEU:  Good morning, your Honor.

12          THE COURT:  Good morning.

13          MR. KNIGHT:  Defendant Neil Wampler has waived his

14   personal appearance today.  Counsel of record, Lisa Maxfield,

15   is here.

16          THE COURT:  Where is she?

17          Good morning.

18          (Ms. Maxfield standing.)

19          MR. KNIGHT:  Defendant Jason Blomgren is present, in

20   custody, with counsel Robert Rainwater.

21          DEFENDANT BLOMGREN:  Good morning.

22          MR. KNIGHT:  Defendant Darryl Thorn is present, in

23   custody, with counsel Laurie Shertz.

24          MS. SHERTZ:  Good morning, your Honor.

25          THE COURT:  Good morning.

1          MR. KNIGHT:  Defendant Geoffrey Stanek is present out

2    of custody with counsel Benjamin Anderson.

3          THE COURT:  Good morning.

4          MR. KNIGHT:  And finally, your Honor, Defendant Eric

5    Flores has waived his personal appearance today.  Counsel Ernie

6    Warren is present.

7          MR. WARREN:  Good morning.

8          THE COURT:  Good morning.

9          Thank you.  Go ahead and proceed with the

10   arraignment.

11         MR. KNIGHT:  Thank you, your Honor.

12         A Superseding Indictment has been presented to all

13   the parties, both under seal last night via e-mail.  It also

14   has been provided in hard copy form this morning.  It's our

15   understanding the Court has now unsealed that Indictment.  The

16   Government is prepared to proceed on the Indictment.

17         It's my understanding that a reading has not been

18   waived.

19         THE COURT:  Then proceed with that, please.

20         MR. KNIGHT:  Thank you.

21         The Government will now read the Superseding

22   Indictment.

23         Omitting the initial caption, starting with Count 1

24   of the Indictment, Count 1 alleges a Conspiracy to Impede

25   Officers of the United States in violation of 18 United States

1    Code Section 372 as follows:

2           On or about November 5th, 2015, and continuing

3    through February 12th, 2016, in the District of Oregon,

4    Defendants Ammon Bundy, John Ritzheimer, Joseph O'Shaughnessy,

5    Ryan Payne, Ryan Bundy, Brian Cavalier, Shawna Cox, Peter

6    Santilli, Jason Patrick, Duane Ehmer, Dylan Anderson, Sean

7    Anderson, David Lee Fry, Jeff Wayne Banta, Sandra Lynn

8    Anderson, Kenneth Medenbach, Blaine Cooper, Wesley Kjar, Corey

9    Lequieu, Neil Wampler, Jason Charles Blomgren, Darryl William

10   Thorn, Geoffrey Stanek, Travis Cox, Eric Lee Flores, and

11   redacted individual, did knowingly and willfully conspire and

12   agree together and with each other and with persons known and

13   unknown to the grand jury to prevent by force, intimidation,

14   and threats officers and employees of the United States Fish &

15   Wildlife Service and the Bureau of Land Management, agencies

16   within the United States Department of Interior, from

17   discharging the duties of their office at the Malheur National

18   Wildlife Refuge and other locations in Harney County, Oregon,

19   in violation of Title 18 United States Code 372.

20          In furtherance of the conspiracy and to effect the

21   illegal objects thereof, one or more of the defendants and one

22   or more of the conspirators performed the following overt acts

23   in the District of Oregon and elsewhere, including but not

24   limited to the following:

25          (A) On or about November 5th, 2015, Ammon Bundy and

Ryan Payne traveled to Harney County, Oregon, to warn the Harney County sheriff of, quote, extreme civil unrest if certain demands were not met.

(B) Beginning in or about November of 2015, defendants and conspirators recruited and encouraged other individuals known and unknown to the grand jury, in person and through social media and other means of communication, to participate and assist in the above-described conspiracy.

(C) In or about November 2015, continuing through January 26th of 2016, defendants and conspirators traveled to Harney County, Oregon, to intimate and coerce the population of Harney County, Oregon, in order to effectuate the goals of the conspiracy.

(D) Beginning on December 15th, 2015, defendants and conspirators brandished and carried firearms throughout Harney County, Oregon, in order to effectuate the goals of the conspiracy.

(E) Beginning on January 2nd, 2016, defendants and conspirators occupied the Malheur National Wildlife Refuge by force while using and carrying firearms.

(F) Beginning on January 2nd, 2016, defendants and conspirators brandished and carried firearms on the premises of the Malheur National Wildlife Refuge and prevented federal officials from performing their official duties by force, threats, and intimidation.

1    (G) Beginning on January 2nd, 2016, defendants and
2  conspirators refused to leave the Malheur National Wildlife
3  Refuge and allow federal officials to return to their official
4  duties.

5    (H) Beginning on January 2nd, 2016, defendants and
6  conspirators threatened violence against anybody who attempted
7  to remove them from the Malheur National Wildlife Refuge.

8    Count 2, Possession of Firearms and Dangerous Weapons
9  in Federal Facilities, 18 United States Code Sections 930(b)
10  and 2.

11    On or about January 2nd, 2016, and continuing through
12  February 12th of 2016, in the District of Oregon, Defendants
13  Ammon Bundy, John Ritzheimer, Ryan Payne, Ryan Bundy, Brian
14  Cavalier, Shawna Cox, Jason Patrick, Dylan Anderson, Sean
15  Anderson, David Lee Fry, Jeff Wayne Banta, Sandra Lynn
16  Anderson, Wesley Kjar, Corey Lequieu, Jason Charles Blomgren,
17  Darryl William Thorn, Geoffrey Stanek, Travis Cox, Eric Lee
18  Flores, and redacted individual, aided and abetted by each
19  other and by others known and unknown to the grand jury, did
20  knowingly possess or cause to be present a firearm or dangerous
21  weapon in a federal facility located at the Malheur National
22  Wildlife Refuge, and counseled, commanded, induced, and
23  procured the commission thereof with the intent that the
24  firearm or dangerous weapon be used in the commission of a
25  crime; to wit:  18 United States Code Section 372, Conspiracy

1    to Impede Officers of the United States in violation of Title

2    18 United States Code Sections 930(b) and 2.

3         Count 3, Use and Carry of a Firearm in Relation to a

4    Crime of Violence, 18 United States Code Sections 924(c)(1)(A)

5    and 2.

6         On or about January 2nd, 2016, and continuing through

7    February 12th of 2016, in the District of Oregon, Defendants

8    Ammon Bundy, John Ritzheimer, Ryan Payne, Ryan Bundy, Brian

9    Cavalier, Jason Patrick, Sean Anderson, David Lee Fry, and

10   Corey Lequieu, aided and abetted by each other and by others

11   known and unknown to the grand jury, did knowingly use and

12   carry firearms during and in relation to a crime of violence

13   for which they may be prosecuted in a court of the United

14   States.  That is, Conspiracy to Impede Officers of the United

15   States, in violation of 18 United States Code Section 372.  And

16   counseled, commanded, induced each other and procured the

17   commission thereof, in violation of Title 18 United States Code

18   Sections 924(c)(1)(A) and 2.

19        Count 4, Theft of Government Property, 18 United

20   States Code Section 641.

21        On or about January 15th, 2016, in the District of

22   Oregon, Defendant Kenneth Medenbach willfully and knowingly did

23   steal, convert, purloin, and convert for his own use a 2012

24   Ford F350 truck, license plate I581021, the value of which

25   exceeded 1,000 dollars, which is property of the United States

Government, United States Fish & Wildlife Service, in violation of Title 18 United States Code Section 641.

Count 5, Theft of Government Property, 18 United States Code Section 641.

On or about January 15th, 2016, in the District of Oregon, Defendants John Ritzheimer and Ryan Bundy willfully and knowingly did steal, purloin, and convert to their own use and the use of another cameras and related equipment, the value of which exceeded a thousand dollars, which is property of the United States Government, in violation of Title 18 United States Code Section 641.

Count 6, Depredation of Government Property, 18 United States Code Sections 1361 and 2.

On or about January 27th, 2016, in the District of Oregon, Defendants Sean Anderson and name redacted, aided and abetted by each other, did willfully and by means of excavation and the use of heavy equipment on the lands of the Malheur National Wildlife Refuge, property of the United States, injure and commit a depredation against such property, specifically an archaeological site considered sacred to the Burns Paiute Tribe, resulting in damage in an amount exceeding 1,000 dollars, in violation of Title 18 United States Code Sections 1361 and 2.

Dated this 8th day of March 2016.  Underlying captions omitted.

1          THE COURT:  Thank you, Mr. Knight.

2          Please state the maximum penalties for each of the

3     charges in this proceeding.

4          MR. KNIGHT:  Thank you, your Honor.

5          On Count 1, 18 U.S.C. 372, the maximum penalties are

6     six years imprisonment, a fine of 250,000 dollars, a three-year

7     term of supervised release.

8          On Count 2, 18 U.S.C. 930(b), the maximum penalty is

9     a five-year term of imprisonment a 250,000 dollar fine, and a

10    three-year term of supervised release.

11         On Count 3, 924(c), the maximum term under that

12    statute is life imprisonment and a five-year term of supervised

13    release, and I believe a 500,000 dollar fine.

14         Counts 5 -- 4 and 5, 18 U.S.C. 641, as alleged, the

15    maximum term of imprisonment is ten years, a 250,000 dollar

16    fine, and a three-year term of supervised release.

17         Count 6, allegation of U.S. -- 18 U.S.C. 1361, the

18    maximum statutory penalty is a ten-year term of imprisonment,

19    250,000 dollar fine, and a three-year term of supervised

20    release.

21         THE COURT:  Mr. Knight, please confirm for me,

22    Defendant Travis Cox has not yet made any initial appearance?

23         MR. KNIGHT:  That is correct, your Honor.

24         THE COURT:  Every other person named as a defendant,

25    except for the person identified as name redacted on this

 1   record, has made a first appearance and has been advised of

 2   constitutional rights at least once?

 3              MR. KNIGHT:  Yes, your Honor.

 4              THE COURT:  All right.  So it does not appear to me

 5   that a repeat of the advice of rights is warranted, so let's

 6   proceed now with entry of plea or response by each defendant.

 7              Would you go ahead, Mr. Knight, since you've read the

 8   names so well thus far, please go through in order so that we

 9   can get entries of pleas and any comment by each counsel for

10   each defendant of those personally appearing and those who have

11   waived appearance.

12              MR. KNIGHT:  Thank you.

13              The first named defendant, your Honor, is Ammon

14   Bundy.

15              THE COURT:  Good morning, Counsel.

16              MR. ARNOLD:  Good morning, your Honor.  Mike Arnold

17   in this case for Mr. Bundy.

18              He acknowledges the reading of the Indictment.  He

19   will proceed as named.  He'll enter a not guilty plea.  He'll

20   request a reading of his rights.  And that's all we have, your

21   Honor.

22              THE COURT:  Is there a requirement that I read his

23   rights yet another time?  He's already had them read to him on

24   at least three occasions I note in the record.

25              MR. ARNOLD:  Not that I'm aware of, your Honor.

1            THE COURT:  Then I think that's noted for the record.

2            Thank you, sir.  Go ahead and be seated.

3            DEFENDANT AMMON BUNDY:  I know I have no rights, so

4    thank you.

5            THE COURT:  Counsel.

6            MR. KNIGHT:  Thank you.

7            Next named defendant, your Honor, is John Ritzheimer.

8            MS. WOOD:  Your Honor, Terri Wood appearing with

9    Mr. Ritzheimer.

10           THE COURT:  Good morning.

11           MS. WOOD:  He will -- good morning.  He will proceed

12   as named.  He'll enter not guilty pleas to all counts and

13   continue to assert his rights to speedy trial.

14           THE COURT:  Thank you.

15           MR. KNIGHT:  Your Honor, next named defendant is

16   Joseph O'Shaughnessy.  He has executed a waiver of appearance.

17   Counsel, Amy Baggio, is present.

18           THE COURT:  Ms. Baggio.

19           MS. BAGGIO:  Good morning.

20           THE COURT:  Was the waiver of appearance sufficient

21   in your view for you to respond to the Superseding Indictment?

22           MS. BAGGIO:  No, your Honor.

23           THE COURT:  All right.  Then we'll deal with an

24   arraignment on another occasion for your client on the

25   Superseding Indictment.

1            Let's, Counsel, please keep track of who all needs to
2       be scheduled for another arraignment proceeding.
3            Go ahead.
4            MR. KNIGHT:  Thank you, your Honor.
5            The next named defendant is defendant Ryan Payne.
6       Counsel, Lisa Hay, is present.
7            THE COURT:  Ms. Hay, good morning.
8            MS. HAY:  Good morning, your Honor.  Lisa Hay for
9       Ryan Payne.  He's prepared to proceed as named in the
10      Indictment, enter pleas of not guilty to the three counts on
11      which he's named.
12           THE COURT:  Thank you.
13           MS. HAY:  Thank you.
14           THE COURT:  Go ahead and have a seat.
15           MR. KNIGHT:  Your Honor, next named defendant is Ryan
16      Bundy, present with counsel Andrew Bates.
17           MR. BATES:  Good morning, your Honor.
18           THE COURT:  Good morning.
19           MR. BATES:  Andrew Bates representing Mr. Ryan Bundy.
20      He's prepared to proceed as named and enter not guilty pleas on
21      all counts as named.
22           I would mention, your Honor, that Mr. Bundy --
23      Mr. Ryan Bundy has decided to represent himself.  He would like
24      to retain me as a legal advisor, so we will need to set up a
25      **Faretta** hearing to accomplish that goal.

1        THE COURT:  We will note that, and we'll schedule a
2   **Faretta** hearing for you and your client.
3        MR. BATES:  If we could do that at the end of next
4   week, that would give me some time to consult with him.
5        THE COURT:  So you're requesting no earlier than the
6   end of next week?
7        MR. BATES:  That's correct, your Honor.
8        THE COURT:  All right.
9        MR. BATES:  Thank you.
10        THE COURT:  Go ahead.
11        MR. KNIGHT:  Your Honor, the next defendant is Brian
12   Cavalier.
13        THE COURT:  Good morning.
14        MR. BOFFERDING:  Good morning, your Honor.  Todd
15   Bofferding for Mr. Cavalier.  We'll proceed as named, plead not
16   guilty as to the counts as to which Mr. Cavalier is named.
17        THE COURT:  Thank you.
18        Go ahead.
19        MR. KNIGHT:  Your Honor, the next named defendant is
20   Shawna Cox, who is appearing by phone.  Counsel of record,
21   Tiffany Harris, is present.
22        THE COURT:  Ms. Harris, have you had an opportunity
23   to review the Superseding Indictment with your client relative
24   to the waiver of appearance?
25        MS. HARRIS:  Yes, your Honor, we have.

1          THE COURT:  And does she still waive the personal

2    appearance for purposes of arraignment on the Superseding

3    Indictment?

4          MS. HARRIS:  That is my understanding, your Honor.  I

5    know that she understood that there could be an arraignment

6    scheduled for today.

7          THE COURT:  All right.  Then go ahead with the entry

8    of plea, please.

9          MS. HARRIS:  Your Honor, she'll proceed as truly

10   named.  I know there were some reservations of rights made

11   clear on the record at the previous proceeding.  I know it

12   would be important for my client to have me reserve all of

13   those rights under the U.S. Constitution yet again at this

14   hearing.  I'm doing that on her behalf.  And with those

15   reservations clear, she will enter pleas of not guilty and

16   request a jury trial.

17         THE COURT:  Thank you.

18         I'll simply note for the record a jury trial is

19   presumed and requested for all defendants.  And as was just

20   noted, some rights have been reserved previously.  They

21   continue to be reserved unless and until they're given up.

22         Thank you, Counsel.

23         Go ahead.

24         MR. KNIGHT:  Your Honor, the next named defendant is

25   Peter Santilli, present.

1               THE COURT:  Good morning.

2               MR. COAN:  Good morning, your Honor.  Tom Coan here

3    with Mr. Santilli.  He will proceed as named and enter not

4    guilty pleas to Count 1.

5               THE COURT:  Thank you.

6               MR. COAN:  Thank you.

7               THE COURT:  Go ahead.

8               MR. KNIGHT:  Next named defendant is Jason Patrick.

9               MR. KOHLMETZ:  Good morning, your Honor.  Mr. Patrick

10   will proceed as named, with reservation of rights, and enter

11   pleas of not guilty.

12              THE COURT:  Thank you.

13              DEFENDANT PATRICK:  For the ones that don't exist,

14   right.

15              MR. KNIGHT:  The next named defendant, your Honor, is

16   Duane Ehmer.

17              THE COURT:  Good morning.

18              MR. AUDET:  Good morning, your Honor.  Dave Audet

19   here with Mr. Emmer this morning.

20              We'll also proceed as named, enter a plea of not

21   guilty.

22              THE COURT:  Thank you.

23              MR. KNIGHT:  Next named defendant is Dylan Anderson.

24              MR. KILBERG:  Good morning, your Honor.  Jamie

25   Kilberg appearing on behalf of Mr. Anderson.

1            Mr. Anderson will proceed as named and enter a plea

2    of not guilty on Counts 1 and 2.

3            THE COURT:  Thank you.

4            MR. KNIGHT:  Next named defendant is Sean Anderson.

5            MR. McHENRY:  Good morning, your Honor.  Matthew

6    McHenry here with Mr. Anderson.

7            THE COURT REPORTER:  I need you to keep your voice

8    up, please.

9            MR. McHENRY:  He will proceed as named and enter

10   pleas of not guilty to the four counts as --

11           THE COURT:  Thank you, Mr. McHenry.

12           MR. KNIGHT:  Next named defendant is David Fry.

13           MR. OLSON:  Good morning, your Honor.  Per Olson here

14   with Mr. Fry.

15           THE COURT:  Keep your voice up, please, so we can all

16   hear.

17           MR. OLSON:  Mr. Fry would proceed as named and enter

18   not guilty pleas.

19           THE COURT:  Thank you, Mr. Olson, Mr. Fry.

20           MR. KNIGHT:  Thank you, your Honor.

21           The next named defendant is Jeff Banta.  Appearing on

22   Mr. Banta's behalf -- he has waived appearance -- is Matthew

23   Schindler.

24           THE COURT:  Good morning, sir.

25           MR. SCHINDLER:  Good morning, your Honor.  Here on

behalf of Mr. Banta.  We're prepared to proceed as named with
the Indictment, waive any advice of rights, and enter a plea of
not guilty.

I believe, based on the waiver of appearance that was
filed, it's satisfactory for me to appear on that arraignment
here this morning.

THE COURT:  And his assigned counsel of record, for
whom you're appearing, is --

MR. SCHINDLER:  Is Robert Salisbury, your Honor.

THE COURT:  Thank you.

MR. KNIGHT:  Your Honor, the next named defendant is
Sandra Anderson.  Her appearance has been waived today.
Counsel of record, Tyl Bakker, is present.

THE COURT:  Mr. Bakker, do you think the waiver
previously filed is sufficient for purposes of this Superseding
Indictment, just --

MR. BAKKER:  I do, your Honor, on behalf of
Ms. Anderson.  I've also had an opportunity to read the
Superseding Indictment to her.  She is truly named.  Her name
is spelled correctly.  We would enter a not guilty plea.
Reserve the right to move against the charging instrument or
file appropriate motions or notices at a later time, and
request a trial date.

THE COURT:  Thank you.

Go ahead.

1          MR. KNIGHT:  Your Honor, the next named defendant is

2     Kenneth Medenbach.

3          DEFENDANT MEDENBACH:  Good morning, your Honor.  This

4     Court has still failed to prove its jurisdiction.

5          THE COURT:  Excuse me, Mr. Medenbach.  I won't take

6     up those kinds of assertions at this hearing.  I previously

7     noted that if you wish to represent yourself, you need to file

8     a motion and ask for a **Faretta** hearing.  Until you do,

9     Mr. Schindler will speak for you.

10          Mr. Schindler.

11          MR. SCHINDLER:  Thank you, your Honor.

12          Mr. Medenbach is not prepared to enter a plea today

13     and would ask the Court to enter one on his behalf.

14          We are scheduled for a **Faretta** hearing for tomorrow.

15     He has been representing himself relative to the other docketed

16     matter in this case and, up to this point, has been

17     representing himself on this matter as well.

18          THE COURT:  He's been doing what he's been doing.  I

19     can't note a waiver of that right until I've had the

20     opportunity for Mr. Medenbach and I to speak about all of the

21     features of the requirements under the **Faretta** case.  So we'll

22     address those more particularly tomorrow.

23          I will enter a not guilty plea on his behalf, noting

24     that there was a declining to enter any plea at this time.

25          Thank you, gentlemen.

1          MR. KNIGHT:  Your Honor, the next named defendant is

2     Blaine Cooper.

3          MS. SHIPSEY:  Good morning, your Honor.  Krista

4     Shipsey on behalf of Mr. Cooper.  He will proceed as named and

5     enter a not guilty plea to the count.

6          THE COURT:  Thank you, Counsel, and Mr. Cooper.

7          MR. KNIGHT:  Your Honor, the next named defendant is

8     Wesley Kjar.  His appearance has been waived today.  Counsel of

9     record, Jim Halley, is present.

10          THE COURT:  Mr. Halley, is your client's waiver

11     sufficient to allow you to proceed with the arraignment this

12     morning?

13          MR. HALLEY:  I don't believe so, your Honor.  I was

14     unaware of the arraignment at the time that that waiver was

15     prepared, signed, and filed.  And I haven't reviewed the

16     Indictment with him.

17          THE COURT:  All right.  Then we will schedule a

18     separate proceeding for you and your client, and

19     Mr. O'Shaughnessy and his counsel.

20          Go ahead.

21          MR. HALLEY:  Thank you, your Honor.

22          MR. KNIGHT:  Your Honor, next defendant is Corey

23     Lequieu.

24          THE COURT:  Good morning.

25          MR. PAGAN:  Good morning, your Honor.  Ramon Pagan

1    for Mr. Lequieu.

2              THE COURT:  A little louder, please.

3              MR. PAGAN:  Sorry, your Honor.  Ramon Pagan appearing

4    for Mr. Lequieu.  Proceed as named.  Enter a plea of not guilty

5    at this time, your Honor.

6              THE COURT:  Thank you.

7              MR. KNIGHT:  Your Honor, the next defendant is Neil

8    Wampler.  His appearance has been waived today.  Counsel of

9    record, Lisa Maxfield, is present.

10             THE COURT:  Good morning, Ms. Maxfield.

11             MS. MAXFIELD:  Good morning, your Honor.

12             Your Honor, my client's -- I have not had the

13   opportunity to review this new Indictment with my client, so he

14   would probably need to be scheduled for --

15             THE COURT:  All right.  So we will put him in the

16   group with the other two defendants who need another

17   opportunity for arraignment.

18             Go ahead, Counsel.

19             MR. KNIGHT:  Next named defendant, your Honor, is

20   Jason Blomgren, present today.

21             THE COURT:  Good morning, Mr. Rainwater.

22             MR. RAINWATER:  Your Honor, Robert Rainwater on

23   behalf of Mr. Blomgren.  His name is set forth correctly on the

24   Indictment, and we enter a plea of not guilty.

25             THE COURT:  Thank you.

1          MR. KNIGHT:  Next named defendant is Darryl Thorn,

2    present with counsel.

3          MS. SHERTZ:  Good morning, your Honor.

4          We'll proceed as named and enter a not guilty plea to

5    Counts 1 and 2, to which he's named, and request a jury trial.

6          THE COURT:  Thank you.

7          MR. KNIGHT:  Next named defendant is Geoffrey Stanek,

8    present out of custody, with counsel.

9          THE COURT:  Good morning.

10         MR. ANDERSEN:  Your Honor, we have reviewed the

11   Indictment.  We acknowledge the reading of that, just moments

12   before.  We'll enter not guilty pleas on the two counts he is

13   named in.  He is correctly named.

14         We would reserve all of the rights, as has been

15   stated a few times on the record.

16         THE COURT:  Thank you.

17         MR. KNIGHT:  And lastly, your Honor, Eric Flores.

18   His appearance has been waived today.  Counsel of record,

19   Mr. Warren, is present.

20         THE COURT:  Mr. Warren, do you believe the waiver

21   addresses sufficiently the Superseding Indictment?

22         Can you proceed on the arraignment now, or do you

23   need to be grouped with the others?

24         MR. WARREN:  Your Honor, I can proceed on the

25   arraignment now.  I actually filed a separate waiver as to this

1  Superseding Indictment and consulted with my client yesterday,

2  before he left the District of Oregon.

3            THE COURT:  All right.  So he's entering a plea of

4  not guilty?

5            MR. WARREN:  Yes.

6            THE COURT:  Proceeding as named?

7            MR. WARREN:  Yes.  Yes, ma'am.

8            THE COURT:  All right.  Thank you.

9            All right.  Jury trial is requested for all

10 defendants and will be scheduled as part of today's

11 proceedings.

12           Mr. Knight, does that sufficiently address the

13 arraignment process for all for whom we can proceed today?

14           MR. KNIGHT:  Yes.  Thank you, your Honor.

15           THE COURT:  I want to move now to the matter of

16 setting a trial date, which necessarily involves considering

17 the Government's motion, which is Docket 185, to designate the

18 case as complex.

19           There has been briefing on the motion, arguments

20 submitted on both sides.  I want to give a brief opportunity to

21 supplement that record with any other argument on the question

22 of complexity.  Much of the defendants' response, which

23 Mr. Kohlmetz submitted on behalf of the joint interests,

24 addressed the assertion that the Government's arguments were

25 speculative, inasmuch as new charges have not yet been filed.

1        Those, of course, now have been filed, so I'm

2   interested in an updated position from defendants on the

3   complexity issue.  But, first, for the Government, is there any

4   other matter that needs to be noted for the record in support

5   of Motion 185?

6        MR. KNIGHT:  Nothing additional, your Honor.

7        THE COURT:  All right.  Mr. Kohlmetz, do you wish to

8   address the motion?

9        MR. KOHLMETZ:  Your Honor, I think Ms. Hay was

10  prepared to do that.

11        THE COURT:  All right.  I'm sorry.  Ms. Hay?

12        MS. HAY:  Thank you, your Honor.

13        Your Honor, Mr. Kohlmetz did file one response to the

14  Government's.  And then in our status report, our case

15  management status report, we also referred to the complex case

16  issue.

17        THE COURT:  Yes.

18        MS. HAY:  The Government has not put forward evidence

19  that -- on which the Court could rely to find the cases

20  complex.  They submitted arguments in their briefing, so we had

21  requested actual evidence to support their claim.

22        In particular, your Honor, they refer to the volume

23  and scope of discovery as being the most complicated in the

24  history of the district.  Now that we see the Superseding

25  Indictment, it doesn't appear that these are the type of claims

1      on which -- that should create so much discovery.

2              I understand the Government's collecting social media

3      and intends to present that to the defense, but that seems to

4      be an effort by the Government to collect more evidence to use

5      against our clients.

6              We're not interested in having our clients' speedy

7      trial rights delayed, so that the Government can go collect

8      more evidence.  I don't think that's an appropriate basis on

9      which the Court should delay the trial.

10             The second factor the Government cites is the number

11     of defendants.  They have added more defendants to the case,

12     including defendants who have not yet been arraigned.  Clearly

13     a motion to sever is a likely outcome here, so that we don't

14     have -- all of these defendants have their speedy trial rights

15     delayed by the presence of people who have not yet even been

16     arraigned.

17             And in particular, your Honor, I wanted to note the

18     difficulty that's been created by the Nevada Indictment that

19     came after this one.

20             There are now defendants charged in this case who are

21     in the custody of the Nevada authorities.  I'm assuming that

22     that court is unlikely to release them to come here for trial,

23     but their failure -- their lack of presence in this district

24     might delay the trial date for our clients.  So --

25             THE COURT:  So let's stop for a moment, just so that

1    I can track which defendants are in the Nevada case.  There's

2    nothing formally in this record that identifies that, and I

3    want to be a little more careful in understanding your argument

4    about its implications for the complexity issue here.

5            So who among the existing defendants are named in the

6    Nevada proceedings?  Do you know?

7            MS. HAY:  Your Honor, I understand that Defendant

8    No. 3, Joseph O'Shaughnessy, is named in the Nevada

9    proceedings.  That he's been released from this court.  And my

10   understanding is he may be in custody of that -- of that court

11   now or on his way there.

12           A number of other defendants are named in the Nevada

13   proceedings.  There are more than ten of them, which -- if you

14   would like me to read them, I can.

15           THE COURT:  The ones who are common, between Nevada

16   and our case, please.

17           MS. HAY:  Yes, your Honor.  Ammon Bundy, Joseph

18   O'Shaughnessy, Ryan Payne, Ryan Bundy, Ryan Cavalier, Peter

19   Santilli, Blaine Cooper, and I believe that's the -- that's the

20   list, your Honor.

21           THE COURT:  All right.  And Mr. Santilli's release

22   status continues to be an issue of review, and the Nevada

23   case's implication as to it is what it is.

24           Mr. O'Shaughnessy's status was released from here,

25   but you say he's been arrested on that?  Or taken into custody?

1          MS. HAY:  Your Honor, that's a report from the media,

2     so I --

3          THE COURT:  Well, look, perhaps Ms. Baggio can tell

4     us.

5          MS. BAGGIO:  Thank you, your Honor.

6          My client was arrested on Friday, when he went in to

7     check in with Pretrial Services in Phoenix.

8          He made an initial Rule 5 appearance on the Nevada

9     warrant.

10          Mr. O'Shaughnessy had a detention hearing yesterday

11    before a magistrate judge in Phoenix, and the Government argued

12    for detention.  The defendant requested release and was

13    supported by Pretrial Services in his request for release.

14          My understanding is that at the conclusion of that

15    hearing yesterday the magistrate judge took the issue under

16    advisement, and we're waiting to hear whether he'll be released

17    on that case.

18          It does obviously complicate things exponentially for

19    me, and it was on my agenda as something else I would like to

20    bring up with the Court today.

21          THE COURT:  Thank you for that.

22          So in the context, then, of this issue of complexity,

23    we have -- nine of the defendants in this matter are named in

24    the Nevada case.  Two of those -- Mr. O'Shaughnessy is, as

25    noted, presently in Nevada.  Mr. Santilli has a release issue

1   that's complicated by the Nevada proceeding.

2          But the remaining defendants who are common to this

3   matter are all in custody here.  Is that right?

4          MS. HAY:  Your Honor, Mr. Travis Cox, I believe, has

5   not been taken into custody.  And my understanding --

6          THE COURT:  Right.  He is not present yet, so we're

7   just not concerned with him at the moment.

8          I'm sorry.  Ms. Baggio was still standing, so was

9   there something else?

10         MS. BAGGIO:  I just wanted to correct something, your

11  Honor.  Mr. O'Shaughnessy is in custody in Arizona.

12         THE COURT:  Yes.  Oh, I apologize.

13         MS. BAGGIO:  The Court said Nevada.

14         THE COURT:  Not in Nevada.  In Arizona for the Nevada

15  hold.

16         MS. BAGGIO:  That's correct.

17         THE COURT:  All right.  Back to the point, though,

18  with respect to how the commonality may affect complexity.

19  Mr. Ammon Bundy is in custody.  Mr. Ryan Bundy is in custody.

20  Mr. Ryan Payne is in custody.  Mr. Brian Cavalier is in

21  custody.  Mr. Santilli's status is as noted.  I've lost my

22  list.  Just a moment.

23         Mr. Cooper is in custody.  Is that right?  Yes.

24         MS. HAY:  Yes, your Honor.

25         THE COURT:  So the complexity issue is obviously

1    something to take into account -- to analyze it, one has to

2    analyze this issue about Nevada.

3            But, on the other hand, the case was filed here first

4    and, by rights, should proceed as a priority over Nevada.  And

5    it may be necessary for this Court to confer with the presiding

6    judge in Nevada at an appropriate time about that priority.

7            Does anyone know to whom the Nevada proceedings have

8    been assigned?  Is there an Article III judge assigned yet?  Do

9    we know that yet?

10           MR. KNIGHT:  There is.  I believe it's the chief

11   judge in the district, and I can't recall that individual's

12   name.

13           THE COURT:  All right.

14           MS. HAY:  Your Honor, on the matter of coordinating

15   with the Nevada case, I am aware that they filed writs of

16   habeas corpus ad prosequendum to bring some of these defendants

17   to Nevada.  I understand that because this case was filed

18   first, because the defendants were arrested here first, our

19   clients should be tried here to completion before they were

20   taken out of the district.

21           And, in fact, this district has a consent decree

22   between the United States marshals and the indigent defendants

23   through the Federal Defender's Office that requires the

24   marshals to house defendants in the custody of the marshals

25   relating to these federal proceeding -- to any federal

1    proceedings within 85 miles of the courthouse, to facilitate

2    attorney-client conferences and communications.

3           So both based on the defense decree that exists in

4    this district and based on our clients' rights to due process

5    and a speedy trial, we would ask that the Court issue an order

6    that before the marshals moved anybody currently a defendant in

7    custody in this case to a different district that there be an

8    opportunity for a court hearing to review any -- any questions

9    about that.

10          I'm assuming that they will stay here, but just on

11   the safe side, if the Court could issue an order that they not

12   move without an opportunity for a court hearing in this

13   district, we would be alerted if an effort was made to move

14   them.

15          THE COURT:  Is there any pending plan, Mr. Knight,

16   that you know of to move any of those who are in custody here

17   in this case to Nevada?

18          Do you know of any pending plan?

19          MR. KNIGHT:  No, no pending plan.

20          THE COURT:  Do you have a response to Ms. Hay's

21   concern about the need for this Court to issue an order to keep

22   local the defendants who might be needed in Nevada to address

23   the charges there?

24          MR. KNIGHT:  We don't -- I guess the Government's

25   position is we don't want to disrupt the process normally

1   undertaken by the marshals of the court.  So to the extent the

2   Court believes an order is necessary, the Government is fine

3   with it.  We don't want to create an additional problem, I

4   guess, is our position.  However they want to handle it.

5           THE COURT:  I think it will be helpful on this issue

6   of the Nevada case for me to contact the presiding judge there

7   simply to determine whether any orders have been entered that

8   may impact the progress of this case.  And then I can inform

9   you what -- if anything -- is learned.

10          But back to the complexity issue, which is my concern

11  at the moment.

12          Were there other points, Ms. Hay, you wanted to

13  address in opposition to a complex case designation?

14          MS. HAY:  Yes, your Honor.  Other than the number of

15  defendants, the Government cited to the unique nature of the

16  protest site and the time required for evidence processing.

17          Again, no evidence submitted in support of that

18  argument.  They referred to the 172,000 acres of land at issue.

19  But from our viewing and tour of the -- the site, it's in fact

20  a walkable space.  Not 172,000 acres were involved in this

21  protest.  So that -- that argument as well from the Government,

22  that that makes the case complex, should be disregarded.

23          In addition, we now know that the Government has

24  finished processing evidence at the scene.  In fact, they

25  turned it over to the Fish & Wildlife authorities before

1    defense counsel were able to view the scene untouched, as we

2    had hoped to do.

3              Last, your Honor, they referred to the nature of

4    damage to art and artifacts, but it appears that only Count 6

5    is related to that issue and only two defendants -- one

6    unknown -- are involved in that count.  So, again, that's not

7    an argument that should delay the speedy trial rights of the

8    remaining defendants.

9              And, finally, the Government refers to the

10   overlapping involvement of other districts, including Nevada.

11   And they note that some of the defendants have relevant law

12   enforcement contacts in other districts.  We would ask the

13   Court to address that concern by perhaps setting a date by

14   which the Government should contact those other districts and

15   obtain all of the defendants' statements that would be

16   relevant.  Clearly that's a concern, but one that could be

17   addressed by a court order managing discovery through the

18   discovery process.

19             So for all of those reasons, your Honor, the state --

20   the reasons given by the Government to declare this case

21   complex are not compelling.  These defendants have a speedy

22   trial right under both the statute and the Constitution, and

23   they would ask the Court to honor that speedy trial right and

24   set this case as soon as possible for trial.

25             THE COURT:  Mr. Kohlmetz, since you filed something

1    on behalf of your client that mirrors these arguments, I just

2    wanted to see if there was anything else you wanted to add.

3              MR. KOHLMETZ:  No, your Honor.  Ms. Hay covered it.

4              THE COURT:  Does any other defense counsel want to

5    make any other point on the complexity issue?  Because

6    Ms. Hay's arguments are being considered on behalf of all

7    defendants.

8              All right.  Mr. Knight?

9              MR. KNIGHT:  Briefly, your Honor.  With respect to

10   the scene itself, while the scene has been reopened, the

11   evidence is still being processed.  That is the point, of

12   course.

13             And beyond that, I think Ms. Hay's points really

14   underscore the need for a complex case designation today, your

15   Honor.  The number of defendants is a statutory factor.  Their

16   presence here today in this fashion and the manner in which

17   we're proceeding in and of itself, I think, speaks to the

18   complexity issues in the statute.

19             And I will say only with respect to the artifact

20   issue and statute, that analysis and investigation is ongoing;

21   as is the processing of much of the discovery.  And it's our

22   obligation and desire to get that done as quickly as possible,

23   but it does speak to the underlying complexity.  Nothing

24   additional, your Honor.

25             THE COURT:  Mr. Knight, I appreciate the Government's

1  taking to heart the Court's request at the last hearing to

2  proceed promptly with a Superseding Indictment and to have

3  included in this the charges that were additional to the

4  original conspiracy charge.

5  Does the Government, at this time, anticipate

6  additional charges beyond what was in the Superseding

7  Indictment returned yesterday?

8  MR. KNIGHT:  Your Honor, quite honestly -- and we

9  stated this in the joint status report -- it depends entirely

10 on the continuing forensic analysis of some material and the

11 analysis related to the artifacts at the refuge.  And so I

12 think it is a possibility certainly there would be one.  But we

13 are waiting for information, as investigators pore through it,

14 to determine if it is indeed appropriate to return to the grand

15 jury.  So I will represent to this Court it is a distinct

16 possibility.  We don't know with certainty.

17 THE COURT:  Ms. Hay, you mentioned motions to sever.

18 At the last hearing, I understood the defendants'

19 collective position was there was a desire to proceed to trial

20 collectively.

21 Is there some divergence there that I need to know

22 about?

23 MS. HAY:  Your Honor, I can't speak for all of the

24 defendants, but my concern and the reason to raise the motion

25 to sever is that a number of the defendants, as you saw in our

1    joint status report, Docket 244, had indicated what they

2    thought was a potential trial schedule.  And they broke

3    themselves into group B.  Other defendants felt,

4    understandably, that given the lack of information they

5    couldn't commit to any kind of trial date at all.

6         So one -- one option would be for defendants who want

7    to pursue that trial date to file a motion to sever from any

8    defendant who's not prepared to go to trial at that date.

9    That's certainly something I think the defendants would want to

10   consider, and I don't think there's any joint position on that

11   at this point.

12        In addition, your Honor, given that one defendant is

13   apparently not -- hasn't been located, Mr. Cox.  And another

14   defendant has been named here that none of us were aware of,

15   whose name is redacted.  And then that -- and then, finally,

16   given that Mr. O'Shaughnessy's ability to participate in a

17   trial is at least in question, there's maybe a reason that the

18   defendants would want to file a motion to sever in order to

19   prevent those co-defendants from interfering with their speedy

20   trial rights.

21        Again, that's something I think all of the defendants

22   will discuss, and unlikely to get a unified position.  But I

23   could certainly anticipate that some defendants would choose to

24   try to -- try to pick a date certain and ask to be severed from

25   any defendant who's not prepared to meet that trial date.

1          THE COURT:  All right.  Give me a few moments,

2     please.

3          (Pause, referring.)

4          THE COURT:  The defendants' rights to a speedy trial

5     are first provided in the Constitution and then amplified in

6     the Speedy Trial Act, which provides that the Court, in certain

7     cases that meet a criterion of complexity, may suspend the

8     speedy trial clock, statutorily setting 70 days from Indictment

9     as the time within which a person must be brought to trial.

10          The standards for complexity are, as have been

11     referenced here on the record, several:  The nature of the

12     prosecution, the number of co-defendants, the volume of

13     discovery, the time that would be necessary for the parties to

14     prepare for trial.  I view also, in the context of complexity

15     here, the issues that have been referenced by Ms. Hay; the

16     pendency of other charges in another district against many of

17     these defendants, most of whom are in custody, as an issue.

18     But it certainly should not weigh against defendants who are

19     asserting a speedy trial right.

20          I think any person looking at this room would have to

21     concede the case is complex by its sheer volume of persons

22     accused, the nature of the charges of -- the primary charge of

23     conspiracy involving every one of the 25 named defendants,

24     Mr. Cox included, and the one person who has not yet been

25     publicly named; so 26 defendants.

1          The potential that was asserted at the last hearing

2     that all parties, including the Government, sought for the

3     Court to set the matter for a single trial.  The complexity of

4     even managing the trial process with this number of individual

5     rights at issue.  The scope of calling a jury.  Trying to

6     identify a jury pool who reasonably can be expected to serve

7     for weeks at trial, who can be fair and impartial

8     notwithstanding the widespread publicity of the case.  Just the

9     process of getting a jury summoned is exceedingly complicated

10    in this matter and could not be prepared in -- and pleaded in

11    the time that remains between now and the current April trial

12    date.  That's just one small example.

13         Of course, picking a jury is something we could not

14    do until the defendants have filed the motions they're already

15    telling me they want to file; potentially three rounds of

16    pretrial motions.  Each of which requires briefing, response,

17    and argument.  Each of which requires consideration, so that

18    the issues that will be tried, assuming the case proceeds to

19    trial, are narrowed and appropriate.

20         There isn't any way the case could proceed to trial

21    on the current trial date given the number of defendants, the

22    nature of the charges, the discovery which has only begun.

23    And, as I understand it, there were some -- there were 25 CD

24    discs distributed by the Government to the 25 -- or 24?  24, 25

25    to counsel.

1          Let me just ask, did all of the defendants in the

2   room receive that one CD disc?

3          MR. ARNOLD:  (Nods head.)

4          THE COURT:  And as I also understand from the last

5   hearing, that was simply to represent --

6          MS. CASEY:  (Nods head.)

7          THE COURT:  -- the existing law enforcement reports,

8   the FBI reports.

9          Is that a fair understanding?

10          Mr. Barrow?

11          MR. BARROW:  Your Honor, there have been two volumes

12   of discovery that have been released so far.  They total 3500

13   pages.  They primarily involve law enforcement reports and the

14   legal pleadings we obtained:  Search warrants, pen registers,

15   that sort of information.

16          The total number of pages is 3500 pages.  And as of

17   today, every defendant has received both volumes.

18          THE COURT:  How many search warrants were executed in

19   this case?

20          MR. BARROW:  Your Honor, I don't have that in front

21   of me.

22          THE COURT:  About?

23          MR. BARROW:  There are dozens.

24          THE COURT:  Dozens.  So dozens of affidavits in

25   support thereof.  Dozens of origin documents that defense

1    counsel will need to consider in deciding how to approach

2    defense of motions and preparing for trial.

3              Yes?  Something --

4              MR. BARROW:  That's correct, your Honor.

5              THE COURT:  I go back to the point I made at the

6    beginning.

7              Looking at this room alone and thinking of the

8    seriousness of the charges each defendant is facing, the

9    complexity of discovery, I do not need to know this precise

10   volume of every discovery production the Government will make.

11   I already know, from the representations made at the last

12   hearing, there were more than 500 F.B.I. reports initiated, and

13   each of those generates information that needs to be considered

14   fairly.

15             And I know defense counsel are asserting earnestly

16   the rights of their clients.  But they also have an obligation

17   to prepare effectively and efficiently and thoroughly for any

18   trial; and preceding trial, any motions.  This is, by any

19   definition, a complex case.

20             And so I now make that designation under 18 United

21   States Code Section 3161(h)(6).

22             DEFENDANT PATRICK:  The Constitution --

23             THE COURT:  I'll be issuing a written order with

24   that -- formalizing that finding.

25             The question now is whether I can set a firm trial

1    date or whether I should defer the setting of that date to the

2    next status hearing at the beginning of April.

3         I would keep the April trial date in place until I

4    can make a new trial date finding.  Then I would be finding

5    excludable delay to the new trial date.  Or I can proceed now,

6    with the information the parties have given me, to the extent

7    it's been given or anyone else wants to add, to set a date.

8         I do need to note, there is pending in the court a

9    case with, I think, 20 -- 20-plus defendants, United States

10   versus Guillen, G U I L L E N.  Judge Jones is presiding in

11   that matter.

12        And many of the very defense lawyers who are on this

13   case are in that case, and that case is set for trial on

14   November 26.

15        So the suggestion in the joint status report that we

16   start trial in October won't work.  We'll have to start trial

17   sooner than October in order not to conflict with that trial

18   and in order to accomplish what I am committed to accomplish,

19   and that is a trial as soon as possible for this matter.

20        That decision is also complicated by the extent to

21   which any party wants to assert a motion to sever.  The

22   scheduling of trial and the staging of trial in these matters

23   with so many parties is often handled in a situation where

24   defendants of like interest determine they want to go to trial

25   in a group and another group of defendants conclude they want

1    to go to trial in a group.  The Government all the while

2    asserting it's entitled to have one trial with one jury, with

3    the burden of producing the evidence one time.  And those are

4    arguments that I suspect will -- some of you will want to make,

5    and I need to address.

6            So what I would like to know right now is whether the

7    parties want to defer to the status hearing on -- in April, the

8    first Wednesday in April, the actual setting of a firm trial

9    date, knowing that it has to be sooner than October 10, as

10   proposed, and knowing that you would need some time to confer

11   among yourselves about whether you will or won't be seeking

12   severance.  And here I'm speaking to defendants.

13           I'm -- I'm fine with that.  We can did defer the

14   decision to that date.  Otherwise, I'll make a decision now,

15   and the parties will have to live with it.

16           We are going to have a firm trial date and all of

17   us -- and I do mean everyone -- will have to adjust his and her

18   personal lives -- those are who are not the defendants -- to

19   ensure that once the trial begins, we're all there to see it

20   through.

21           Now, I'm guessing it's going to take a matter of a

22   week or more to pick a jury.  I'm guessing we're going to have

23   to be subpoenaing jurors, sending out summonses months before

24   jury trial and a process.  So we have to think through a jury

25   plan.

1          So I see the need to set the date, and I'm willing to

2     do it now.  But if the parties believe we ought to give it more

3     thought -- particularly the defendants -- I'm also willing to

4     defer.

5          Mr. Arnold.

6          MR. ARNOLD:  Your Honor, I have spoken to my client

7     about a group that would be fitting to go forward if we elected

8     to move to sever.  I have spoken to at least one attorney about

9     it.  I plan on doing that very shortly.  I think that will

10    affect the scheduling.

11         We would request that we defer scheduling until a

12    later date.

13         THE COURT:  Does anybody insist that I set a new

14    trial date to date -- today?

15         All right.  What I'll do is at the April hearing I

16    will set a trial date.

17         Now, let me ask -- I think the earliest trial date

18    currently on the docket is April 5.

19         Does anybody have any contrary information to that?

20    (Pause.)

21         Can someone tell me -- since I don't have my actual

22    desk set up in this courtroom, can someone tell me what the

23    first Wednesday in April is?

24         MR. KNIGHT:  That's the 6th, your Honor.

25         THE COURT:  The 6th of April?

1          MR. KNIGHT:  Yes.

2          THE COURT:  Why don't I do this.  I'm going to find

3    excludable delay for the reasons just indicated, through at

4    least April 6th, so that to the extent there is an earlier

5    trial date, the Act is honored.  And then at the April 6

6    hearing, with the submissions you make in advance thereof, I'll

7    be in a position to set a firm trial date.

8          When you think about trial -- and I will want a joint

9    submission from everyone on that.  When you think about a trial

10   setting, I want to know your projections as to how long you

11   expect trial will take.

12         I know that's a hypothetical projection, based on

13   what you -- what little you know or don't know now.

14         I expect, under anybody's view, it will be a

15   weeks-long trial.  Potentially more than four weeks and into a

16   second month.  That means a lot to selecting a jury and the

17   willingness of people to serve for extended periods of time.

18   So the more reliable the information is about what we're

19   planning for trial, the sooner we can begin in the process of

20   planning ahead for a jury.

21         So with respect to, then, the April 6th status

22   conference, in preparation therefor, the parties must submit a

23   single filing.  I understand you will have differing positions.

24   But I want it captured in one filing, the positions of the

25   parties as to a firm trial date.

1          And to the extent there are proposals that the Court

2    consider severance, then I'm happy to hear about those either

3    by way of a joint proposal in the filing or -- or otherwise.

4          Given that there are 26 named defendants, one of whom

5    hasn't been publicly identified, I want to reiterate the

6    importance that motion filing follow the directive I made at

7    the last hearing.  Unless it's an emergency, no motion should

8    be filed without an affirmation of conferral with opposing

9    counsel.

10          With respect to defendants filing motions, the moving

11    party, after conferral of course, has to have conferred with

12    the other defendants, too.  The first paragraph of the motion

13    should recite the conferral has occurred and recite if any

14    defending party has asserted he or she does not join the

15    motion.

16          So the presumption is everyone joins all motions

17    unless, in the moving papers, the moving party identifies who

18    has not joined; or within three days of the filing thereof, a

19    party wishes not to be considered as part of that motion.

20          So, again, with respect to the joint filing on trial

21    date, I require it to be that; a single filing.  That means you

22    have to work together.  And I'll leave it to you to figure out

23    who's going to assist in facilitating that process.

24          I want to commend you thus far for the way you're

25    trying to share work.  And we're all learning this as we go.

 1    So I will -- won't make assignments on the defense side or the

 2    Government's side as to who's going to do it.  But you will do

 3    it, and then I'll address that actual trial date setting at the

 4    next hearing.

 5            Yes, Ms. Hay.

 6            MS. HAY:  Your Honor, just a housekeeping matter for

 7    all of us.

 8            The -- the ECF system allows a defendant to check

 9    whether they're filing a motion just for themselves or for all

10    of the defendants in a case -- or all of the parties in a case.

11            And, earlier, Ms. Boyer had given us instruction to

12    be sure we don't accidentally file for everybody and we only

13    file it for our own defendant.

14            But I'm wondering if the Court would allow us in

15    cases where -- for example, the objection to the protective

16    order that was filed yesterday by Mr. Kohlmetz, if that is a

17    document that could be filed on behalf of all defendants.  And

18    the reason for that is that when we are individually printing

19    the docket for our defendant, we do want the -- the motions

20    that -- our joint motions to be reflected on our docket;

21    otherwise, we would have to print the whole thing.  So I just

22    wanted to clarify, because there was some confusion on how we

23    should do this.

24            Can we --

25            THE COURT:  You may work with court staff for

1    whatever convenience works for you.  But for purposes of the

2    fundamental issue here, the ruling is any motion filed must

3    have in the first paragraph a certification of actual conferral

4    with opposing counsel and a statement of the extent to which

5    the moving party knows who does not want to join the motion.

6          Within three days of the filing of the motion, if

7    anyone wants not to be deemed to have filed -- joined the

8    motion, that filing comes in.  Otherwise, the presumption is a

9    motion made with conferral with the opposing party is a motion

10   on behalf of all, and everyone gets the benefit of the ruling

11   and the reservation of the rights.  So I've said that a number

12   of times here on the record.  It's in the original case

13   management order.  And I believe the defendants' rights are

14   preserved that way.

15         With respect to the mechanics of how CM/ECF works,

16   you all have leave to work out with the court staff what is

17   most effective.

18         MS. HAY:  Thank you.

19         THE COURT:  But it's all going to be interpreted the

20   way I just indicated.

21         All right.

22         MR. PAGAN:  Your Honor?  I have one question that

23   somewhat relates to that.

24         THE COURT:  Yes, Mr. Pagan.

25         MR. PAGAN:  Since we have a Superseding Indictment,

1    one of the questions that we have is, is the Government

2    dismissing the other --

3              THE COURT:  It's on my list.  But thank you,

4    Mr. Pagan.  I might as well go there now.

5              I think the Government needs to file a motion to

6    dismiss the Cooper case before Judge Jones, now that all

7    defendants are in this matter.

8              And then counsel and the parties won't be burdened by

9    any electronic filing requirements from that other case.  So

10   that will be closed because the interests of justice require it

11   in light of this Superseding Indictment.

12             MR. PAGAN:  And one of the issues that we were

13   discussing last night, because -- because there were two

14   Indictments, oftentimes if there was somewhat of a joint

15   motion, we would have to ask someone to file someone -- the

16   same motion in another case.

17             So one issue is that if -- can the Court deem -- in a

18   sense, nunc pro tunc -- any motions or reservations of

19   rights --

20             THE COURT:  Yes.

21             MR. PAGAN:  -- that have been filed prior to these

22   new defendants being superseded --

23             THE COURT:  Yes.

24             MR. PAGAN:  -- as applying nunc pro tunc --

25             THE COURT:  I will note in the order that issues from

1    today all motions filed in the Cooper matter, all reservations

2    of rights made in the Cooper matter are deemed made in this

3    matter, so that they don't need to be refiled or repeated.

4            MS. SHERTZ:  Your Honor --

5            THE COURT:  I don't want to -- I want to stay on

6    task, unless it relates to that point.  And I was going to

7    address it.  But I have an agenda we need to get through

8    substantively, first, before we cover up -- cover every

9    question.

10           Does it relate to this?

11           MS. SHERTZ:  Yes.

12           THE COURT:  Go ahead.

13           MS. SHERTZ:  I don't know whether you want to

14   reappoint the Cooper lawyers, now that we have a different case

15   number and a different --

16           THE COURT:  It's on my list.

17           MS. SHERTZ:  Thank you.

18           THE COURT:  You're all appointed.  You're all

19   reappointed.

20           MS. SHERTZ:  Thank you.

21           THE COURT:  The clerk will take care of that

22   transfer.

23           It's not really a reappointment.  The appointments

24   from the Cooper matter are carried to this matter.  I want

25   to -- so with respect to Docket No. 185, I am granting the

1    motion.  I am designating the case complex.  I am deferring the

2    setting of a firm trial date to the April 6 status hearing.

3    And the parties will file a joint submission with their

4    requests and recommendations as to the date of that trial and

5    as to whether the trial should be a joint trial on all charges,

6    with all defendants, or in some staging and grouping of

7    defendants.  In which case the parties must also recommend an

8    order of trial because, obviously, I cannot preside over more

9    than one trial at one time and I cannot expect the Government

10   to divide up into different courtrooms to try two or three

11   cases at one time.

12           So if there are severances, they will -- they will be

13   accomplished in a series.  And I will have to determine which

14   group goes first, based on all of the rules that apply, and

15   then go from there.  So I want your input about that in that

16   joint statement.

17           Now, I want to turn to the discovery management

18   issues.  And, here, we need to address the Government's motion

19   for protective order which was filed Monday.  We need to

20   address the parties' stipulated order regarding discovery 238

21   and a joint proposal that came through in the joint status

22   report.

23           I want to emphasize, again, consistent with the

24   direction I just made, the Government's motion for a protective

25   order should have included -- and in the future will include --

1    a certification of conferral.  And -- because I need to know

2    that in every single filed motion.

3           The -- such a submission ideally would be a joint

4    submission.  A submission on a discovery dispute:  Here's the

5    issue, here's the Government's position, here are the

6    defendant's positions, either collectively or individually.

7    Ideally -- I know we're not in an ideal place yet, but we can

8    keep working on it until we get to that place.  And the reason

9    I'm going to continue to insist on that is the more that model

10   is followed, the sooner the rulings can be made, the sooner the

11   matter can get to trial, the sooner the speedy trial rights of

12   the defendants are honored.  So that is just a reminder of a

13   way in which that issue needs to arise.

14          I have read the Government's motion for discovery.

15   I've read, Mr. Kohlmetz, your response.  I know that these

16   issues are of concern to both sides.

17          So what I would first like to have discussion about

18   is the showing the Government made as to whether a protective

19   order is warranted at all.  The defendants' argument is that it

20   is not.

21          So I would appreciate the Government's summary of its

22   position as to why any protective order is warranted.  I assume

23   the Government's had an opportunity at least to read

24   Mr. Kohlmetz's filing as of last night.

25          And then I would like the defendants' position on

1  whether a protective order is warranted at all.  And then we'll

2  get to the scope issues.

3       Who's addressing that?

4       Mr. Barrow.

5       MR. BARROW:  Thank you, your Honor.

6       And forgive me, my voice may leave me at some point

7  here.

8       Agent -- we have submitted, in conjunction with the

9  motion for a protective order, an affidavit from Special Agent

10  Katherine Armstrong.  That affidavit lays out specific examples

11  in which individuals including the defendants, but also

12  including others, have contacted those that are adverse or

13  believed to be adverse to their position and either threatened

14  or intimidated them.

15       Mr. Kohlmetz, in his response, objects to that

16  showing.  Short of showing that defendants in this matter have

17  used the discovery materials to approach the Government's

18  witnesses to threaten or intimate them, I don't know what more

19  we could show.  In other words, these are very specific

20  showing -- it's a very specific showing involving very

21  particular events that demonstrate the risk that is posed if

22  the discovery was not subject to a protective order.

23       Of course, the Court is aware that protective orders

24  are quite common in our district, and they're frequently

25  granted among many of the attorneys that are in this room.

1    This particular protective order is fairly -- is meant to be

2    very -- the least restrictive as possible.  And the spirit of

3    the protective order is that we would work with the defendants

4    to deal with any issues that arise, and I'm confident we could

5    do so.

6            As for at least the showing in Agent Armstrong's

7    affidavit, I believe it is -- it's made, and it's well

8    supported.

9            THE COURT:  All right.  Mr. Kohlmetz.

10           MR. KOHLMETZ:  Your Honor, I -- I disagree.

11           I don't think the affidavit establishes, even close,

12   a particular need as the case law supports for such a blanket

13   order on the dissemination of the discovery here.

14           When I reply -- when I responded last night to the

15   Government's motion -- which was not filed Monday, it was filed

16   yesterday as well --

17           THE COURT:  I'm sorry.

18           MR. KOHLMETZ:  That's okay.

19           THE COURT:  I misspoke.

20           MR. KOHLMETZ:  I was short of time.

21           In the interim, I've been made aware by two attorneys

22   here, who wish to address the Court, that they -- by way, I

23   believe, of a proffer -- have information that would counter at

24   least some of the averments in the affidavit.

25           I filed my motion going on the assumption that the

1    affidavit stated what it stated.  And, even so, I don't believe

2    it supports anything more than perhaps some particularized

3    protective orders that would apply directly to the instances

4    that the Government refers to.

5           I'm not conceding that point because, quite frankly,

6    I don't have enough information from the affidavit to

7    determine, one, whether any actual threats were made other than

8    that individuals apparently may have felt threatened.  And I

9    think that's important because I think in terms of whether a

10   threat is made, the Court should look to was an actual threat

11   made?  What was the intent of any threat or the intent of any

12   intimidation?  Were those specifically tied to any of the

13   defendants here, as opposed to a mass of people who were out at

14   that scene?  Okay?  There were, at points, hundreds of people

15   in the Burns community and -- going to and from the refuge.

16   There are some tenuous links, at best, to some of the people in

17   this room.

18          I think the Government needs to make a particularized

19   showing as to particular statements and particular individuals

20   when it is seeking a protective order that covers, at this

21   point -- I have been told -- over 95,000 potential pages of the

22   discovery.  So I don't think we get there with the current

23   blanket order.

24          What is disturbing to us is that the blanket order

25   seeks to -- the motion seeks a blanket order preventing us from

1    disseminating discovery materials, yet the Government has been
2    selectively disseminating discovery materials throughout the
3    course of this investigation.

4          I woke up this morning to the front page of our
5    paper, *The Oregonian*, to read that there is now a conduct
6    inquiry.  The F.B.I. agents are actually facing a potential
7    criminal investigation involving potential lies and coverups
8    involving the shooting of LaVoy Finicum.  I can't think of a
9    case in this district that calls for more open dissemination of
10   this information to the public.

11         Why should the Government be allowed to pick and
12   choose what discovery materials are given to the media?  And,
13   on the same hand, prevent the defense from disseminating these
14   materials as we see fit?

15         Beyond that, your Honor, the language of the proposed
16   motion and order is so vague, I -- I bring that up -- and I
17   don't want to reiterate a point.  But I've been approached --
18   and I'm sure many of the defense attorneys in this room have
19   been approached by any number of individuals who have offered
20   their assistance in an investigatory capacity.  I -- I don't
21   know who I would be able to provide any discovery to under
22   that.

23         This is a nontraditional criminal case involving
24   freedom of speech, freedom of assembly.  I think there is a
25   compelling public interest in not just select disclosure but

1   full disclosure.

2         The gallery here is full and has been at every

3   conference.  There have been literally hundreds of media

4   articles, not including what we have seen on -- on social

5   media, that have -- have been and are being written about this

6   case.  So I am absolutely fine with -- and I did confer

7   directly with Mr. Gabriel, and I'm happy to do so again.  But I

8   think that if the Government wants protective orders, it should

9   selectively approach the Court.

10         I'm fine, until Mr. Gabriel and I -- or someone else

11   works -- continuing for the next week or so under the

12   stipulated order now until we can hash this out.  But I just

13   think a blanket order is inappropriate, your Honor.

14         The rest of the reasons I've cited in my memo.

15         I do know that Mr. Arnold's team and Ms. Wood, for

16   Mr. Ritzheimer, will want to address some of the averments that

17   they had a chance to review in the affidavit.  But those are my

18   points, your Honor.

19         THE COURT:  All right.  Mr. Arnold.

20         MR. ARNOLD:  Thank you, your Honor.

21         First, regarding some of the general statements about

22   what happened in *The Oregonian* front page.  I want to refer the

23   Court to Docket No. 177, which was the second response to the

24   site inspection request.  Recall that, in court, we asked for a

25   representative of the defense to be present during F.B.I.

1    processing of information.

2            On page 5 of that Government response -- this is a

3    quote:

4            Defendant Ammon Bundy complains that without his

5            requested order, he will, quote, be forced to

6            depend upon the goodwill and diligence of state

7            actors to do their job properly.  As if --

8            And this is the end of the quote.

9            This -- the Government's saying, As if that is

10           anything but the normal and well-settled practice

11           in criminal matters.

12           And then we learn -- not through a production in

13   accordance to **U.S. versus Brady.**  We learn from a news

14   conference, disseminated to the media, that this was not the

15   normal and well-settled practice.  Of course, the prior case in

16   this own district, as cited by counsel in our response to the

17   protective order, shows that that is not the well-settled

18   practice in this district.

19           We have essentially, as brought out, some allegations

20   of F.B.I. misconduct.  And I just refer the Court to, I think,

21   the **People verses OJ Simpson**, which is on the news right now.

22   That is that TV show.  And one of prosecutors in there says,

23   Why does this sort of thing -- referring to just the craziness

24   of -- of acquittals and things that happen in these

25   high-profile cases -- why does it always happen in these cases,

1   these strange things happen?

2         Well, the reason is because of public accountability.

3   Because the media --

4         AUDIENCE MEMBER:  Yes.

5         MR. ARNOLD:   -- is present to overlook the

6   Government.  The fourth estate is there to protect not only our

7   clients but the citizenry in general.

8         So I will refer the Court to the affidavit in support

9   of the protective order.  In essence, that's document No. 246,

10  page 4.  This is an affidavit by Ms. Armstrong.  That is sub B.

11        She refers to a Harney County law enforcement

12  official who received an e-mail and referred to some

13  allegations of -- of a threat.  And then -- then jumped ahead,

14  from December 16th to January 1st.

15        Well, what is left out -- and by way of proffer --

16  and, in fact, your Honor, I'm in a position where I'm afraid to

17  make my argument because I think my argument needs to name that

18  Harney County official so we can understand the true

19  motivations for the protective order.  So I would request

20  permission to discuss the parentry (phonetic), and how it

21  relates to that Harney County official.  Or, if the Court deems

22  it appropriate, to hold a proceeding outside the presence of

23  the public to address this issue.  But I believe it's in the

24  interest of my client to name that Harney County official and

25  read the portion of discovery that relates to it, that was left

1    out of the Government affidavit.

2              THE COURT:  I need the Government's position on that

3    request, please.

4              MR. KNIGHT:  Go ahead.

5              MR. BARROW:  Your Honor, I don't know exactly what

6    Mr. Arnold is referring to.

7              THE COURT:  Why don't you walk over to counsel table

8    and speak to him briefly.

9              This is another reason why conferral is required.

10             (Pause, Mr. Arnold and Mr. Barrow conferring.)

11             THE COURT:  Mr. Barrow.

12             MR. BARROW:  Your Honor, I'm not going to attempt to

13   restrict what Mr. Arnold argues.  I don't know the point he's

14   trying to make, but there's nothing about the affidavit that we

15   intended to restrict what counsel could argue, so --

16             THE COURT:  Well, it sounded like he was concerned

17   that naming the Harney County public official, around which

18   this evidence exists, would somehow run afoul of the interests

19   you were trying to protect.

20             You don't object to him naming that official?

21             MR. BARROW:  I don't object naming who he thinks that

22   person is, no.

23             THE COURT:  Go ahead, Counsel.

24             MR. ARNOLD:  Thank you, your Honor.

25             And I'm just -- for the record, by way of proffer, I

1    have a discovery Bates stamp marked 927.  It's an unclassified

2    Federal Bureau of Investigation report dated 12-17-2015.

3                    It reads that:

4                    Harney County Sheriff Dave Ward was interviewed

5                    via telephone.  After being advised of the

6                    identity of the interviewing agent and the nature

7                    of the interview, Ward provided the following

8                    information:  On December 11th, 2015, Ryan Pay --

9                    or Ryan Payne and Corey Lequieu paid Ward a visit

10                   at his office.

11                   Am I saying --

12                   (Pause, conferring.)

13                   MR. ARNOLD:  Yeah.

14                   Payne and Lequieu told Ward by a complete accident

15                   they had interaction with Ward's parents.  During

16                   the interaction, Payne and Lequieu said that

17                   Ward's parents threatened them.

18                   This is Sheriff Ward of Harney County.

19                   After Payne and Lequieu left Ward's office, Ward

20                   had a telephone conversation with his mother,

21                   Linda Ward.

22                   And my first point, to interrupt, is that this sort

23   of investigation by Sheriff Ward into a threat against his

24   parents is going to be perceived as a conflict of interest.

25   And I'll get back to that, because the reason the F.B.I. got

1   involved was over a dispute with his parents.

2            And I'll -- I'll get back to that in a moment.

3            Linda -- this is the mother of Sheriff Ward --

4            said that she and Ward's father, James Ward, were

5            assisting with the garage sale at the American

6            Legion.  Linda said that three males and a female

7            were handing out flyers regarding Dwight and

8            Steven Hammond's resentencing.

9            One of those individuals made the remark that they

10           were going to force the sheriff to do his job.

11           This is handing out pamphlets, kind of like the

12   founders did.

13           Linda then identified herself as the sheriff's

14           mother and confronted the individuals.

15           So it's actually the -- the sheriff's mother

16   confronted the protesters exercising their free speech.  And

17   she's entitled to do that because she's a citizen as well.

18           Linda told Ward that she had not threatened the

19           individual.

20           So the Sheriff Ward's mother told her son, who's

21   investigating the threat, that the mother didn't threaten our

22   clients over her son's assertions of not doing his job.

23           Linda did tell the individuals that if they attempt

24   to harm one hair on the sheriff's head, her and the community

25   would arm themselves and stand by the sheriff.

1          Our position there, your Honor, that sounds a lot

2    like the threats they're accusing our clients of making.  If,

3    then, statements -- that if illegal activity happens, they get

4    to defend themselves.

5               (Pause conferring.)

6               MR. ARNOLD:  And, your Honor, it continues.

7               That James -- this is James Ward, the father of

8    this -- of the good sheriff.

9               James called one of the individuals a son of a

10                  bitch and remarked that a .45/70 would have put a

11                  big hole in somebody.

12              Your Honor, for the record, a .45/70 is a -- is a .45

13   caliber load with a -- I think it's about 70 grain.  It's sort

14   of an historic round.  It's used shooting out of a long gun.

15              And, agreed, it would put a big hole in somebody.

16   We'll concede that that threat is accurate by Sheriff Ward's

17   father.

18                  Linda said the individuals were openly carrying

19                  firearms.  Ward advised that the individuals

20                  matched the description of Payne and Lequieu.  And

21                  Ward told Payne and Lequieu that he was receiving

22                  threats via e-mail.  And Payne attempted to

23                  convince Ward that the threats were coming from

24                  the federal government.

25                  And just for the interest of fairness to the

```
1  Government:
2              Ward received an e-mail from, quote, Mcscrawface
3              that said, quote, Have a good read, you two-bit
4              lying punk.
5              I believe that's referenced in the -- in the
6  affidavit.  By --
7              THE COURT:  It is.
8              MR. ARNOLD:  And, your Honor, that's the completion
9  of that -- of that report.
10             THE COURT:  So your point is --
11             MR. ARNOLD:  My --
12             THE COURT:  -- that -- that the evidence cited by the
13 Government in support of the protective order -- there's more
14 to it.  There's an evidentiary concern about the extent to
15 which that legitimately displays a threat the Court should be
16 concerned with protecting against?
17             MR. ARNOLD:  That's one point, your Honor.  The other
18 point is how that dovetails with counsel's remarks regarding
19 disseminating this information selectively to the public for
20 consumption.  These are calculated -- essentially, a motion for
21 press release that is getting information out to the public.
22 And -- and -- and in support of -- ironically, in support of a
23 protective order to try to keep our clients from doing that.
24             The other important thing I want to raise to the
25 Court is that our clients, who have been protesting, exercising
```

1    their free-speech rights, they're going to want to talk about

2    discovery.  The order, as written, talks about disseminating

3    copies.

4           What we worry about is even if they talk about

5    discovery and someone else talks about learning about

6    discovery, that that's going to lead to a contempt charge

7    against our clients.

8           So, in essence, this is a -- has a chilling effect on

9    our client's free speech, which is unconstitutional under the

10   First Amendment.

11          The chilling effect is, in essence, if we can't

12   disseminate information and we're afraid someone is going to

13   accuse us of disseminating copies, are they going to confuse

14   our statements, our free speech as possibly receiving a copy of

15   it instead.

16          And the other issue for -- counsel described is we've

17   had -- and we actually have teams of volunteers combing through

18   social media right now, and we -- we've got teams of volunteers

19   doing essentially paralegal work for free, and they're going to

20   need copies of that discovery.

21          And we are very concerned that -- how do we determine

22   who those individuals are and whether or not they -- they go

23   into this category?  And, quite honestly, I haven't vetted them

24   outside of the fact that they're doing a really good job of

25   getting the information that I need.

1          So I -- I'm in a position where I don't have

2     relationships with these people, other than the Internet,

3     essentially.  And by giving them copies of discovery to assist

4     me in assisting Mr. Bundy, are they going to release

5     information; have it come back for a contempt charge against me

6     or Mr. Bundy?

7          Now, I feel -- and just for the record, by way of

8     proffer, I feel chilled from utilizing volunteer paralegals now

9     because of this proposed order.  And now I, for the record,

10    feel that compromises my ability to represent Mr. Bundy.

11         And the last thing, your Honor, to counter the

12    affidavit, this is another report.  This one is from January

13    4th, 2016.

14         THE COURT:  You've made your point on the evidentiary

15    quality.

16         I'm talking only now about standards.  And in the

17    interests of time, I need to hear from the other counsel who

18    wanted to address the issue.

19         Yes, Ms. Wood.

20         MS. WOOD:  Your Honor, I'll be brief, and it goes to

21    Court's inquiry about whether the Government has made adequate

22    showing in this case.

23         I actually have briefly conferred with Mr. Barrow on

24    this.  It was in connection with a release matter, but not --

25    because I didn't see the protective order until yesterday.

1          But the first allegation deals with this

2    confrontation of a woman wearing a BLM T-shirt at Safeway on

3    December 18th.

4          I'm sure the Court has read that in the complaint as

5    well.  The complaint identified Mr. Ritzheimer as being one of

6    the two men, although he wasn't alleged to have made any

7    threatening statements himself.  The other individual was not

8    identified.

9          We have obtained bank Visa credit card records from

10   Mr. Ritzheimer and can establish by those records, as well as

11   at least one reputable witness that we've interviewed so far,

12   that he was in Peoria, Arizona, on -- I'm sorry, on December

13   18th of 2015.

14         He was still there early morning of the 19th.  And he

15   proceeded to travel to Meridian, Idaho, and got there on the

16   evening of the 19th of December.

17         And so it's -- it's clear from the 302 report that we

18   just received in the first installment of discovery, the woman

19   identifies Mr. Ritzheimer and immediately identifies Blaine

20   Cooper.

21         Mr. Cooper, I would proffer to the Court, traveled

22   with my client, Mr. Ritzheimer, in Mr. Ritzheimer's truck;

23   which does not, in any shape or form, match the description

24   given by the witness.  It's not the same color, not the same

25   make.

1          THE COURT:  So is your point, Ms. Wood, that the

2     threat didn't happen or that it was wrongly associated with

3     your client?

4          MS. WOOD:  Well, your Honor, I think both of those

5     possibilities are there for the Court's consideration.

6          You either have someone making a false complaint or

7     you have someone making a misidentification.

8          THE COURT:  Okay.  I understand your point.

9          MR. ARNOLD:  And, your Honor, for the record --

10          THE COURT:  Mr. Arnold, I'm not finished.

11          MR. ARNOLD:  Oh, sorry, your Honor.

12          MS. WOOD:  Your Honor, that was my point.

13          In terms of the showing made by the Government's

14     affidavit that there have been threats by these defendants to

15     warrant issuing a protective order --

16          THE COURT:  Well, I think actually the showing isn't

17     necessarily limited to your clients.  The issue, supported in

18     the Government's submission, is that the very nature of this

19     entire controversy has promoted -- as Ms. Arnold argued --

20     Mr. Arnold argued, threats that are occurring.  Whether they're

21     coming from one camp or another, there have -- there have been

22     documented these kinds of disputes.

23          And the risk that I'm concerned with is the extent to

24     which, when the Government obliges its duty to produce

25     discovery, it may be putting at risk a person who shouldn't be

1    put at risk.

2            So that's the issue.  Not so much that your client

3    did or didn't, on a particular day, make a threat.  But the

4    risk issue is much broader than the Safeway incident.  It's

5    inherent in the nature of the dispute in the first instance.

6            MS. WOOD:  Your Honor, I would just say this very

7    briefly.  Obviously, it was a heated situation during the time

8    of the occupation.  There were some people in Burns who were

9    for it, some against it.  There was a lot of words.  There was

10   a lot of freedom of expression going on.  There was not, to my

11   knowledge, any individual in that community physically injured

12   in any way or that's -- you know, that's made that type of

13   allegation.  And so now the situation has defused.  Groups are

14   geographically separated.  And, you know, I just question the

15   need for a protective order to protect people now that that

16   heated situation is past.

17           THE COURT:  Well, the heat has passed in that light,

18   and certainly -- certainly the fact that many of the accused

19   are in custody limits those interactions.  But there remain

20   people in the community on both sides of the dispute.

21           So the real issue is whether there has been an actual

22   showing made of a risk of threat.  The Government's protective

23   order seems limited to that concern.  The -- there isn't any

24   effort here to deprive the defendants of personal direct

25   access, which is the more common protective order problem, when

1   there are -- when a defendant is prohibited from holding or

2   keeping a record.  The Government is not seeking that here.

3   They're seeking a restriction on what the defendants may do

4   with that information that they rightfully receive.

5          And so I understand your point.

6          Mr. Arnold, what new did you want to add?  Something

7   new?

8          MR. ARNOLD:  Your Honor, I just -- counsel pointed

9   out there's two possibilities.  I just, for the record, want --

10  regarding who the threat came from.  I understand your Honor

11  doesn't find that as weighty, but I wanted to add the third

12  possibility that the threat -- or the perceived threat, the

13  person wasn't wrong.  Maybe it was somebody posing to be a

14  protestor, was the third possibility that we don't know.  And I

15  just want to put that on the record.

16         THE COURT:  All right.  Mr. Barrow.

17         MR. BARROW:  Your Honor, in my initial comments, I

18  was really focused on the Government's showing.  I would like

19  to just address a few of the points that Mr. Kohlmetz has

20  raised.

21         THE COURT:  We've certainly gone beyond the standard.

22  Yes, go ahead.

23         MR. BARROW:  The Government really is not picking and

24  choosing what to release in this case.  There were two videos

25  that were released.  Obviously, one of those was related to a

1    separate investigation.  It was not released by -- by this

2    office.

3           And if there is a particular piece of information in

4    the discovery that the parties feel is important to release,

5    the protective order contemplates us meeting and conferring and

6    discussing that.  That's never been a problem in past cases.

7    It's never been an issue that we haven't been able to work out.

8           And, of course, if there was something, like a

9    particularly sensitive witness statement that the parties

10   wanted to release, that we felt couldn't be in the public

11   realm, then the Court could get involved.

12          THE COURT:  But why shouldn't the burden initially be

13   on the Government to identify that which the Government is

14   concerned should be protected, as opposed to putting the burden

15   on 25 or 26 lawyers selectively to seek permission to work with

16   one piece of discovery or another?

17          MR. BARROW:  Well, we think that this is perhaps the

18   most efficient way.  We have -- consistent with the Court's

19   order, we've been pushing as hard as --

20          THE COURT:  Excuse me, please.  Counsel's speaking

21   and I need to hear.

22          MR. BARROW:  We've been pushing as quickly as

23   possible to produce as much as possible.

24          As this Court's well aware, the Government has a

25   statutory right to hang on to things.  Now, we could take that

approach.  We could hold on to witness statements and say that

we're not going to produce them at this stage.  But that's

inconsistent with everything we've been talking about today.

That's inconsistent with the idea of trying to get all of the

information to the defendants as quickly as possible so that

they can prepare for trial.

So I don't -- again, I don't think there will be a

problem if people approach this in terms of what they truly

need to release.  I don't think it will be an issue.

This case is very unusual in one respect.  Not only

is there a lot of press interest but it seems to me that --

well, let me tell you what happened -- happened in this

particular case that I've never ever seen.  We had a procedure

for defendants' attorneys to pick up their discovery disks last

Friday.

Before some of these attorneys came to pick up their

disks, a member of the media came to see when they could pick

up their disk.

The notion that our discovery would be delivered to

the media is completely foreign.  I've not seen any case in

this district or heard of any case in any district that the

discovery was disseminated to the media.

And I think the reasons for that are that discovery

is something that we both compile during the course of the

investigation, often with court authorization for things like

search warrants; that we're investigating a crime.  And we
collect it for that purpose.  And then we deliver it to the
defendants as discovery.

And all of the rules of criminal discovery talk about
delivering to the defendant, not disseminating to the public.
Rule 16 talks about disclosing discovery to the defendant.
**Jencks** talks about the same concept, as does **Brady**.

This trial will be a very public and open trial.  All
of the witnesses will testify on the stand and all of the
evidence will be presented and the media will be -- be free to
report on it.

But if the discovery itself is immediately in the
public realm, I think it's very likely to interfere with the
rights of a fair trial, and it certainly will have a chilling
effect on what the Government is prepared to produce at a
particular time.

Again, we believe that through the meet-and-confer
process we can work through any legitimate issues and resolve
it that way.

One -- Mr. Gabriel reminded me, a lot of the material
in this particular case is open source information; the social
media stuff we've been talking about.  This protective order
doesn't restrict the dissemination of that information.

THE COURT:  But, Mr. Barrow, that, I guess,
underscores my initial question to you.

1          If the Government has a concern that a particular

2     witness is at risk, why shouldn't the process be that the --

3     the Government confers and seeks a protective order as to

4     particularized discovery; as opposed to the discovery as a

5     whole?  Why shouldn't that be the Government's burden in the

6     first instance, as opposed to putting that burden on any

7     defendant?

8          MR. BARROW:  Your Honor, we have approached it this

9     way because I think it was the fastest way for us to get to

10    where we are.

11         Discovery currently, in the two volumes we have,

12    consists of all of those legal pleadings which are currently

13    sealed by court order that allowed us to produce them in

14    discovery but doesn't allow for their public dissemination.

15         THE COURT:  Well, a protective order that says thou

16    shalt not disclose that which is sealed is a different concern

17    than what counsel are arguing here.

18         Isn't that right?

19         MR. KOHLMETZ:  It is, your Honor.

20         THE COURT:  All right.

21         MR. BARROW:  And then the second half of the

22    discovery involves these reports.  The bulk of those reports do

23    involve interviews with individuals.  There are some that are

24    not -- that don't raise those concerns.

25         I -- again, I'm happy to work with attorneys on that.

1    I wouldn't have had time to do that and produce the discovery

2    on -- in the manner that we have.

3            THE COURT:  All right.  I understand everyone's

4    position here.

5            I'm satisfied that the Government has made a showing

6    that there is a potential for a risk.  What I'm not satisfied

7    is that the scope of the proposed protective order is

8    sufficient.

9            And so, for now -- but only in an interim basis --

10   I'm going to grant the Government's existing form of order but

11   with the explicit direction that it will be revised and made

12   more limited and targeted and less restrictive.

13           The process to do that is more conferral between the

14   Government and those among defense counsel who designate

15   themselves as the ones with whom Mr. Barrow will confer.  And

16   then I want a joint statement regarding the parties' positions

17   on the scope of the protective order filed, and I want it filed

18   in two weeks from today so that this doesn't interfere with the

19   collateral issues around the production of discovery.

20           So there will be a protective order.  Clearly no

21   defendant and no defense lawyer may share material that is

22   subject to seal.  That the order -- that the Court has already

23   ordered that.

24           And I understand the discussion here this morning is

25   not targeted there but to just the production of general

1    discovery.

2          So what we have here is a balance of risks, a balance

3    of interests.  There is a showing of a legitimate potential

4    risk, without ascribing fault or wrongdoing.  As has been

5    acknowledged here today and has been demonstrated consistently

6    throughout the events that give rise to the Indictment, there

7    are opposing points of view.  There are competing interests

8    here.

9          Right now I'm focusing on the Government's obligation

10   to provide discovery, the defendant's right to have discovery.

11   No one has asked, yet, for a so-called gag order or some order

12   prohibiting any party from speaking to the media.  It's well

13   known that parties have been.  At least representatives of the

14   Government have been speaking.  Certain defendants have been

15   speaking.  It's happening.  It is what it is.

16         We're going to work -- work on this to try to get a

17   fair limitation of disclosure of discovery that accomplishes

18   the risk we're -- I'm -- I am going to protect against.  And

19   that is interference with a witness or retaliation to a

20   witness, threatening of a witness -- or even a party, a third

21   party.  Someone who may not be a witness but someone whose

22   speech is being targeted because it's being reproduced as a

23   result of the discovery.

24         We need a way to define that narrowing appropriately.

25   And I know counsel can make significant headway on that.  So

1   two weeks from today, a joint statement, please, that narrows

2   the scope of discovery in the interim.  And, again, it's only

3   for an interim period.  The form of order that was tendered

4   with the motion for protective order will be entered.  But I'll

5   modify it to state that it is, as noted, interim.

6          Now, with the subject of discovery on the table, we

7   need to address, also, discovery management.

8          At the last hearing, I made an order that all

9   Government discovery would be produced through the Federal

10  Defender's Office CJA coordinator.  That proved to be not the

11  appropriate approach.

12         What I need from the parties -- and here, it is again

13  going to have to be a joint effort, is a reasonable plan so

14  that the Government and defendants and the Court are satisfied

15  that discovery will move forward without any unnecessary

16  impediments and that there will be a clear way for the

17  Government to assure everyone that that which should be

18  produced is produced.  I approve now the acquisition of some

19  third-party vendor on behalf of defendants collectively to help

20  organize electronic discovery, but I want you to work together

21  to let me know what specifications beyond that you'll need.

22         So the Government is within its rights to make the

23  point Mr. Barrow just made.  That there are limitations on the

24  Court's authority to time the production of discovery.  I very

25  much appreciate that the Government is simply moving forward.

1   There are ways the Court can deal with recalcitrant prosecutors

2   who don't want to produce a **Jencks** statement until a witness is

3   on the stand at trial, and there have been occasions where I've

4   noted the Court's authority to grant a recess until everybody's

5   ready to cross-examination.  But that's not going to happen

6   here.  I know you're all going to work together, and we're

7   going to try to get this case to a jury with all deliberate

8   speed but with respect to the process the Government has to

9   undertake and that which the defendants are entitled to

10  undertake.  It is complicated.

11          Ms. Hay, do you have a particular suggestion with

12  respect to how to move the discovery management issue to

13  resolution in terms of timing and mechanism, and the like?

14          MS. HAY:  Your Honor, I think Ms. Baggio is going to

15  address discovery for the defendants.

16          THE COURT:  All right.  Ms. Baggio, good morning.

17          MS. BAGGIO:  Good morning.

18          THE COURT:  Thank you for your efforts on behalf of

19  everyone.

20          MS. BAGGIO:  Thank you, your Honor.

21          Your Honor, we are -- I would say preliminarily -- in

22  terms of principles, it's our position, jointly, that it's

23  really the Government's obligation to provide us the discovery.

24  But in this unique case, we are working with them to try to

25  make arrangements so that we can get our information --

1            THE COURT:  Efficiently.

2            MS. BAGGIO:  -- as quickly and as effectively as

3    necessary.

4            We have formed a subgroup to work together to

5    identify potential third-party vendors.  But because there's a

6    bureaucratic aspect involved, we are required to get multiple

7    bids from different potential vendors, and we're trying to

8    figure out the right groups who cannot only host the

9    information for all of us but who can also provide additional

10   search support to assist us, again, in hopes of being both

11   efficient and effective.

12           THE COURT:  And client-specific, without disregarding

13   the privileges and other issues among the varying defendants?

14           MS. BAGGIO:  Exactly, your Honor.  And we are making

15   our best efforts, and it is of penultimate importance for us to

16   identify that person as quickly as possible, or organization as

17   quickly as possible.  So we are working on that from our end,

18   your Honor.

19           THE COURT:  Ms. Baggio, it seems to me that unless

20   the defendants collectively want a specific court order, some

21   general discovery management order, I'm satisfied that that

22   representation and knowing that you're working and that --

23   these monthly status hearings would be the mechanism to bring

24   any specific discovery issues to the Court's attention.

25           Of course, we're working on the protective order

 1   part.  But if there's more to it than that, if you think it

 2   would be in the interests of justice and efficiency for the

 3   Court to enter a discovery management order, then what I would

 4   charge you and your subgroup people to do is to confer with --

 5   who's the discovery -- is that you, Mr. Barrow?

 6            MR. BARROW:  Yes, your Honor.

 7            THE COURT:  And to submit, then, a joint proposal for

 8   a stipulated order.  I'm fine with either approach.

 9            MS. BAGGIO:  Thank you, your Honor.

10            THE COURT:  It seems to me you are moving forward.

11            Clearly the Government has heard the siren call; that

12   they must produce quickly and as much as they can, as soon as

13   they can.  But I know that there's just been that initial

14   showing, and there's more to come.

15            So I want the Court's involvement, to the extent it's

16   necessary.  But I also don't want to interfere and require work

17   that is not necessary on your part.

18            MS. BAGGIO:  I appreciate that.

19            THE COURT:  I will leave it to you, and it can come

20   up at the next status conference, then, as you propose.

21            I wanted to note that Judge Jones, who was presiding

22   in the Cooper case, has kindly agreed -- at my request -- to

23   handle all reviews of detention that are requested.

24            So with respect to Mr. Fry's motion, Mr. Olson, you

25   should docket that -- contact Judge Jones's chambers --

1          MR. OLSON:  Okay.

2          THE COURT:  -- and he will hear it.

3          With respect to Mr. Santilli, Mr. Coan, I understand

4     you're in front of Judge Papak this Friday --

5          MR. COAN:  Okay.

6          THE COURT:  -- for a review of the magistrate judges,

7     here.

8          I actually asked Judge Jones if he could just take

9     it, to save a step.  But he is not available Friday.  And I

10    understand there are prosecutors coming from elsewhere for

11    Friday.

12         MR. KNIGHT:  (Nods head.)

13         THE COURT:  So I don't want to interfere with what is

14    already scheduled.  But to the extent there's any need for

15    review after that, again, docket it with Judge Jones.

16         So I'll be entering an order in this now-consolidated

17    case that whenever any party seeks a review of detention by an

18    Article III judge, it should go to Judge Jones.  That will also

19    ensure a little quicker review and consistency across the

20    board.

21         MR. GABRIEL:  Your Honor?

22         THE COURT:  Yes.

23         MR. GABRIEL:  On the matter of detention, in Judge

24    Jones's case, we have certain defendants who have been released

25    on conditions; other defendants who have been detained.

1        The Government does intend to dismiss that

2  Indictment -- or move to dismiss that Indictment.

3        So we do have a representative from Pretrial Services

4  here.  We would ask that any preexisting release order or

5  detention order for a defendant --

6        THE COURT:  I think I already said everything from

7  the Cooper case is preserved.

8        All of the rights reserved, all of the orders made,

9  all of the appointments.  And I'll enter a specific order to

10  that effect.

11        Is that what you're asking?

12        MR. GABRIEL:  Yes, your Honor.  Thank you.

13        THE COURT:  Okay.  We'll be sure that all orders in

14  the Cooper case are deemed applicable to this.  So the parties

15  are still subject to the same release conditions under this

16  case number, even though they were originally made in the other

17  case.

18        Is that -- is that clear enough for Pretrial's

19  purposes?

20        THE PRETRIAL OFFICER:  Yes, your Honor.

21        THE COURT:  Thank you.

22        Thank you, Mr. Gabriel.

23        All right.  I want to address the matter of pretrial

24  motions and a litigation schedule.  And I appreciate the

25  parties having addressed this in part.

1          Much of this is driven -- the timing of it will be

2     driven by the timing of a trial date.  And the general calendar

3     that you've laid out in the status report would clearly not

4     work for a trial starting in September or sooner.

5          So I'm going to say that these motions need to be

6     advanced on a calendar that is earlier than what you describe.

7     And I want, within two weeks, a specific proposal.

8          I want you to assume trial is in September.  And,

9     therefore, I want you to give me a more accelerated schedule to

10    make any motions.

11         You allowed a fair amount of time for briefing in

12    between sessions.  I don't think that's necessary.  I also do

13    not think it's necessary for you to budget time for reply

14    memoranda.  Motion, response, hearing, reply on your feet in

15    the courtroom.

16         The motion is made on conferral in the first

17    instance, so the response shouldn't have to be delayed because

18    the responding party didn't know it was coming, didn't know

19    what the issues were, and needed to start on a clean slate.

20    We're going to need to move this more quickly.

21         So I propose that for the -- in -- in -- you give me

22    another schedule.  And if -- depending on the degree to which

23    you can agree in a joint filing in two weeks, I may go ahead

24    and make an order.  Otherwise, I'll make it at the April 6th

25    hearing.

1          But I want -- I want these issues brought to the

2     Court's attention much sooner, and potentially we don't need

3     three rounds.  Maybe two.

4          The first round of motions that the defendants

5     anticipated did not require review of discovery by definition.

6     It seems to me those ought to be moving sooner, rather than

7     mid-April.

8          Ms. Baggio, concerns?

9          MS. BAGGIO:  Thank you, your Honor.

10         My concern with the briefing schedule and setting a

11    firm trial date really derives from the fact that in order for

12    me to know what motions I might want to litigate, I need a

13    final charging instrument and I need the discovery --

14         THE COURT:  I think you should assume this is the

15    final charging instrument.  I do.  And to the extent the

16    Government brings another one, we'll deal with it.

17         If it means severance of a new charging instrument to

18    an entirely different day and time, fine.  I -- I -- I have to

19    do what I have to do.  And so I'm regarding this current

20    charging instrument as the instrument.

21              (Indiscernible voice emitting over the telephone

22              line.)

23         THE COURT:  And we -- especially in light of the

24    unified statements of every defendant about speedy trial, we

25    simply cannot wait to the time that was projected in the status

1    report for a first round of motions, a second, and a third, and

2    still be ready to speak with the jury early in September.  It

3    just can't be done.

4            So I think two rounds of motions ought to be your

5    goal.  I think you should squeeze out the time, condense it by

6    eliminating an issue for reply.  I think you should aim for

7    arguments on the dates already indicated.

8            So back your motions up to a status hearing date so

9    that a response comes in two weeks before and the motion is

10   filed two weeks before that, and we could -- we could deal with

11   many of these things at the May hearing.  I think you need to

12   think more pressed in terms of time.

13           And I appreciate it's a big deal, but I know there

14   were some challenges that have nothing to do with the

15   Indictment -- I mean, nothing to do with the discovery

16   production; everything to do with the Indictment.  Consider

17   this the Indictment, and let's move.

18           MS. BAGGIO:  I will do so.  Thank you, your Honor.

19           THE COURT:  So did I say when that was to be

20   submitted?  Did I say when?

21           THE ATTORNEYS:  Two weeks.

22           THE COURT:  Two weeks.  Two weeks.  That's a good

23   time.  Two weeks for a joint proposed schedule on pretrial

24   motions.

25           Now, this is separate and apart from a pretrial

1    conference and the trial motions.  So what I want here is not

2    the motion in limine at trial, is not the motion to exclude

3    this evidence or that.  But it's anything that is in the

4    nature -- and it may not happen here.  But a motion to

5    suppress, an evidentiary hearing.  I heard from Mr. Arnold last

6    time that there was going to be a challenge to the Indictment

7    then coming.

8           So those things ought to be discussed among you

9    collectively.  And a joint proposal, to the extent you can make

10   it, fine.  Again, if your proposals diverge, say so in the

11   filing.  This proposal is made on behalf of these defendants.

12   This proposal is made on behalf of the Government.  Others

13   don't care or don't have an opinion, whatever.

14          Tell me what your scheduling proposals are within two

15   weeks.

16          Yes, Ms. Shipsey?

17          MS. SHIPSEY:  Your Honor, to the extent that this is

18   relevant to the dates, many of us are in that larger case in

19   front of Jones, as you noted.

20          Offer -- plea offers in that case just recently went

21   out.  And yesterday the defense group, as a whole, made a

22   request that that be set over.

23          There may be a request to Judge Jones to set the

24   trial over as well.  And I think the Court noted in our last

25   hearing on this case that the Court may be willing to work with

1  other courts if it deems it necessary.  So I wanted to bring

2  that up because I don't --

3          THE COURT:  The only reason I made the point is that

4  Judge Jones himself mentioned to me this morning the November

5  26 date, and alerting me to take care not to -- not to commit

6  you all to two places at once.  And my solution to that is to

7  move the trial date sooner.

8          MS. SHIPSEY:  And to the -- to the extent that the

9  defense counsel in that -- that other case moves -- is

10  requesting to move that case out further because of where we

11  are --

12          THE COURT:  Then that won't be an issue.

13          But then all of the people in the room who are

14  asserting a right to a speedy trial still are going to get it.

15  I'm going to move the matter as -- as best I can --

16          MS. SHIPSEY:  Thank you.

17          THE COURT:  -- to a trial as soon as I can.

18          I do need to know whether it's a trial of 26; or it's

19  a trial of 11, followed by a trial of 8, followed by a trial of

20  7.  I need to know what your views are.

21          But right now my presumption is a trial of everyone

22  as soon as feasible, and we all work very hard to move that

23  forward.

24          MS. SHIPSEY:  We'll note in the next status report

25  the status of that case.

1          THE COURT:  You may want to give input of it, to the

2     extent you can, on this scheduling part.

3          But I --

4          (Telephonic dial tone.)

5          THE COURT:  Counsel, can you see if your client lost

6     connection?

7          Go ahead and use your telephone here.  You're free to

8     stay where you are to do that.

9          MS. HARRIS:  (Nods head.)

10         THE COURT:  All right.  Thank you, Ms. Shipsey.

11         With respect to the joint -- or to the status

12    hearings, I did note in the agenda I sent out that the first

13    Wednesday of June is not available.  I'm committed on a

14    national assignment that I must be out of the district that

15    day.

16         So I can do the hearing the day before, the Tuesday,

17    which would be the last day of May.  Or I can -- we can move it

18    to the following Wednesday.

19         Votes in favor of Tuesday?

20         Nobody.

21         MR. AUDET:  (Raises hand.)

22         THE COURT:  One.

23         The following Wednesday, then?

24         Yes?

25         (Hands raised.)

1          THE COURT:  Well, then we'll just move it to the

2     following Wednesday.  So that is -- Mr. Minetto, is that the

3     7th?  I think June 7.

4          MR. SCHINDLER:  Your Honor, I'm sorry.  Mr. Salisbury

5     specifically asked me to request that status conferences not be

6     set for the second Wednesday of the month because he has a

7     standing meeting with the Port of St. Helens.  He represents

8     the Port.  So he would not be -- I mean, I can cover for him at

9     those meetings, obviously, if need be.  But he did specifically

10    ask me to raise that scheduling issue with the Court.  I wanted

11    to make sure to do that.

12         THE COURT:  All right.  Thank you for letting me know

13    that.

14         Tell him this is a one-time issue.  And if he needs

15    to be heard further, to be here on the first Wednesday because

16    he doesn't have a conflict that date, right?

17         MR. SCHINDLER:  Got it, yes.

18         MS. SHERTZ:  Your Honor, for clarification, I think

19    that's actually June 8th, Wednesday.

20         THE COURT:  All right.  Thank you.  Seven days in a

21    week.  One plus seven is eight.

22         Oh, I'm out June 8.

23         All right.  Let's see.  Hold on.  Let's get this

24    solved.

25         (Pause, conferring.)

1          THE COURT:  Well, all right.  Would it be a hardship

2   for the parties to do the June conference on Tuesday, May 31;

3   the Tuesday, rather than Wednesday, June 1?  Does anybody see

4   that as a hardship right now?

5          (No response.)

6          THE COURT:  All right.  The June status hearing will

7   be on Tuesday, May 31, not Wednesday.  And I realize this is a

8   burden to the marshals, too, because they've set up assistance

9   to help us.  But for -- yes?

10          MS. BAGGIO:  I'm sorry.  I cannot on the 31st.  If

11   someone else can represent on my behalf, your Honor.  I am not

12   available May the 31st or 1st.

13          THE COURT:  And, Mr. Rainwater?

14          MR. RAINWATER:  I will be flying back from France on

15   that day, but I won't be here till late.

16          THE COURT:  Well, the alternative is to move it to

17   the -- to June 15.  Which, Mr. Schindler, is the third

18   Wednesday of the month.

19          MR. RAINWATER:  That's fine.

20          MR. SCHINDLER:  I think that's going to be fine, your

21   Honor.

22          THE COURT:  Does anybody object to the June matter

23   being -- yes.

24          MS. MAXFIELD:  I will can cover for Ms. Baggio, or

25   she can cover for me.  But I will not available on the third

1    Tuesday in June.  I will be in Italy.

2             THE COURT:  All right.  Would you cover then, please,

3    so that we can do it on the 15th?

4             MS. BAGGIO:  Yes, your Honor.

5             THE COURT:  All right.  June 15.  The status

6    hearings -- now, please note, nine o'clock a.m.

7             I want feedback from counsel through the courtroom

8    deputy --

9             Mr. Kohlmetz?

10            MR. KOHLMETZ:  I'm sorry.

11            THE COURT:  Is there an issue?

12            There's talking going on --

13            MR. KOHLMETZ:  I apologize.

14            THE COURT:  -- and I'm wondering if people are trying

15   to make a point or just chat.

16            MR. KOHLMETZ:  No, there was some discussion with

17   counsel.

18            THE COURT:  With respect to the room layout, we tried

19   hard to make it better than last time.  I hope you found this a

20   little better, but I know you may have suggestions.  So if you

21   do, please let Ms. Boyer know.  The suggestions need to be

22   reviewed with the marshal, as well.

23            There isn't any way we can conduct a jury trial, I

24   think, this way but I don't know.  We will see.

25            What I've learned is that the square footage here, in

1   this well, is larger and more plentiful than that on the 16th

2   floor, and that's why this room was taken.  It's not presently

3   being used on an active basis.  The idea is to keep the tables

4   set up.

5           There are other cases -- Ms. Shipsey's case, and so

6   forth -- other cases with multiple defendants that will be

7   using this kind of setup.  So if you have ideas, please give

8   them to Ms. Boyer, about -- about that setup.

9           We are going to need a plan that I think needs to

10  include input from the parties at the front end about the

11  handling of the jury.  And that is the -- the manner in which

12  the initial summonses go, a jury questionnaire, potentially

13  anonymity of the jurors and the like because of a lot of risks,

14  and other issues that have been discussed.

15          So I want each side to designate representatives to

16  speak together.  And for the next status hearing, I want your

17  preliminary thoughts on what needs to be in a jury plan in

18  order adequately to protect -- to get enough jurors summoned

19  who would be qualified to serve.  That includes, of course,

20  the -- a projection about how long service would be and how

21  many people would be disqualified because of familiarity or

22  strong opinions on a subject that has caused a lot of

23  discourse.

24          So I'm interested in your perspectives, and I want a

25  joint submission at the next status hearing about your thoughts

on how best to accomplish that.  That is -- that being

summoning enough potentially qualified jurors that, after a

voir dire process that will have to be a little different than

what we're used to -- given numbers -- will produce a jury that

can try the case.  I need your recommendations on the number of

alternates you think that you would want.  How jury challenges

would go in a case with 26 defendants.  How -- how they should

be allocated, the numbers, and the like.  So I want your

preliminary thoughts there.

Again, it is important for the record that every time

a defendant waives personal appearance there be a signed waiver

for every hearing.  I'm going to continue to insist on that

because it is a reminder to that person, by signing each

time -- I know it's a bit of repetition.  But it's a reminder

there is a right to attend and that a person is giving that up.

By the way, Counsel, were you able to reach your

client?  Was there an issue?

MS. HARRIS:  No.

THE COURT:  Okay.  Well, not very good, but I

understand.

We asked before if any defendant who is in custody

seeks to waive appearance, that needs to be filed the Thursday

two weeks before.  Two weeks before for any in-custody person.

I doubt any of you do.  But if you do, it's a matter of

staffing for the United States marshals, and I appreciate your

1    working with us on that.  For those who are out of custody, one

2    week before.

3              And we'll say (pause, referring) -- oh, with respect

4    to the start time, I earlier said nine o'clock.  I misspoke.

5    To accommodate the marshal's duties, we need to start at 9:30.

6              I'm going to ask that counsel start practice -- the

7    practice of arriving much earlier than nine o'clock, then;

8    8:30.  So that you can use the time that you're together.

9    No. 1, it's an opportunity to confer.  And, No. 2, to take --

10   to try to avoid things that happen to any of us in coming, that

11   delay all of us starting on time.  And then we'll -- we'll

12   start on time at 9:30.

13             I want to review my list, and then I'll be asking if

14   you have other matters to address.

15             When you -- when you do submit your proposed -- your

16   statement on a proposal for motions scheduling, if you can

17   identify generally the subject of the motions that you already

18   know you think you want to file, that will help me evaluate the

19   timing request.

20             All right.  Does the Government have any other

21   matters to address today?

22             MR. KNIGHT:  No, your Honor.

23             THE COURT:  All right.  Anybody on behalf of

24   defendants, anything else?

25             Yes, Ms. Shipsey.

1        MS. SHIPSEY:  May I just suggest, your Honor, for

2   purposes of the trial and these hearings, that defense counsel

3   in this case be able to get some type of court ID that could

4   maybe further our ability to get in a little bit quickly?  When

5   we all have laptops, bags, et cetera, it's a pretty cumbersome

6   process, especially during trial and motions hearings.

7        THE COURT:  I think that is a good matter to take up

8   in discussion with a representative of the United States

9   Marshal's Office and the Government.  So a joint proposal.

10        MS. SHIPSEY:  I will do that, your Honor.

11        THE COURT:  Pursue it, and see if something can work.

12        MS. SHIPSEY:  The second would be if we could get

13   maybe a large room when we have hearings and looking forward to

14   trial, so that during breaks defense counsel can confer as a

15   group when needed.

16        THE COURT:  Yes.  Well, this morning you'll have the

17   room, as soon as we're finished --

18        MS. SHIPSEY:  Yes.

19        THE COURT:  -- and the marshals have escorted the

20   clients out and the public is gone, you'll have the room to do

21   a meeting.

22        MS. SHIPSEY:  Thank you.

23        THE COURT:  All right.  Ms. Shertz.

24        MS. SHERTZ:  Your Honor, I just wanted to note

25   briefly, in addition to the case that Ms. Shipsey cited --

1  which I also have and I know probably at least a half-dozen of

2  us have, there's another case in front of Judge Simon that's

3  currently scheduled for trial September 20th.  And that's Case

4  No. 15-349.

5          And, looking around, I'm going to guess there's at

6  least ten of us on that case.

7          THE COURT:  That case was filed after this 16-51

8  case.  Right?

9          MS. SHERTZ:  It's a 15-349 case.

10          THE COURT:  Never mind.  All right.

11          MS. SHERTZ:  The point being, there's a whole bunch

12  of really big cases right now that we all got loaded up right

13  before this one.  I just wanted to point out, when you were

14  looking at September dates, that that one is there.  I don't

15  know what the status is going to be in terms of whether it will

16  go or not.  But sort of to plan for that.

17          THE COURT:  Thank you for noting that.

18          Yes, Ms. Wood.

19          MS. WOOD:  Your Honor, just as to Mr. Ritzheimer, the

20  marshals had agreed to hold him downstairs temporarily for a

21  Pretrial Services interview.

22          I just -- I don't know if that got communicated.

23          THE COURT:  Today, you mean?

24          MS. WOOD:  Today, yes.  So I just want to make sure

25  he doesn't get lost in the shuffle.  We'll be right down.

1          THE MARSHAL:  Your Honor, we're aware of that.  He

2    will be there.

3          THE COURT:  Thank you.  Thank you.  That will happen.

4          Anything else, then, for the record?

5          Yes, Mr. Rainwater.

6          MR. RAINWATER:  I am just letting the Court know that

7    in May I will be in France the whole month.  Is it possible, in

8    the May conference, for me to call in?

9          THE COURT:  Yes.  But that's a matter to take up with

10   the clerk.  There are ways.

11         MR. RAINWATER:  Okay.

12         THE COURT:  But it would be good if you had a

13   substitute personally present, too.

14         MR. RAINWATER:  Okay.

15         THE COURT:  All right.  Thank you, everyone, for your

16   work getting organized for today; for your participation here.

17         Please give Ms. Boyer any feedback you want us to

18   consider regarding the way the room was set up.

19         I would like all of the members of the public to

20   please leave the courtroom now.  The Government's counsel to

21   please leave the courtroom now.  Defense counsel -- defense

22   counsel, please stay in the room now.

23         (Conclusion of proceedings.)

24

25

102

*Certificate*

--oOo--

I certify, by signing below, that the foregoing is a correct
stenographic transcript of the oral proceedings had in the
above-entitled matter this 17th day of June, 2016.  A
transcript without an original signature or conformed signature
is not certified.  I further certify that the transcript fees
and format comply with those prescribed by the Court and the
Judicial Conference of the United States.

                    /S/ Amanda M. LeGore
        _____

            AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
                 CSR No. 15-0433  EXP:  3-31-2018