1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,         )
                                       )  Case No. 3:16-CR-0051-BR
4              Plaintiff,              )
                                       )
5    v.                                )  April 6, 2016
                                       )
6    AMMON BUNDY (1),                  )
     JON RITZHEIMER (2),               )
7    JOSEPH O'SHAUGHNESSY (3),         )
     RYAN PAYNE (4),                   )
8    RYAN BUNDY (5),                   )
     BRIAN CAVALIER (6),               )
9    SHAWNA COX (7),                   )
     PETER SANTILLI (8),               )
10   JASON PATRICK (9),                )
     DUANE LEO EHMER (10),             )
11   DYLAN ANDERSON (11),              )
     SEAN ANDERSON (12),               )
12   DAVID LEE FRY (13),               )
     JEFF WAYNE BANTA (14),            )
13   SANDRA LYNN ANDERSON (15),        )
     KENNETH MEDENBACH (16),           )
14   BLAINE COOPER (17),               )
     WESLEY KJAR (18),                 )
15   COREY LEQUIEU (19),               )
     NEIL WAMPLER (20),                )
16   JASON CHARLES BLOMGREN (21),      )
     DARRYL WILLIAM THORN (22),        )
17   GEOFFREY STANEK (23),             )
     ERIC LEE FLORES (25),             )
18   JAKE RYAN (26),                   )
                                       )
19             Defendants.             )
     ==================================)  Portland, Oregon
20

21                      TRANSCRIPT OF PROCEEDINGS

22                          (Oral Argument)

23         BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

24

25

```
 1   COURT REPORTER:            AMANDA M. LeGORE
                                CSR, RDR, FCRR, CRR, CE
 2                              U.S. Courthouse
                                1000 SW Third Avenue Suite 301
 3                              Portland, OR  97204
                                (503)326-8184
 4

 5   APPEARANCES:
     FOR THE PLAINTIFF:         CRAIG GABRIEL
 6                              GEOFFREY BARROW
                                ETHAN KNIGHT
 7                              Assistant U.S. Attorneys
                                U.S. Attorney's Office
 8                              1000 SW Third Avenue
                                Portland, OR  97204
 9                              (503)727-1000

10   FOR DEFENDANT AMMON
     BUNDY:                     LISSA CASEY
11                              MICHAEL ARNOLD
                                Arnold Law Office, LLC
12                              401 E 10th Avenue, Suite 400
                                Eugene, OR  97401
13                              (541)338-9111

14
     FOR DEFENDANT
15   JON RITZHEIMER:            TERRI WOOD
                                730 Van Buren Street
16                              Eugene, OR 97402
                                (541)484-4171
17
     FOR DEFENDANT JOSEPH
18   O'SHAUGHNESSY:             AMY BAGGIO
     (defendant not present)    621 SW Morrison, Suite 1025
19                              Portland, OR  97205
                                (503)222-9830
20

21   FOR DEFENDANT RYAN
     PAYNE:                     RICHARD FEDERICO
22                              Assistant Federal Defender
                                101 SW Main Street, Suite 1700
23                              Portland, OR  97204
                                (503)326-2123
24

25
```

3

```
 1   APPEARANCE: (continuing)
     FOR DEFENDANT RYAN
 2   BUNDY:                    RYAN BUNDY
                               Pro se
 3                             79400-065

 4                             LISA LUDWIG
                               Standby Counsel
 5                             811 SW Naito Parkway, Suite 500
                               Portland, OR  97204
 6                             (503)223-5570

 7   FOR DEFENDANT BRIAN
     CAVALIER:                 TODD BOFFERDING
 8                             1215 B Street
                               PO Box 539
 9                             Hood River, OR 97031
                               (541)490-9012
10
     FOR DEFENDANT SHAWNA
11   COX:                      TIFFANY HARRIS
     (defendant present        121 SW Salmon Street, Suite 1420
12   telephonically)           Portland, OR  97204
                               (503)546-2927
13

14   FOR DEFENDANT PETER
     SANTILLI:                 THOMAS COAN
15   (defendant not present)   1000 SW Fifth Avenue, Suite 1400
                               Portland, OR  97204
16                             (503)221-8736

17   FOR DEFENDANT JASON
     PATRICK:                  ANDREW KOHLMETZ
18                             Raivio, Kohlmetz & Steen, PC
                               741 SW Lincoln Street
19                             Portland, OR  97201
                               (503)224-1104
20
     FOR DEFENDANT DUANE
21   EHMER:                    DAVID AUDET
                               249 NE Lincoln
22                             Hillsboro, OR  97124
                               (503)648-3020
23

24

25
```

```
 1   APPEARANCES:  (continuing)
     FOR DEFENDANT DYLAN
 2   ANDERSON:                    SAMUEL KAUFFMAN
                                  Kauffman Kilberg, LLC
 3                                1001 SW 5th Avenue, Suite 1414
                                  Portland, OR  97204
 4                                (503)224-2595

 5   FOR DEFENDANT SEAN
     ANDERSON:                    MATTHEW McHENRY
 6                                Levine & McHenry, LLC
                                  1001 SW Fifth Avenue, Suite 1414
 7                                Portland, OR  97204
                                  (503)546-3927
 8
     FOR DEFENDANT DAVID
 9   FRY:                         CELIA HOWES
                                  (Appearing for Per Olson)
10                                Hoevet Olson Howes, PC
                                  1000 SW Broadway, Suite 1500
11                                Portland, OR  97205
                                  (503)228-0497
12
     FOR DEFENDANT JEFF
13   BANTA:                       ROBERT SALISBURY
     (defendant not present)      330 South 1st Street
14                                PO Box 1272
                                  St. Helens, OR  97051
15                                (503)397-9000

16   FOR DEFENDANT SANDRA
     ANDERSON:                    TYL BAKKER
17   (defendant not present)      621 SW Alder Street, Suite 621
                                  Portland, OR  97205
18                                (503)721-0140

19   FOR DEFENDANT
     KENNETH MEDENBACH:           KENNETH MEDENBACH
20                                Pro Se
                                  25795-086
21
                                  MATTHEW SCHINDLER
22                                Standby Counsel
                                  501 4th Street #324
23                                Lake Oswego, OR  97034
                                  (503)699-7333
24
     FOR DEFENDANT BLAINE
25   COOPER:                      KRISTA SHIPSEY
                                  820 SW 2nd Avenue, Suite 275
```

```
 1                                   Portland, OR  97204
                                     (503)309-9024
 2   APPEARANCES:  (continuing)
     FOR DEFENDANT WESLEY
 3   KJAR:                           JAMES HALLEY
     (defendant not present)  735 SW First Avenue, 2nd Floor
 4                                   Portland, OR  97204
                                     (503)295-0301
 5
     FOR DEFENDANT COREY
 6   LEQUIEU:                        RAMON PAGAN
                                     121 SW Salmon Street, 11th Floor
 7                                   PMB #1195
                                     Portland, OR  97204
 8                                   (971)270-0421

 9   FOR DEFENDANT NEIL
     WAMPLER:                        AMY BAGGIO
10   (defendant not present)  (Appearing for Lisa Maxfield)
                                     621 SW Morrison, Suite 1025
11                                   Portland, OR  97205
                                     (503)222-9830
12

13   FOR DEFENDANT JASON
     BLOMGREN:                       ROBERT RAINWATER
14   (defendant not present)  Rainwater Law Group
                                     1327 SE Tacoma, Suite 239
15                                   Portland, OR  97202
                                     (971)271-7566
16
     FOR DEFENDANT DARRYL
17   THORN:                          LAURIE SHERTZ
                                     121 SW Salmon Street, 11th Floor
18                                   Portland, OR  97204
                                     (503)406-2136
19
     FOR DEFENDANT GEOFFREY
20   STANEK:                         BEN ANDERSEN
     (defendant not present)  101 SW Madison Street, #9068
21                                   Portland, OR  97207
                                     (503)860-2531
22
     FOR DEFENDANT ERIC
23   FLORES:                         ERNEST WARREN, JR.
     (defendant not present)  Warren & Sugarman
24                                   838 SW First Avenue, Suite 500
                                     Portland, OR  97204
25                                   (503)228-6655
```

APPEARANCES:  (continuing)

FOR DEFENDANT JAKE
RYAN:                     JESSE MERRITHEW
                          Levi Merrithew Horst, LLP
                          610 SW Alder Street, Suite 415
                          Portland, OR  97205
                          (971)229-1241

1          (Wednesday, April 6, 2016; 9:30 a.m.)

2

3                    P R O C E E D I N G S

4

5          THE COURT:  Good morning, everyone.  Please be

6     seated.

7          THE ATTORNEYS:  Good morning, your Honor.

8          THE COURT:  Mr. Knight.

9          MR. KNIGHT:  Good morning, your Honor.  We're present

10    in the matter of the United States versus Ammon Bundy, et al.

11    This is Case No. 16-CR-0051.

12          Ethan Knight, Geoff Barrow, and Craig Gabriel

13    appearing on behalf of the United States.

14          Defendants are present as noted, with counsel.

15    Specifically, your Honor, I will note for the record that eight

16    defendants have executed waivers of personal appearance today

17    and they are as follows:

18          Defendant Shawna Cox has waived her personal

19    appearance.  She is present by phone.

20          Defendant Peter Santilli has executed a waiver of

21    appearance.

22          Defendant Jeff Banta has executed a waiver of

23    appearance.

24          Defendant Sandra Anderson has executed a waiver of

25    appearance.

1          Defendant Wesley Kjar has executed a waiver of

2    appearance.

3          Defendant Neal Wampler has executed a waiver of

4    appearance.

5          Defendant Jason Blomgren has executed a waiver of

6    appearance.

7          And Defendant Eric Flores has executed a waiver of

8    appearance.

9          I will also note for the record, your Honor, that

10   evidently Defendant Geoffrey Stanek is not yet present in the

11   courtroom but will, however, be appearing shortly.

12         Thank you.

13         THE COURT:  Well, let's confirm for the record that

14   as to those defendants you've named, who've waived appearances,

15   each of their counsel is present.

16         MR. KNIGHT:  Thank you.

17         I believe they are, your Honor.  I can name them for

18   the record, if you would like.

19         THE COURT:  Please do that.

20         MR. KNIGHT:  Thank you.  Appearing on behalf of

21   Shawna Cox is counsel Tiffany Harris.

22         Appearing on behalf of Defendant Peter Santilli is

23   Tom Coan.

24         Appearing --

25         MR. COAN:  Good morning, your Honor.

1          MR. KNIGHT:  Appearing on behalf of Defendant Jeff

2     Banta is Robert Salisbury.

3          MR. SALISBURY:  Good morning, your Honor.

4          MR. KNIGHT:  Appearing on behalf of Defendant Sandra

5     Anderson is Tyl Bakker.

6          MR. BAKKER:  Good morning, your Honor.

7          MR. KNIGHT:  Appearing on behalf of Defendant Wesley

8     Kjar is Jim Halley.

9          MR. HALLEY:  Good morning, your Honor.

10          THE COURT:  Appearing on behalf of defendant Neil

11     Wampler is Lisa Maxfield.

12          MS. BAGGIO:  Your Honor, good morning.  Amy Baggio

13     appearing for Ms. Maxfield this morning.

14          THE COURT:  Thank you.

15          MR. KNIGHT:  On behalf of Defendant Jason Blomgren is

16     Robert Rainwater.

17          MR. RAINWATER:  (Raising hand.) Good morning.

18          MR. KNIGHT:  And on behalf of Defendant Eric Flores

19     is Ernie Warren.

20          MR. WARREN:  Good morning, your Honor.

21          THE COURT:  Good morning.

22          With respect to Jake Ryan --

23          MR. KNIGHT:  Yes.

24          THE COURT:  -- is he personally present?

25          MR. KNIGHT:  I believe he is present.

1          MR. MERRITHEW:  Your Honor, represented by counsel

2     Jesse Merrithew.  He has not yet made his first appearance --

3          THE COURT:  As I understand.

4          Good morning, sir.  I asked that you be brought to

5     the courtroom so you could simply observe the proceedings.

6     Officially, they don't start as to you until you're formally

7     presented this afternoon on the magistrate judge.  The record

8     should note he's here for the defendant.

9          All right.  Continue with the other appearances,

10    please.

11         MR. KNIGHT:  Thank you, your Honor.

12         Those are all of the appearances with respect to the

13    defendants who have waived appearance today.

14         THE COURT:  And?

15         MR. KNIGHT:  And with respect to those who are

16    present with counsel in the courtroom, your Honor, Defendant

17    Ammon Bundy is present with counsel, Michael Arnold and Lissa

18    Casey.

19         MS. CASEY:  Good morning, your Honor.

20         THE COURT:  You needn't stand, folks, unless you want

21    to.

22         Go ahead.

23         MR. KNIGHT:  Defendant Jon Ritzheimer is present with

24    counsel Terri Wood.

25         DEFENDANT RITZHEIMER:  (Raised hand.)

1          MS. WOOD:   (Nods head.)

2          THE COURT:  Joseph O'Shaughnessy is not present in

3     the courtroom.  Counsel of record, Amy Baggio, is present on

4     his behalf.

5          For the record, Mr. O'Shaughnessy is in the district

6     of Nevada.

7          Defendant Ryan Payne is present in the courtroom with

8     counsel Rich Federico.

9          Defendant Ryan Bundy is present, acting on his own

10    behalf in the courtroom with the assistance of Ms. Ludwig.

11         Brian Cavalier is present in the courtroom with

12    counsel Todd Bofferding.

13         (Hands raised by Defendant Cavalier and

14         Mr. Bofferding.)

15         MR. KNIGHT:  Jason Patrick is present in the

16    courtroom with Andrew Kohlmetz.

17         DEFENDANT PATRICK:  Good morning, Catherine and David

18    (speaking to audience).

19         MR. KNIGHT:  Defendant Duane Ehmer is present in the

20    courtroom with counsel Dave Audet.

21         MR. AUDET:  Good morning, your Honor.

22         MR. KNIGHT:  Defendant Dylan Anderson is present in

23    the courtroom with Sam Kauffman.

24         Defendant Sean Anderson is present in the courtroom

25    with counsel Matthew McHenry.

1          MR. McHENRY:  Good morning, your Honor.

2          MR. KNIGHT:  Defendant David Fry is present in the

3    courtroom today with counsel Celia Howes standing in for

4    Mr. Olson.

5          MS. HOWES:  Good morning.

6          MR. KNIGHT:  Defendant Kenneth Medenbach is present

7    in the courtroom today acting on his own behalf with the

8    assistance of Matt Schindler.

9          Defendant Blaine Cooper is present in the courtroom

10   with counsel Krista Shipsey.

11         Defendant Corey Lequieu is present in the courtroom

12   with counsel Roman Pagan.

13         Defendant Darryl Thorn is present in the courtroom

14   with counsel Laurie Shertz.

15         MS. SHERTZ:  Good morning, your Honor.

16         MR. KNIGHT:  And that is it, your Honor.

17         THE COURT:  All right.  Thank you.  So we are

18   assembled for the April status hearing in this matter.

19         Before we begin, I want to remind all present that

20   pursuant to the longstanding policy of the judicial conference

21   and consistent with that policy, the local rule of this court,

22   Rule 83-14, no recordings of any type are permitted within the

23   courthouse itself and specifically within this courtroom.

24         Any person who is observed seeking to record these

25   proceedings will be removed from the building.

1          UNIDENTIFIED DEFENDANT:  No First Amendment.

2          THE COURT:  The official record of today's proceeding

3    is being taken by the court's reporter.  Counsel and the media

4    are well advised as to how to obtain a transcript of the

5    proceedings.

6          We are going to begin with addressing calendering

7    matters, the first of which is the scheduling of a trial date,

8    dates.

9          I sent to all counsel yesterday an agenda of the

10   matters we'll be addressing today, and I intend to proceed in

11   its order.

12         The first issue we need to address is whether it is

13   necessary for the court to set any more than one trial date.

14   All defendants presently are named in one Indictment.  It will

15   be an enormous effort for all concerned to participate in a

16   jury trial.  It will be a difficult process to select a fair

17   and impartial jury one time, not to mention multiple times.

18         There are many witnesses I understand the Government

19   and the defendants will want to bring to trial.  The Court is

20   determined to exercise its discretion in a way that respects

21   the right to a speedy trial, one that is fair.  But at the same

22   time, I am duty-bound to ensure that resources are not wasted,

23   that the burden we place on jurors and witnesses is not undue,

24   and that we get to the conclusion of a trial or trials as soon

25   as practicable.

1           So I want to hear the parties' positions with respect
2   to why the Court should consider setting anything but one trial
3   date in the first instance.

4           For the Government, on that point.

5           Mr. Gabriel.

6           MR. GABRIEL:  Yes, your Honor.

7           The Government's position is that one trial date is
8   appropriate at this time, and September 7th should be that
9   trial date.

10          After pretrial motions are litigated, specifically
11  the substantive motions in June, if -- if the Court sets that
12  schedule, then the Government believes at that time it would be
13  appropriate for the Court to entertain motions to sever.

14          But before plea negotiations, before the parties know
15  what evidence will be coming in at trial, before the parties
16  have the full scope of discovery with respect to relative
17  weight of evidence and other factors that are considered in a
18  motion to sever, we believe that a single trial date is
19  appropriate.

20          Additionally, your Honor, we believe that the
21  pretrial schedule, as suggested by the Court in yesterday's
22  e-mail, should be undertaken by all parties together.  And that
23  is another reason to hold the trial date on September 7.

24          At a later point, your Honor, the Government would be
25  prepared to -- to offer the Court its final opinion on whether

1    there should be more than one trial, but at this time we

2    believe one trial is the correct route.

3              THE COURT:  All right.  Thank you.

4              Who is addressing this on behalf of defendants?

5    Anyone?

6              MR. ARNOLD:  I have a position, your Honor.

7              THE COURT:  Yes, Mr. Arnold.

8              MR. ARNOLD:  Mike Arnold for Mr. Bundy.  We agree

9    with the position to the extent that we cannot come to a

10   decision regarding anything until we get a representation from

11   the Government that their **Brady** obligations have been met and

12   we've received all of the discovery.  And we'll address that,

13   too, regarding the motion time lines.  But our investigation is

14   incomplete, and it will probably continue after receipt of

15   additional discovery from the Government.

16             THE COURT:  All right.  Does anyone else have a

17   comment on that point?

18             Excuse me.  Ms. Shertz was first and then Mr. Bundy.

19             Go ahead.

20             MS. SHERTZ:  Thank you, your Honor.

21             I think part of the problem is we don't have a joint

22   position at this point as far as the defense.

23             I object to the trial date in September.  I don't

24   think that we can have a fair trial if it goes in September.

25   The defense is doing everything we can to coordinate, to put

1    our resources together, to pool resources to try to reduce the

2    workload on each lawyer to ensure that we each meet our

3    constitutional requirements to these defendants.  And I don't

4    think it's possible by September.

5            I also don't think the motions deadlines that the

6    Court set out yesterday -- or the day before, forgive me, in

7    the e-mail, are realistic.  We still don't have discovery.  The

8    Government's provided discovery to the panel office that hasn't

9    yet been provided to the defense.  And that assumes that we

10   don't have other cases that we also have constitutional

11   obligations to meet, which every lawyer in this courtroom does.

12           So I object to the dates, both on motion deadlines

13   and the current trial date as unrealistic and unconstitutional.

14           AUDIENCE MEMBER:  Yes.

15           THE COURT:  Counsel -- I'm sorry.  Mr. Bundy, go

16   ahead.

17           DEFENDANT RYAN BUNDY:  Yes, your Honor.  I do

18   maintain my rights to a quick speedy and fair trial.  However,

19   I cannot agree to a specific trial date and/or a motion

20   schedule today because I'm not being afforded the tools and

21   equipment to prepare my defense the same as others, being that

22   my incarceration is withholding me from -- from these things.

23   I have not yet received any discovery at all, to my person.

24   And -- and continually I am being inhibited from communicating

25   with my legal team and -- and with others, that I need to, to

1    be able to build a proper defense.  And until these tools, and

2    so forth, can be afforded me, I am -- I'm crippled.  And so a

3    fair trial is not being afforded to me because of these

4    cripplings right now.

5            And so until these things can be remedied -- and I do

6    have a motion prepared -- or not quite prepared to address this

7    issue that I will be presenting to the Court.  But I cannot

8    agree to a trial date or a motion schedule at this time.

9            THE COURT:  Ms. Ludwig, have you had access to the

10   discovery?

11           MS. LUDWIG:  I've had access -- (coughing), excuse

12   me, to the materials that are generally available but not the

13   materials that were described by Ms. Shertz as being kind of

14   in -- still in the stage of being in the --

15           THE COURT:  And with respect to the material you have

16   had access to, have you begun a process to work with Mr. Bundy,

17   so that he can use those materials?

18           MS. LUDWIG:  We're in the preliminary stages of that,

19   your Honor.

20           It's difficult because of the time limitations and

21   because of the lack of any kind of digital access that

22   Mr. Bundy would have currently.

23           I have been in contact with the jail.  And as he

24   mentioned, I think he will be preparing and filing a motion

25   with my assistance, requesting the Court to direct the marshals

1     to afford him more access to resources.

2              THE COURT:  All right.  Well, I'll take that up in

3     due course.

4              Yes, sir.

5              DEFENDANT RYAN BUNDY:  Well -- and, for instance, I

6     could go into more detail to that.  Simply not having a decent

7     pen or a decent paper or a chair to sit on when I write.  Or

8     not being able to communicate.  Even here, I put in a kite

9     for -- to have some copies made, and it was denied to me,

10    saying that I should go through my standby counsel.  And yet I

11    can't obtain my standby counsel easily.  And she's got

12    schedules such that she can't just come to me at the drop of a

13    hat.  And so I'm continually -- continually a problem.

14             THE COURT:  So I understand the issue, and I look

15    forward to hearing the motion.  Remember it needs to be subject

16    to conferral with opposing counsel before it's filed.

17             All right.  Who else wants to be heard on that?  Yes.

18             MS. WOOD:  Your Honor, I just want to join in what

19    Ms. Shertz has told the Court.

20             I want to make sure the Court understands that the

21    Government's -- I think -- earliest date for completion of

22    discovery or substantial discovery was around the end of May.

23    We don't have discovery yet, and we don't have a -- a vendor to

24    get discovery out to us and that is still being worked on.

25             So the problem that defense counsel is having is that

1    we want to operate efficiently.  We don't want to try to send

2    investigators out talking to people when we don't have all of

3    the discovery and we haven't formulated a plan.

4            We can't -- can't intelligently prepare motions

5    without the thought of maybe we're going to have to submit a

6    second round on the same issue because there may be information

7    in discovery that affects this motion.  And so the problem is

8    we need discovery first.  We need to be able to conduct a

9    defense investigation.  We need to -- to continue to work

10   together, which takes a tremendous amount of time.  You can

11   imagine, with 25 lawyers.  And now the Court wants us to confer

12   in real time with three Government lawyers.  And so --

13           THE COURT:  No, not with three.

14           MS. WOOD:  Okay.

15           THE COURT:  I imagine one of you, representing one

16   issue, will be conferring with one of the Government's lawyers.

17   I never suggested any one lawyer had to confer with each and

18   every assistant U.S. attorney on this.  There needs to be

19   conferral for the very reason you're talking about, however.

20   Because I'm confident that when there is conferral, issues are

21   narrowed and time -- time that would otherwise be used

22   inefficiently in addressing matters that actually aren't in

23   dispute or can be resolved by agreement would be wasted.

24           So conferral is an absolute requirement for every

25   motion unless it's an emergency, in which case I'll deal with

1    it.

2                MS. WOOD:  And I -- you know, I agree completely with

3    the Court.  Again, it's just always a matter of even with two

4    lawyers, one for the defense and one for the Government, being

5    able to connect.

6                So all of these things take time.  And -- and my

7    position, your Honor -- and particularly with Mr. Ritzheimer --

8    there's a large volume of -- of video recordings.  And he was

9    an activist in some unrelated matters that I believe the

10   Government would be using as prior-bad-act type evidence in

11   this case.  It's already been raised in connection with the

12   detention hearings.  So those -- those recordings are perhaps

13   500 hours, is what we understand from the Government.  And

14   there's no way set up yet to even figure out which ones of

15   those apply to Mr. Ritzheimer or to the other clients.

16               And so my realistic assessment of being able to be

17   prepared, and given the fact that I also represent other

18   clients and I have obligations to them and they were

19   preexisting -- I have not taken on any new cases since

20   appointed to Mr. Ritzheimer's case at the beginning of March.

21               So to be able to get that all done, to be effective,

22   I believe that -- that April of 2017 is a realistic trial date

23   for a 25-defendant trial.

24               THE COURT:  Thank you.

25               Yes, Mr. Pagan.

1          MR. PAGAN:  Good morning, your Honor.

2          I -- you know, I want to maintain my client's

3    interest in speedy trial, but I want to speak about the motion

4    schedule --

5          THE COURT:  I'm not talking about motions yet.  I'm

6    talking about a trial date.  I can adjust motion schedules.  I

7    will be backing them up.  I will be modifying them as we go.

8    The issue now is a trial date.

9          MR. PAGAN:  Fair enough, your Honor.

10         I -- one of the things I think that we're dealing

11   with, your Honor --

12         THE COURT:  I can't hear you, sir.

13         MR. PAGAN:  I don't think the Court is aware of

14   when -- the last time we were here, the Government noted that

15   there were 3500 police reports or pages of documents that were

16   given to us.

17         In the weeks that have followed, what we have learned

18   is that the Government intends to give us -- and I'm

19   speaking -- this is kind of secondhand, with a report from one

20   of the defense attorneys in conversation with the Government,

21   between 5 and 10 terabytes of information, including up to

22   500,000 pages of police reports that they say is kind of one of

23   the first waives.

24         That may be a high number.  But all we know is that

25   we're -- the 3500 pages that we received is literally the tip

```
 1   of an iceberg, at this point.  And so it's very difficult, I
 2   think, for all of us counsel here to say today what exactly
 3   we're going to be dealing with.  So even the discussion at this
 4   point about the trial date, I think, may be premature for a lot
 5   of the attorneys here and we're kind of shooting in the dark.
 6             THE COURT:  I think you're repeating points already
 7   made, Mr. Pagan.  So I appreciate the point.  If there's a new
 8   point any counsel wishes to make, please let me know;
 9   otherwise, I want to move on.
10             Yes, Mr. Medenbach.
11             DEFENDANT MEDENBACH:  I would like to join in
12   everything Ryan Bundy said.  All the complaints he has are the
13   same complaints I have.  I haven't been able to get access to
14   anything.  I would truly like to be released to have time to do
15   this kind of stuff.  You didn't allow me to respond on our --
16   our hearing we had last -- on the 11th of March.  But -- I'm
17   sure most of the people, if they get released, then we would
18   have more time to do all of this kind of stuff.  But I'm not --
19   I desire a trial in September.
20             THE COURT:  Yes.
21             MR. WARREN:  Your Honor, I have a murder trial that
22   starts the first week of September, before the Honorable Henry
23   Cantor, Multnomah County.
24             THE COURT:  Mr. Warren, would you e-mail to the clerk
25   the name of the case and the case number, please.
```

1        MR. WARREN:  Yes.

2        THE COURT:  Thank you.

3        Counsel.

4        MR. AUDET:  Thank you.  Dave Audet on behalf of

5   Mr. Ehmer, your Honor.

6        I join in the other concerns specifically raised by

7   Ms. Shertz.

8        In addition, if the trial is to start in October

9   [sic], I anticipate that it would extend well into October.

10       I have other personal and professional conflicts for

11  the month of October.

12       THE COURT:  Yes, Counsel.

13       MR. KOHLMETZ:  Just briefly, your Honor.  I join in

14  the objections raised by Ms. Shertz and Ms. Wood.  I cannot --

15  my professional evaluation in my client's case, I cannot be

16  ready for trial in September.

17       MR. KAUFFMAN:  Sorry, your Honor.  The Court may well

18  be aware of this, but there's another 20-some-odd-defendant

19  trial scheduled in September before Judge Simon.

20       THE COURT:  Well, he told me that he was adjusting

21  the trial date in light of the expectation that this matter

22  would be set for trial in September.  He told me there was a

23  conference in the case to be had yesterday.

24       Is that right?

25       MR. KAUFFMAN:  I was not at a conference yesterday

1    but --

2              MR. BAKKER:  Your Honor, that was actually a

3    different case before Judge Simon.

4              THE COURT:  I think he's well aware of this case and

5    working around it.

6              MR. KAUFFMAN:  Very good.

7              THE COURT:  Yes, Counsel.

8              MS. SHIPSEY:  On behalf of Mr. Cooper, I would also

9    object to a September trial date.

10             Your Honor, one of my concerns that I think we'll be

11   talking about after the status hearing is the lack of funding

12   for many of the CJA attorneys, which I know we will -- we will

13   work on.  But, at this point, there are some of us who don't

14   have adequate funding for our investigators yet.  That's in the

15   pipeline.

16             I specifically have concerns -- we would like to join

17   on the change-of-venue motion.  There is a large venue request

18   in for that.  I understand it's going to take several months to

19   get that data and be prepared to argue that motion.

20             But based on -- even the trial date -- I understand

21   the Court can adjust the motions, that the Court is wanting

22   that to be filed within less than two weeks.  We wouldn't even

23   be able to file that before the trial date as it stands now,

24   your Honor.

25             I know Mr. Kohlmetz is going to talk further about

1    it, but that is a specific example that we have concerns about.
2    And, therefore, we would object.

3              THE COURT:  All right.

4              MR. KOHLMETZ:  Your Honor, I did talk to my proposed
5    expert yesterday.

6              He -- once funding was in place, the best estimate
7    would be 60 to 90 days before the data was available.

8              THE COURT:  Everyone's going to need to work on a
9    different timeline.  This case is not a usual case.  Each
10   defendant has asserted a right to speedy trial, and that is the
11   priority here.

12             So I am not going to treat this case as if it's any
13   other case.  I'm not going to put it at the end of the line of
14   all of your other work.  It is the priority, and it will be set
15   as soon as practical.

16             If there are legitimate reasons why it cannot proceed
17   as set, then I'll hear them at the time.  I appreciate you're
18   all concerned with meeting your responsibilities.  I would
19   expect nothing less.  But the point of having these regular
20   conferences is to move the matter forward.  These gentlemen who
21   are in custody have been in custody since January.  Those
22   lawyers who have been on the case have been on it since
23   January.  I've been told for weeks there are motions to dismiss
24   that should be made, and there isn't any reason they can't be.
25   They don't require evidence.  They don't require discovery.  If

1    there are legal arguments to be made, they need to be made and

2    done now.

3              So we're going to move forward.

4              MR. BAKKER:  Your Honor, I just wanted -- on behalf

5    of Ms. Anderson, I just wanted the record to be clear.  She is

6    out of custody, and she is prepared to waive her speedy trial

7    rights.  And I would second the concerns of Ms. Shertz and

8    Ms. Woods [sic], as far as the trial date goes.

9              THE COURT:  Okay.

10             MR. HALLEY:  Jim Halley, I just want to register my

11   concern about being able to effectively prepare for my client

12   under the circumstances.

13             THE COURT:  May I say that a remark made by any

14   defense lawyer is deemed made by all of you.

15             You don't need individually each to repeat the same

16   point.  It's been made eight times now.

17             Is there a new point any of you need to make?

18             THE COURT:  Ms. Shertz?

19             MS. SHERTZ:  I'm sorry, your Honor, I had a question.

20             I think that when we discussed the trial date

21   previously, you discussed two weeks for the defense case.  The

22   other part of scheduling the trial date is I don't think that's

23   realistic.  If you do the math, that's three hours per

24   defendant for their case.

25             I think these gentlemen want their day in court, and

1    so I think it's probably more like five or six weeks for the

2    defense case in court by the time you include defendants

3    testifying and possible experts that the defense have been

4    conferring and discussing.  So that also affects scheduling.

5    It also backs this case into a case that's over a year old,

6    that's been scheduled -- I don't know if somebody else can help

7    me out when we got the trial dates in the 15-44 case.  But

8    it's --

9              THE COURT:  Is that Judge Jones' case?

10              MS. SHERTZ:  It's been scheduled for more than six

11    months, and our pretrial conference --

12              THE COURT:  No, his case was a September trial

13    setting that just got moved to November.

14              MS. SHERTZ:  And it's -- our pretrial conference is

15    scheduled to start November 16th.  And if you add up the --

16              THE COURT:  You know what, Ms. Shertz, if we're in

17    trial, then you can't be in two places at once.  And even Judge

18    Jones would respect that.  All we can do is the best we can do.

19    Your point is noted.  Please take a seat.

20              Mr. Arnold, what did you want to --

21              MR. ARNOLD:  I just wanted to point out --

22              THE COURT REPORTER:  One at --

23              THE COURT:  One at a time.  And, sir, if you are not

24    going to be quiet, you'll be removed from the room.

25              (Speaking to Defendant Patrick.)

1          MR. ARNOLD:  You know, I don't join in on all of the

2   statements by defense counsel.  I just want to put on the

3   record that we do not agree that September, at this point,

4   is -- is inappropriate.  It's our position --

5          THE COURT:  You made that point, Mr. Arnold.

6          MR. ARNOLD:  I know.  But your Honor said that

7   anything that other attorneys said --

8          THE COURT:  No.  You made a separate point that you

9   agreed with September.

10         Please add only new matter.

11         MR. ARNOLD:  The only new matter I have is I would

12  like the Court to tell -- or at least instruct the Government

13  to get more resources to do more things, to get us the

14  information quicker.  It's not --

15         THE COURT:  Excuse me.

16         MR. ARNOLD:  Yes, your Honor.

17         THE COURT:  Behind you, there is talking going on,

18  and I cannot hear when this happens.

19         If you cannot remain silent, you'll be removed from

20  the room, sir.  Do you understand me?

21         DEFENDANT PATRICK:  I was just asking if there was

22  going to be more violent outbursts by the judge.

23         THE COURT:  I'm asking the man to removed from the

24  courtroom now.

25         Counsel, you'll observe -- take him to a -- take him

1    to a video, so he can watch the room -- the proceedings.

2              THE MARSHAL:  Let's go.

3              THE COURT:  Unless -- hold on a minute.  Sir, if

4    you'll agree to be quiet while I try to conduct this

5    proceeding, you can remain.

6              DEFENDANT PATRICK:  Excuse me?

7              THE COURT:  If you will agree to be quiet, you may

8    remain.  Will you be quiet?

9              DEFENDANT PATRICK:  Is there going to be more

10   violence in the courtroom?

11             THE COURT:  This is not violence.  I'm trying to

12   conduct a proceeding.

13             DEFENDANT PATRICK:  There was a violent outburst, and

14   this is violence.

15             THE COURT:  Sir -- all right.  Marshals, step away

16   from the defendant.  I'll give him one more chance.  You can be

17   quiet and stay, or you can keep talking and you'll leave.  It's

18   up to you.

19             Now, Mr. Arnold, you were saying.

20             MR. ARNOLD:  Yeah, I appreciate the conferrals and

21   the efficiency by defense counsel.  I just understand that the

22   Government has the resources and the power available to -- I

23   can't speak for the efforts they're taking.  I'm sure they're

24   doing their best with the resources they have.  But they need

25   to get main justice involved, they need to get other resources

1    involved.  We would appreciate that.

2              THE COURT:  Mr. Arnold, I've addressed that issue.

3    Anything else?

4              MR. ARNOLD:  No, your Honor.

5              THE COURT:  All right.

6              MS. WOOD:  Your Honor, just on behalf of

7    Mr. Ritzheimer, we would also waive speedy trial.  I want the

8    Court to know that.

9              THE COURT:  Ms. Baggio?

10             MS. BAGGIO:  Thank you, your Honor.

11             On behalf of Mr. O'Shaughnessy, my client will not

12   waive his speedy trial rights, and we are requesting a trial at

13   the earliest possible date.

14             Thank you, your Honor.

15             THE COURT:  Do you have a suggested date, other than

16   those that have been offered by others?

17             MS. BAGGIO:  My original proposal, your Honor, was --

18   was included in the joint status report that was --

19             THE COURT:  September?

20             MS. BAGGIO:  That was October, your Honor.

21             And the Court said, no, it needed to start earlier

22   than that.  I will work with whatever schedule --

23             THE COURT:  Mr. Arnold, I can't hear with your mic

24   on.  So if you're going to confer, turn it off, please.

25             MR. ARNOLD:  Thank you, your Honor.

1        THE COURT:  Say again, Ms. Baggio.

2        MS. BAGGIO:  I will work with whatever schedule the

3   Court deems appropriate.

4        I will be prepared in September, if the Court orders

5   it to begin in September.

6        THE COURT:  We'll all do the best we can do.  I know.

7        All right.  Anything else that's new on the issue of

8   the setting of the trial date?

9        There are many competing interests here.

10       I understand that there may be presented in the

11  future reasons why not all defendants should go to trial at the

12  same time.

13       There may be motions to sever filed.  There may be

14  issues that actually materialize regarding the concerns counsel

15  are expressing as to an ability to actually be ready for trial,

16  which in turn depends upon the Government meeting its

17  obligation to provide discovery timely and in a manner that

18  allows each of the defendants to move forward.

19       Today, I am going to set a jury selection to begin on

20  Wednesday, September 7.

21       And until further -- further order of the Court, that

22  is a trial date for all defendants.

23       I will take up motions to sever or motions to

24  continue once there is a real record where a lawyer can make a

25  point and establish that there isn't any way to go forward.

1            For now, the priority is the speedy trial right of

2     each of the accused, and I am insisting that everyone keep that

3     paramount.

4            If a lawyer, after the exercise of all due diligence,

5     cannot be ready, then you'll have to make that motion, and I'll

6     take it up at the time.

7            But we are going to press forward now, premising our

8     preparation -- all of us -- on jury selection beginning

9     September 7.

10           Now, let's move to the issue of motions.

11           As I already referenced, there have been points made

12    at both prior proceedings that there are legal motions

13    defendants wish to make.  They need to be made, and I assume

14    you've been preparing them.

15           The idea of requiring you to file a motion that you

16    just think of today, tomorrow will not be reasonable, and I

17    would not be suggesting that.  But from the very first

18    proceeding I was told there will be legal arguments, dismissal

19    arguments to be made, and that they needed to be addressed

20    promptly.  In the status report, I was told there were four

21    grounds for a dismissal motion.

22           I need someone to tell me what those grounds are now,

23    so that I can take that into account as I set a schedule for

24    motion practice.

25           Who among the defendants can address that?

1          Ms. Baggio.

2          MS. BAGGIO:  Thank you, your Honor.

3          I would state that the basis of the four motions, as

4  referenced, was because of the potential legal arguments

5  related to motions to dismiss counts 1, 2, 3, and 6.  And

6  that's why it's listed as four separate.

7          We are coordinating and organizing amongst ourselves

8  to separate --

9          THE COURT:  What are the grounds for dismissal of

10  Counts 1, 2, 3, and 6 that defendants are anticipating raising

11  in motions?

12          MS. BAGGIO:  Well, your Honor, I can speak to Count 1

13  because that is the one to which I'm assigned.  And I am

14  researching the question of the constitutionality of 18 U.S.C.

15  Section 372.

16          I believe that the statute is ripe for a challenge as

17  to vagueness because it results in the criminalization of

18  constitutionally protected conduct, including the right to

19  freedom of speech, assembly, as well as to possess a firearm.

20          THE COURT:  All right.

21          MS. BAGGIO:  I'm also looking with regard to that as

22  an overbreadth challenge as well.  That is the one that I'm

23  working on, your Honor.

24          I can't speak to the specifics of the other counts.

25          THE COURT:  All right.  Presumably some one of your

1  colleagues can.

2          Who -- who is working the dismissal theories as to

3  Count 2?  Anyone?

4          MR. ANDERSEN:  Your Honor, this is Benjamin Andersen.

5  I have been informed -- I was in the process of researching

6  that.  I don't have anything to present to the Court at this

7  time about what the --

8          THE COURT:  Count 2 is the carrying of a firearm in

9  furtherance --

10          MR. ANDERSEN:  Right.

11          THE COURT:  -- of a crime of violence; that is, Count

12  1.

13          MR. ANDERSEN:  Right, your Honor.  I do believe there

14  could be some vagueness challenges to that, as to what is a

15  crime of violence, how it applies to another specific count.

16          Potentially, it could be overbroad, based on some of

17  the same issues that Ms. Baggio raised.  It's constitutionally

18  protected, ability to possess a firearm.  That could be another

19  issue there that could be raised, your Honor, if you're talking

20  prospectively.

21          THE COURT:  Actually I misspoke.  Count 3 is the

22  count I referenced, the carrying of the firearm in connection

23  with the crime of violence, which was Count 1.

24          Count 2 is possession of a firearm and dangerous

25  weapons in federal facilities.

1          MR. ANDERSEN:  Right, your Honor.  And I was sort of

2     addressing -- I apologize.  I was generally addressing that

3     count as well, the possession of firearms in a protected

4     facility -- or, excuse me, in a facility, could be a grounds

5     for a constitutional challenge as that also hinges on the

6     rights of citizens to possess arms.

7          It could potentially be vague as to what exactly is

8     meant by a federal facility.  There are some factual issues I

9     think that relate to that as well, but I believe there could be

10    a legal challenge.

11         THE COURT:  All right.  Count 3.  Who, among the

12    defense counsel, was looking into a motion to dismiss on that

13    count?

14         MS. BAGGIO:  Your Honor, I believe that Ms. Hay and

15    Mr. Olson are taking the lead on that.

16         THE COURT:  Okay.

17         MS. BAGGIO:  And I have some understanding, but if

18    the Court --

19         THE COURT:  Well, can you tell me what you think the

20    gist of the concern is?

21         MS. BAGGIO:  Yes, your Honor.  The gist of the

22    concern is that an 18 U.S.C. 372 charge, which is the

23    cross-reference count in the 924(c), is not a crime of

24    violence.

25         THE COURT:  Well, that ought to be a discrete

1    argument to raise --

2            MS. BAGGIO:  Right.

3            THE COURT:  -- and present.

4            And then Count 6 is the depredation of Government

5    property count.  Who -- who was going to be addressing

6    dismissal on that count?

7            MS. BAGGIO:  Your Honor, I believe there's some

8    discussion among the defense counsel as to who's going to do

9    that, but I understand it also relates to a potential vagueness

10   challenge.

11           THE COURT:  Okay.  All right.  Let me get a list of

12   the other -- so-called other group 1 motions, that the parties

13   had alerted me to, in front of me.  Give me a moment.

14           (Pause, referring.)

15           THE COURT:  I understand the venue change motion may

16   depend upon data that the parties will want to develop.  So I

17   understand that may need some -- some time to put together.

18           Of the other motions with -- that the parties listed

19   in -- under the so-called group 1 and group 2, are any of them

20   dependent upon evidence -- or put another way, are they -- how

21   many of them are the kinds of motions Ms. Baggio was just

22   discussing?

23           Purely legal arguments that don't -- don't turn on

24   access to discovery.  Whether Count 1 is the kind of crime of

25   violence as to which a Count 3 charge can be brought is a

1   question of law.  It does not depend at all on what the

2   Government's evidence is.

3          Counsel?

4          MR. KOHLMETZ:  Your Honor, there are some federal

5   jurisdictional issues that I've been charged with looking into.

6   They are legal issues.  They are complicated.  I have asked for

7   funding for a law clerk to assist me with those, but I -- those

8   are legal issues --

9          THE COURT:  So my point remains.  The matter's been

10  pending eight weeks, and these legal matters are legal matters

11  that you're all charged with addressing.  We need to go

12  forward.

13         MR. KOHLMETZ:  And I am going forward, and I have a

14  pending final request --

15         THE COURT:  I am going to be setting a schedule for

16  the filing, then, of purely legal motions.  And then we'll set

17  another date for those motions that the parties contend depend

18  upon more discovery coming.  And then we'll have a final round

19  of pretrial motions, conceptually consistent with the way I've

20  laid out.

21         Before you speak, Ms. Baggio was still on her feet.

22         (Mr. Arnold sitting.)

23         MS. BAGGIO:  Thank you, Judge Brown.

24         As the Court described, that's why we separated them

25  into round 1 and round 2.  And the thought is that either the

1    round 2 motions are going to require some sort of evidentiary

2    hearing or they rely on our ability to review discovery prior

3    to be able -- to figure out whether we're going to have a

4    motion or not.

5         So when we were communicating amongst ourselves and

6    trying to brainstorm on what possible motions there are, it may

7    be that once I get discovery and look at a particular report, I

8    say, Okay, this is no longer a legal issue.  So the point was

9    simply to place-hold potential --

10        THE COURT:  Sure, I get that.

11        MS. BAGGIO:  Okay.  But that's why we separate them

12   into 1 and 2.

13        And when the Court -- I believe the Court had asked

14   about the possibility of shifting some of the round 2 motions

15   into round 1.

16        THE COURT:  Right.

17        MS. BAGGIO:  I would state that, from my perspective,

18   I would ask the Court not to do that.  We did spend a lot of

19   time coming up with this schedule, and there was a reason why

20   we asked for them to be set later, your Honor.

21        THE COURT:  Good enough.

22        Counsel.

23        MR. ARNOLD:  Your Honor, additionally, some of the

24   conflict in a purely legal motion would include a

25   jurisdictional issue we have regarding Article 1, Section 8,

1    Clause 17 of the Constitution.

2           There's some legislative -- quote/unquote, framers of

3    legislative history that was not included in some of the prior

4    Supreme Court analysis and -- in our opinion.  And it needs to

5    be brought to the attention of the Court.  And it is a purely

6    legal matter, but some of these -- actually, they're all

7    historical documents from the time of the framers.  They're

8    available and referenced in at least one law -- law review

9    article that I found that talked about the enclave clause

10   versus the property clause and how -- how -- what the framers

11   intended.

12          And I believe I'm going to have to actually go and

13   locate at least an online database that hopefully has some of

14   these scanned in.  But according to the law review article,

15   most of them were not discovered, that may change the

16   perception of enclave-versus-property clause analysis until

17   some time prior to the '90s, I think, is what the law review

18   article said.

19          So that is going to take some time.  And I only bring

20   that up to the Court because a large portion of our time is

21   responding to leads and evidence and witnesses and coordinating

22   an investigation while simultaneously, of course, doing these

23   other things.  So I don't anticipate that our motion to dismiss

24   on those grounds will be available in the first round because

25   of that.

1          THE COURT:  Well, you're not going to have a choice.

2    You'll do one round of motions that are legal motions; there

3    will be one round of motions that depend upon discovery and

4    evidence; and then we're going to deal with the trial motions.

5    Because in order to respect the defendant's right to a speedy

6    trial, we need to move in an orderly way.  If the Court didn't

7    have jurisdiction, that would need to be addressed immediately;

8    not eight months, five months, or six months down the road.

9          So you've got your arguments.  You make them as best

10   you can, like any other lawyer does after conferral with

11   opposing counsel, and then we move forward.

12         So it sounds to me like those who would be moving

13   feel that April 20th, the deadline I set for the first round,

14   is too soon.

15         MR. McHENRY:  Yes.

16         THE COURT:  All right.  My premise in setting April

17   20 as an initial deadline for those motions was in hopes that

18   those legal motions could be heard at the May status hearing.

19         If we don't file them by April 20 and have responses

20   on a very quick turnaround, then I likely can't hear them until

21   June, and that is getting very close to pushing other issues.

22         So I think what I will do is direct you -- I want you

23   all to confer about a date between the May status hearing and

24   the June status hearing when we could have a hearing on

25   motions -- on the round 1 motions, so that you're not pushed as

1    hard as I had anticipated in the 4-20 suggestion.

2          I want two different dates that you suggest, so that

3    I can consider the Court's availability on other matters, and

4    then I will back up from that date.  I'll find a hearing date.

5    I'll back up from that date to allow the filing of all the

6    legal motions, filing of a response.  Again, no replies because

7    we simply will need to move forward.

8          I'm inclined to limit the length of these motions for

9    purposes of requiring a concise explanation.  And to the extent

10   more page length is needed for particular development, then you

11   would have leave to ask for it before the filing deadline.

12         But, again, it's a management decision I'm making in

13   order to ensure that we just get to the point of the motion,

14   whatever it is.

15         If the conspiracy count is not capable of being a

16   crime of violence, one ought to be able to say that in ten

17   pages of substance or less.

18         The standards are what they are.  We don't need pages

19   and pages and pages of rhetoric.  We need law and the point and

20   a response and an opportunity to be heard.

21         So defendants, pick your representatives.  I don't --

22   I don't need to know who they are.  Mr. Gabriel will be the

23   coordinator on the Government's side for identifying two

24   different hearing dates after the May status date and before

25   the June status date on which hearings can be conducted.

1          The Court is not available from May 31 to June 8, so
2     you cannot use those dates.
3          And then I want that date submitted to me by
4     Friday -- well, what's today?  Let's say by Monday, noon.
5          In the meantime, you better get going on your
6     motions.  It won't be April 20th, but you need to get going, so
7     that you're ready to file your law motions on the -- by the
8     date indicated.  And then I'll adjust, therefore, on the other
9     motions as well.  We may have to wait until May -- at the May
10    status hearing to -- to set a firm date on those, by which I
11    think it's fair to expect the Government will have resolved
12    most if not all of these complaints about discovery.  Because,
13    in the end, it does rest at the Government's table to get to
14    the defendants the discovery they're entitled to, and we can't
15    simply say you have to wait weeks.  It just isn't acceptable.
16         And I do agree with Mr. Arnold that the Government
17    has to provide the resources necessary to meet these demands.
18    And if there aren't enough, I trust, Counsel, you'll be
19    addressing that at your end.  But you simply have to move to
20    put your opposing counsel here in a position where they can
21    proceed.
22         So I won't set any more motion dates yet.  I do want
23    to move forward on a jury plan.  And I think the best way to do
24    that is for me to propose an initial plan about the numbers and
25    manner and dates of summonsing, the manner in which I conceive

1    a fair jury selection process can occur on the present

2    assumption of everyone participating.

3            So I had set in my e-mail message to you April 20 as

4    a day when I can get that to you.  I think that's probably now

5    going to move out a couple of weeks, in light of your

6    persuading me that the legal motions need to move out a bit.

7    But I will be giving you an initial framework around which I

8    want discussion and then legal analysis about the parameters

9    I'm going to be setting, to the extent they're -- there may be

10   objections or better ideas on how to do this.  I think you've

11   come up with some very good suggestions.

12           My general expectation is that we will need to

13   summons a very large jury pool in the first instance.  We will

14   need to do screening for hardship and availability in the

15   summons process so that we can quickly and efficiently excuse

16   potential jurors who have a true hardship and cannot serve in

17   the time expected.

18           And then once that pool is reduced to a more

19   meaningful number, to summons them in groups that are

20   manageable, to come to court to complete a written

21   questionnaire; into which you clearly will have input.  So that

22   you will have answers to a number of the questions as to the

23   specific jurors' backgrounds, attitudes, experiences, and the

24   like, before any voir dire starts.

25           And I appreciate that once those questionnaires are

1    completed, we will need a break in time sufficient for counsel

2    to review those questionnaires, so that you can hopefully come

3    to some agreement about jurors who obviously should be excused

4    at that stage because they're not qualified or have amplified

5    on hardships.  So that we would, again, reduce the pool, if

6    possible, by agreement or by court ruling.

7            And then once we have a pool of jurors who have

8    completed the questionnaire, as to whom you know their

9    biographical backgrounds and attitudes, we would have a voir

10   dire process.  But it's -- given the nature of the case --

11   going to be a different process than the ones that happen in a

12   one-defendant case.  It's just the way it has to be, to manage.

13   But that's what I have in mind.

14           So I'll be giving you more detail on that and then

15   allowing and requesting your joint feedback, so that we can get

16   a jury plan in place.

17           The reason it's necessary to do this, to start

18   working on this now, is if we do expect jurors to show up to

19   fill out questionnaires on the 7th of September, then we'll

20   need to start identifying that larger pool, going through the

21   process of the true hardship challenge and moving people

22   through that -- that exercise.

23           So let's go to the discovery issues.

24           MS. BAGGIO:  Your Honor, excuse me.

25           THE COURT:  Yes.

1          MS. BAGGIO:  If I may, with regard to the jury plan,

2     in the Court's e-mail from yesterday, the Court stated that the

3     parties would be able to offer comments no later than April the

4     13th.

5          THE COURT:  Oh, well, that was a mistyping.

6     Disregard.

7          I thought I was going to be sending it out April

8     20th.

9          MS. BAGGIO:  Correct.

10         THE COURT:  And I did -- you're right.  I did say

11    send comments by April 13.

12         If -- if you all would like to send a joint statement

13    about things you want me to include in the first draft, that's

14    fine.  I'll set a new deadline for that.

15         But I have already seen the -- the submission made in

16    the joint report.  I think Mr. Anderson did a lot of the

17    background work there, and I'm hearing your points.

18         You are going to have a dispute over the number of

19    challenges, and those things.  Those are legal matters we'll

20    take up later.

21         What I have more in mind right now is simply trying

22    to set the steps that need to happen in order that we get a

23    reasonable return on the summonses.  We get a process in place

24    so that jurors fairly can be considered.  But at the same time

25    respecting their concerns, too, about the length of time and

1    their participation in this particular case.

2            So do -- do you think it would be helpful for

3    additional submissions, beyond the comments I've made, in

4    response to what was submitted?

5            MS. BAGGIO:  I would like to have that opportunity.

6            THE COURT:  All right.  Then you take charge, with

7    Mr. Anderson, jointly.

8            I'll pick a date -- once I get through all of these

9    other dates -- for you to do that, and I'll include a

10   consideration of it.

11           But then it needs to be a joint submission, so the

12   Government would need to be looped in too.

13           Did you have anything you wanted to add to that,

14   Mr. Andersen?

15           MR. ANDERSEN:  Just -- thank you, your Honor.  One

16   thing.

17           In my discussions with the clerk's office, in order

18   to effectuate a plan that would include at least one or

19   potentially two rounds of questionnaires, I think that it would

20   be important to get any such mailing, or anything like that, to

21   the clerk's office -- I believe -- sometime in mid-June

22   potentially, or -- or maybe even earlier.

23           THE COURT:  That's why it's on the docket for -- for

24   us to think about now.

25           I think, conceptually, the first communication to the

1    random pool of jurors will be fairly generic.  It will include

2    a questionnaire that addresses hardship challenges.  It would

3    not be the substantive questionnaire.

4          My concerns there have to do with the need that each

5    juror completes the questionnaire personally, when it comes to

6    those substantive issues all of -- all of counsel will be

7    concerned with.  And there's been concern when these

8    case-specific questionnaires are sent that people other than

9    the potential juror concludes them, and that isn't acceptable.

10         So I think probably we will have to only do screening

11   for time and hardship, employment issues, health issues, time

12   commitments, that kind of thing, in the first kind of

13   questionnaire; and not -- not specific to the case.  And then

14   we'll need a -- a case-specific questionnaire that covers the

15   kinds of issues that are unique to this case in particular, as

16   well as the other issues.

17         Jurors' attitudes, jurors' exposure to the

18   information that has been publicly available about the

19   controversies, and so forth.

20         MR. ANDERSEN:  I think that presents a good

21   framework.  I would also like to alert the clerk -- or the

22   Court to -- I believe that the defense will be asking that the

23   jury pool be -- be chosen from the entire District of Oregon.

24   And maybe the general practice that for trials, they are --

25   they -- potential jurors are chosen just from the -- just from

1    the -- from the -- the -- what is it?

2              MR. RAINWATER:  Division.

3              MR. ANDERSEN:  Thank you.  From the division.

4          And I realize we're not litigating this right now,

5    but this is -- I anticipate that we will ask that the jury will

6    be pooled from the entire state.

7              THE COURT:  You'll have an opportunity to make the

8    request.  Of course, it will need to be supported with

9    reasoning and authority and conferral with the Government's

10   counsel.

11             Actually, before we go to discovery, I did want to

12   address this issue that Ms. Baggio has raised repeatedly about

13   access to her client.

14             I did ask the Government look into this and see if

15   the issue couldn't get solved.  Who -- who did that?

16             MR. BARROW:  Your Honor, I did do that.

17             I reached out, as ordered, to the District of Nevada,

18   and just learned a little bit more about Mr. O'Shaughnessy's

19   status.

20             He is being housed in what is known as CCA7 Nevada

21   detention center.  That is a private facility, but it contracts

22   solely to house federal detainees.

23             I -- at my request, AUSA Nick Dickinson reached out

24   to the marshal's coordinator with that facility to ask about

25   Mr. O'Shaughnessy's case.  That phone call occurred this

1    morning, so I haven't heard back about it.  But I understand,

2    from talking to Ms. Baggio, that she was able to have some

3    contact with Mr. O'Shaughnessy this week.

4            I told Ms. Baggio that I would continue to work with

5    her, Nevada, and the marshals in Nevada to assure that there is

6    no issue with access.

7            Nevada told me that they don't typically have a

8    problem of this nature with people they have at that facility.

9    So they don't anticipate there being issues.

10           They also have not heard from Mr. O'Shaughnessy's

11   Nevada attorney, that she has had any issues with contact with

12   Mr. O'Shaughnessy.  But I did make a commitment to Ms. Baggio

13   that this is unacceptable, and we will make sure it's not an

14   issue going forward.

15           I know she has concerns about what's happened in the

16   past, but I'm just focused on fixing things for the future.

17           THE COURT:  Ms. Baggio, anything you would like to

18   add or any suggestion that you may want me to consider?

19           MS. BAGGIO:  Well, your Honor, I do believe this is a

20   fundamental -- fundamentally important issue.

21           And I have been without contact with my client since

22   his arrest on March the 3rd until this week.

23           And I have made repeated attempts when he was housed

24   at a private prison in Arizona, as well as making requests

25   through our local U.S. Attorney's Office to help me set up a

1    phone call to speak with him.  I was never able to speak with

2    him or communicate directly when he was in Arizona.

3            His Rule 5 attorney was willing to pass certain

4    messages to him on my behalf, but obviously that's not

5    effective communication.

6            Upon his transfer to the District of Nevada and his

7    placement at the new private prison, I have also been unable to

8    communicate with him, despite repeated attempts.  And that is,

9    again, up until this week.

10           I would like the record to reflect, your Honor -- and

11   this came up in the hearing -- I believe it was on the 22nd --

12   with regard to the transport order.  It has been a nightmare.

13   It has been so difficult for me, under the constraints that I'm

14   operating, to be able to talk with him.  This is fundamentals

15   of representation --

16           THE COURT:  Ms. Baggio, your point is not disputed.

17   I'm trying to get to the bottom to solve it, and you've made

18   this issue very clear.

19           How did it happen this week that you got contact?

20   How did that work out?

21           MS. BAGGIO:  Thank you, your Honor.  Thank you.

22           Well, with the private prisons, in order to speak

23   with an inmate, the inmate tries to call you.  And then you

24   hear that it's this person's voice on the phone.  And then if

25   you want to speak with them, you press 1.

1          Well, at that time, the call -- it's being handled by

2  another private subcontractor phone company.  And I have

3  tried -- both when he was in Arizona and then in Nevada -- to

4  set up this phone service so that I could speak with my client;

5  at exorbitant rates.  It's just outrageous.  And I have been

6  unable to do so until this week.

7          And what happened, your Honor -- and I think this is

8  important -- is that after spending a lot of time on this --

9  and this goes to the Court saying, you know, you guys need to

10  be working on motions; you need to be doing these other

11  things --

12          THE COURT:  Ms. Baggio, my points are for the record

13  as a whole.  And I will simply note that, as everyone in this

14  room knows, you have carried a huge share of the burden.  And

15  it's appreciated by everyone.  I understand.  I'm trying to

16  figure out what it is I can do --

17          MS. BAGGIO:  Understood.

18          THE COURT:  -- to assist.

19          MS. BAGGIO:  Thank you.

20          So this week, when I was able to set up a

21  relationship with this private company, I asked, Will my

22  telephone calls be recorded?  And the person who set up the

23  phone conversation said, Send us a letter on your letterhead,

24  by fax or e-mail, and it will automatically no longer be

25  recorded.  I sent it both ways.

1          At that time my client called me, and he said -- for

2     the first time we're speaking, your Honor.  And he -- I said,

3     Now, I don't know this private company, but they're telling me

4     this isn't recorded.  And he says, Well, what I'm looking at,

5     at the phone here at the prison, it's telling me it's being

6     recorded.

7          Later, yesterday -- yesterday, your Honor, I spoke

8     with someone who was actually at the prison, the prison

9     employee.  And she was very kind and understanding.  She

10    didn't -- she wasn't familiar with this private company that's

11    providing the phone service, and she didn't understand who it

12    was to whom I sent my letterhead.

13         And she said to me, No, that decision as to whether

14    it's recorded or not happens within the prison.  So I'm not

15    sure who you were talking to or who's making a decision outside

16    the prison.  She says, As far as the prison is concerned, we

17    will now mark it so that your cell phone and your work number

18    will no longer be recorded, but I can't speak to whatever else

19    might be going on.

20         Therefore, your Honor, I have made the two contacts

21    that I know of, in order to establish nonrecorded phone calls.

22    But --

23         THE COURT:  Do you believe you had a nonrecorded

24    conversation with your client then, after this happened?

25         MS. BAGGIO:  I have not spoken with my client after

1    the communication with the prison yesterday.

2              THE COURT:  All right.

3              MS. BAGGIO:  So I'm supposed to speak --

4              THE COURT:  Is there something you think I can or

5    should do?

6              MS. BAGGIO:  (Raising hands up.)

7              THE COURT:  I would say that means no at the moment.

8              MS. BAGGIO:  Well, I --

9              THE COURT:  If you think there's something specific

10   the Court can do, you have leave to contact me directly, with a

11   representative of the Government.  Because this is a priority,

12   I am committed to getting it resolved.

13             If, for example, the transport order that I did enter

14   stands and if the marshal returns Mr. O'Shaughnessy to Oregon

15   with the other defendants who I directed could be transported,

16   then that's a way that you will be back in personal contact.

17             If something else interferes, have you considered

18   flying there to go speak with him?

19             MS. BAGGIO:  Yes, your Honor.  There's lots of moving

20   pieces, and I was hoping he might be released on the Nevada

21   case and that would also solve these problems.  And I will -- I

22   will wait.  I'm hoping, when I talk to him tomorrow, that the

23   phone call will not be recorded.  If it is, I will come back to

24   the Court and -- with Government counsel, and address this.

25             THE COURT:  So Mr. Barrow is charged to get this

1    problem solved.  So your first resource is he.

2            And if you believe a court order is needed to move

3    the matter forward, then you two contact me directly.

4            MR. BARROW:  We'll do that, your Honor.

5            THE COURT:  All right.

6            MS. BAGGIO:  Thank you.

7            THE COURT:  So give me just one moment here.  I want

8    to move to the discovery issues now.

9            (Pause, referring.)

10           MR. PAGAN:  Your Honor?

11           THE COURT:  Just one minute, please.  I asked for a

12   minute, please.

13           (Pause, referring.)

14           THE COURT:  Mr. Pagan, what did you want to add

15   before we move to this?

16           MR. PAGAN:  Yeah --

17           THE COURT REPORTER:  Is your mic on, please?

18           THE COURT:  Your microphone needs to go on, please,

19   so we can hear you.

20           MR. PAGAN:  So item No. 5, 6, your Honor, or -- I

21   think No. 6, on the last issue.  Regarding the tentative

22   schedule and the filing of motions, and the other things that

23   we're talking about, your Honor, I see in this -- the Court's

24   proposed plan here, I know some things have been moved.  But

25   one thing I think we need to talk about here is that it appears

1    the Court wants us to file pretrial motions in or about July.

2            And one of the questions I have for the Court is if

3    the Court would be willing, in this particular instance --

4    considering the unique nature of this case and the fact that we

5    still don't have the majority of discovery -- is moving up a

6    requirement on the Government to provide counsel with a

7    proposed exhibit list and witness list.  Because I think to

8    require defense counsel on, you know, 500,000-plus statements,

9    et cetera, to kind of shoot in the dark as to what the

10   Government might be doing, the Court might be receiving a bunch

11   of motions that are theoretical --

12           THE COURT:  Mr. Pagan, I didn't make myself clear.

13   The only deadlines I'm going to set, after today, on the

14   motions are for the first-round motions.  I'm going to consider

15   other scheduling with respect to these other ideas.

16           Clearly the deadline by which a defendant needs to

17   move to exclude Government evidence depends upon the defendant

18   knowing what the Government's case is going to be.  I am

19   limited by the **Jencks** Act.  I'm also enabled to suspend the

20   trial at any point when I believe a defendant hasn't had a fair

21   opportunity to prepare because the Government didn't give

22   advance notice.

23           I'm going to use those parameters to move the matter

24   forward.  So I understand the point.

25           MR. PAGAN:  And I guess --

1          THE COURT:  I'm not making the decision today.

2          MR. PAGAN:  Right.  And I guess I'm just planting the

3    seed, your Honor, that we discussed.

4          THE COURT:  It's planted, Mr. Pagan.  The tree is

5    growing.  It's getting sun, water, nourishment; unlike the rest

6    of us.

7          All right.  Discovery.  With respect to the

8    protective order that was signed after the last hearing, there

9    were two defendants who did not sign on to the stipulation.

10          Ms. Baggio was one, for the reasons we've already

11    noted.  Mr. Ammon Bundy reserved objections.

12          Last night, a very long submission, Mr. Arnold, was

13    made, which was really outside the scope of the scheduling

14    order I set at our first hearing.  Your arguments should have

15    been included in the joint status report in a concise way.  You

16    didn't give me enough time consider them because you went

17    outside that direction.

18          So for today, your written filings are what they are.

19    To me, they looked essentially repetitive of the point you made

20    the last time we were in court.  I'm going to ask the

21    Government for a timeline within which they can file a written

22    response, and then we'll move on.

23          So, Mr. Bundy?

24          DEFENDANT RYAN BUNDY:  I just wanted to add my name

25    to this same motion that you just spoke about from my brother

1   Ammon.  And add that new information is -- is pending and --

2   pertaining to that and related to an inspection of -- the grand

3   jury inspection.

4          Anyway, I wanted to make on the record that I had

5   my -- that objection.

6          THE COURT:  I'll note that Mr. Bundy joins the

7   objection made by Ammon Bundy to the protective order that is

8   in place.

9          I do want a Government written response to the

10  written objections that were filed and an estimate of when that

11  can happen.

12         Mr. Gabriel?

13         MR. GABRIEL:  We can file a response within seven

14  days, your Honor.

15         THE COURT:  All right.  April 13.

16         And then I'll take the issue of those objections

17  under advisement on April 13 and resolve them by written order.

18         Now, the discovery management issues, generally.

19  We've already heard many complaints that defense -- defendants

20  are not getting what they need, and they're not getting it soon

21  enough.  So I need the Government to tell me what is being done

22  to address those legitimate concerns.

23         The case cannot move forward unless the Government

24  produces the material that the defendants are entitled to have

25  and does it in a way that allows defense counsel enough time

1    meaningfully to access the material and to meet the schedule

2    that I'm trying to set in order to respect each defendant's

3    right to a speedy trial.

4            Who's on discovery?

5            Mr. Barrow.

6            MR. BARROW:  Thank you, your Honor.  Just by way of a

7    status report on what has been produced, we have produced six

8    volumes of discovery.  Volumes 1 and 2 were produced

9    individually to all of the defendants.  Obviously, we have some

10   new defendants now, and we will endeavor to get them that

11   discovery as soon as possible.

12           But Volumes 3, 4, 5, and 6 were provided to the CJA

13   coordinating counsel, Jennifer Horvath, through a secured hard

14   drive.  And that was done in two separate productions, the

15   latest being this week.  In total, the six volumes of discovery

16   amount to 48,000 files and roughly ten gigabytes of data.  Or,

17   I'm sorry, roughly 100 gigabytes of data.

18           So we do believe that is a substantial production,

19   but it is only the beginning.  And we are continuing to produce

20   materials and have virtually daily meetings regarding the

21   discovery.

22           The statement that there are 500,000 documents

23   pending is not accurate.  I don't know where that came from.

24           We do anticipate a large amount of data, but a lot of

25   that data is driven by things like videos, that -- that will be

1    produced as soon as we can, and I think quite quickly.  I would

2    anticipate the first of those going out in another week or so.

3           When we produce these hard drives to Ms. Horvath, we

4    simultaneously provide all defense counsel with an index to

5    those materials, as well as the discovery letter that describes

6    what the materials are.

7           We have always said that -- that we anticipate that

8    we will be substantially complete with discovery by May 15th.

9    As this Court well knows, there are things that trickle in

10   after that date.  But that has always been our target date for

11   substantial compliance with the discovery orders.

12          As to the objections to the process by which the

13   discovery is produced, it's always been my understanding that

14   that process of producing the materials to Ms. Horvath was

15   designed to promote efficiencies both from the Government's

16   production of the materials, as well as the defense use of the

17   materials.

18          The vast majority of the attorneys, as far as I'm

19   aware, have -- haven't had an issue with that.

20          I have had extensive conversations with Ms. Wood

21   about her objections.  She has requested that we provide a hard

22   drive directly to her.  And had good conversations with why the

23   Government believes that that is not as efficient as

24   processing -- or providing the discovery through Ms. Horvath.

25          We both share the same goal of getting the materials

1    to the defendants as quickly as possible.

2            THE COURT:  Why can't the Government provide, to

3    those defendants who request, separate hard drives as well?

4            MR. BARROW:  We can, your Honor, but that will delay

5    the process of providing the materials.

6            THE COURT:  Tell me the specifics.

7            MR. BARROW:  Specifically, your Honor, the Government

8    is under policy directives to encrypt hard drives.  That means

9    that it isn't as fast as -- as people that don't deal with

10   those encryption technologies or don't deal with that policy

11   may believe.  It is not a matter of setting a computer up to

12   copy a hard drive and coming back in the morning and having it

13   done.  That has been suggested that that's what we should do.

14   That simply isn't how it works with our encryption policies and

15   our equipment.

16            I could probably do it at my house faster, but that's

17   not the way it works in the Government.

18            (Laughter.)

19            MR. BARROW:  To give you an example --

20            (Laughter.)

21            AUDIENCE MEMBER:  How much does that cost?

22            MR. BARROW:  To give you an example, your Honor, the

23   estimate of production for a 50-gigabyte production for one

24   hard drive is a day and a half.  And that, of course, involves

25   a lot of what we call QC, or quality control.  And --

1          THE COURT:  So are you saying, in short, that it

2     would take a day and a half to get Ms. Wood that which you've

3     given Ms. Horvath?

4          MR. BARROW:  It would take a day and a half to give

5     Ms. Horvath 50 gigabytes.

6          THE COURT:  I'm asking --

7          MR. BARROW:  It would take -- I'm sorry, your Honor.

8          THE COURT:  Go ahead.

9          MR. BARROW:  It would take, therefore, three days to

10    provide two hard drives.  Ms. --

11         THE COURT:  My point is you've already given that to

12    Ms. Horvath.

13         A day-and-a-half worth of production would generate

14    another drive.

15         MR. BARROW:  It would, your Honor.

16         THE COURT:  All right.

17         MR. BARROW:  And then there's another request for

18    Mr. Rainwater for another drive.

19         So that, again, is an additional period of time.

20         THE COURT:  So it seems to me that can be done.

21         MR. BARROW:  It can be done.

22         THE COURT:  That for those defendants who believe

23    they cannot get the material quickly enough through the Federal

24    Defender's Office, it seems to me the Government could

25    generate, through a day-and-a-half process, a response to each

1    of those requests.

2              MR. BARROW:  Let me be clear, your Honor.  We can do

3    that.

4              THE COURT:  All right.

5              MR. BARROW:  But for each defense attorney that

6    requests that 50 --

7              THE COURT:  Right now I've heard of two.  Mr. Barrow,

8    stay on point.

9              MR. BARROW:  I anticipate that there will be more.

10             THE COURT:  Is there any reason that can't be done

11   this week, then?

12             MR. BARROW:  There isn't a reason that a production

13   couldn't be duplicated in that time frame.  But if we do it 26

14   times --

15             THE COURT:  I didn't say you were doing it 26 times.

16   I've heard of two objections.

17             MR. BARROW:  And I guess I would throw it out to the

18   defense attorneys if anyone else is --

19             THE COURT:  We're not going to discuss here the

20   conferral that should have happened before.

21             So you're telling me for that which has been produced

22   to the federal defender, for each defendant who would want a

23   copy means sequentially one-and-a-half days.

24             MR. BARROW:  For a 50-gigabyte production, that is

25   correct, your Honor.

1          THE COURT:  Well, you keep qualifying what you're

2    saying.

3          Are you saying that which you produced was 50

4    gigabytes?

5          MR. BARROW:  No.  An estimate of producing 50

6    gigabytes, which is half of what's been produced up until now,

7    that that process of producing a single -- let's suppose it's

8    Volume 7.  If Volume 7 is --

9          THE COURT:  Mr. Barrow we need to be far more

10   general.

11         That which you've given Ms. Horvath, Volumes 3, 4, 5

12   and 6 --

13         MR. BARROW:  My estimate on what it would take to

14   provide 3, 4, 5, and 6 --

15         THE COURT:  To one lawyer?

16         MR. BARROW:  -- to one lawyer would be -- let's call

17   it about two days, your Honor.

18         THE COURT:  All right.

19         MR. BARROW:  And, yes, we can do that.

20         THE COURT:  And if it was more than one lawyer, if

21   would be sequentially another two days, and so forth?

22         MR. BARROW:  Correct.

23         THE COURT:  All right.  I understand your point.

24         Ms. Shertz.

25         MS. SHERTZ:  Your Honor, one thing I don't know if

1   the Government's aware of and I'm certain you're not aware of

2   is the panel office has -- and I want to distinguish between

3   the actual federal defender's client and the panel office.

4            THE COURT:  Yes.

5            MS. SHERTZ:  The panel office has this hard drive.

6   We have not been provided all of the information that's on the

7   hard drive.

8            THE COURT:  I know that.  That's been clear in the

9   materials.

10           MS. SHERTZ:  Okay.  So then when the hard drive goes

11  to Ms. Wood and Mr. Rainwater, they will have all of the

12  materials that the rest of us are still waiting for.

13           THE COURT:  Ms. Shertz, if you would just let me

14  finish, I was about to ask whether there were defendants other

15  than Ms. Shertz [sic] and Mr. Rainwater who felt the need to

16  obtain the hard drive directly before waiting for its cloud

17  posting -- is what I understand will happen under the vendor

18  process that's being organized.  Is there any other defendant?

19           DEFENDANT RYAN BUNDY:  (Raises hand.)

20           THE COURT:  One, two, three.

21           Okay.  See?  We can solve the problem.

22           MS. SHERTZ:  There's another issue, your Honor --

23           THE COURT:  Yes.

24           MS. SHERTZ:  -- that may simplify things.

25           On a prior case involving this new encryption -- the

1    encryption is something new that we've been facing -- I would

2    like to say for less than six months. I'm sure Mr. Barrow can

3    correct me if I'm wrong on that date. The Government's

4    encryption, once we get encrypted materials from them, takes

5    approximately forever for us to encrypt -- unencrypt on our

6    end. Hours to unencrypt sometimes.

7            My understanding, from having talked to Susan Cooke,

8    the lead discovery person at their office, is they can get

9    special permission from Washington, D.C., to provide

10   nonencrypted discovery to the defense. I would also request

11   that that be done in this case.

12           Some of the material has come to us unencrypted. It

13   then speeds the copying process for the Government, where it

14   won't take them two days to provide that material. It speeds

15   things on our end. And, quite frankly, a lot of what they're

16   providing, it's already subject to a protective order. So the

17   encryption seems to be belt and suspenders, and I don't --

18   Velcro closures on top of already complicated discovery.

19           THE COURT: Then you are assigned to work with

20   Mr. Barrow to see if this issue can be resolved by agreement.

21           MS. SHERTZ: Thank you. I will do so.

22           THE COURT: All right. So access to discovery is

23   complicated by the process that Mr. Barrow was describing. A

24   process that initially was suggested on behalf of all

25   defendants at the beginning of the case and one that I endorsed

1    with the premise that it would be most helpful to the

2    defendants.

3            The bottom line is defense counsel need access to the

4    materials yesterday.  And if the current system isn't working,

5    I need a suggestion to -- a solution that will get the lawyers

6    what they need yesterday.  So I -- I can't order that which I

7    don't know will accomplish things.

8            Ms. Shertz?

9            MS. SHERTZ:  I think, your Honor, at -- there's an

10   item on the agenda for the ex parte that will hopefully answer

11   some of these issues for you.

12           THE COURT:  All right.  I'm -- I'm willing to

13   facilitate in any way possible the -- this process, to the

14   extent I meaningfully have the authority to do so.  But we

15   can't simply just go in circles on the issue.

16           Ms. Wood.

17           MS. WOOD:  Your Honor, I think a compromise position

18   for right now would be to have the Government make one

19   additional encrypted, if it must, copy, and provide that to the

20   CJA office here, so that individual lawyers, such as myself and

21   Mr. Blomgren's attorney, could provide a hard drive there, and

22   just get it cloned.

23           It -- it -- it doesn't -- that -- that would at least

24   give us a copy that can go to the vendor --

25           THE COURT:  All right.  So, again, hold -- no, I'm

1    not going to negotiate this now.

2            Ms. Shertz and now Ms. Wood and now Mr. Rainwater,

3    the three of you are the committee.  You work with Mr. Barrow,

4    and you get this resolved.  And if you need an order from me,

5    let me know.  But we're not going to spend this time

6    negotiating this.

7            All right.  So that issue -- that is to say, access

8    to that which is being produced -- should be addressed.  And it

9    is a high priority.  And I need to know -- I need to know that

10   it's addressed.

11           So I'll -- I want a status report by next Wednesday

12   from you lawyers, you three -- Shertz, Rainwater, Ms. Wood --

13   and Mr. Barrow, that tells me what's been accomplished and lets

14   me know if I need to do anything to authorize facilitating this

15   in any other way.

16           So I get the problem needs solving.  You're in the

17   position to solve it.

18           Are there -- now, there's the larger question about

19   the other discovery not produced.  You're talking about May 15.

20           Why -- why that long, Mr. Barrow?

21           MR. BARROW:  Your Honor, again, I think we'll have

22   productions weekly or biweekly.  It's just a deadline for us to

23   get -- you know, substantial compliance is everything.  You

24   know, we need that time to ensure that we have uncovered every

25   rock and really gotten them everything.

1          We are -- as we always do -- going well beyond our

2    obligations because we think that's the most efficient.  But it

3    does take time to make sure that we've contacted, for example,

4    every local jurisdiction who may have participated in this

5    event, to make sure that they didn't generate materials that

6    are pretty far beyond our immediate control but may be

7    discoverable.  So that's why we're asking for the time.

8          THE COURT:  And, in the meantime, when is your next

9    production going to be ready?

10         MR. BARROW:  Your Honor, we're meeting tomorrow to

11   work on exactly the time frame for that.  But, again, I -- we

12   produced it as soon as we can.  So I anticipate, you know,

13   weekly or biweekly productions.

14         THE COURT:  So I think it is probably provident for

15   me to have regular status reports on this discovery issue, and

16   I've now constituted a committee of defense attorneys who are

17   the committee to work on behalf of all defendants to facilitate

18   discovery problems.

19         Mr. Barrow, it looks like you're the --

20         MR. BARROW:  I'm the lucky --

21         THE COURT:  You're the one for the Government.

22         So what I want are weekly status reports, every

23   Wednesday, to let me know what's happened and whether there are

24   issues.  And if there are issues the parties believe the Court

25   needs to address, I'll call a hearing to address those

1    promptly, so that we don't wait a month before we can solve the

2    problem.

3           MS. SHERTZ:  May I just inquire of how you want the

4    committee then to deal with the pro se defendants on discovery

5    issues?

6           THE COURT:  Through their -- through their standby

7    counsel, who will be talking with the pro se defendants, who

8    have a right to make decisions and participation.  But standby

9    counsel are functionally the conveying agent.

10          MS. SHERTZ:  I just wanted to make sure.  Thank you.

11          THE COURT:  Yes.  You don't need to go to jail to

12   speak to Mr. Medenbach.

13          MS. SHERTZ:  I would not.  Thank you.

14          THE COURT:  Speak with his standby counsel, who will

15   speak with him and convey information back.  Same with

16   Ms. Ludwig.

17          All right.  Are there other discovery issues you want

18   me to know about right now, beyond taking them up in this

19   weekly status report process?

20          Yes, Mr. Bundy.

21          DEFENDANT RYAN BUNDY:  I want to make an objection to

22   the method of information coming.  I want that information to

23   come directly to me.  I want to be directly involved with the

24   meetings and schedules, and so forth, rather than going through

25   my standby counsel.  My standby counsel, as counsel, does not

1    replace me.  And I want to be able to be involved in the

2    communication with the other co-defendant counsels, and et

3    cetera.  I do not want to be left out of that loop.

4          THE COURT:  I understand that's what you want.  It's

5    not possible.  With you in custody and your having chosen to

6    represent yourself, there are limitations on what can happen.

7          Ms. Ludwig will convey everything to you, and you

8    will convey to her back.  And she will be your agent in

9    communicating your decisions.  She is not making decisions.

10   She is the vehicle of communication.

11         DEFENDANT RYAN BUNDY:  And I do want to note that

12   that is a very difficult vehicle, and it is inhibiting my right

13   to free trial because I'm not being treated fairly and -- as

14   other defense counsels.  And so I want to make that objection

15   noted.

16         THE COURT:  It's noted, Mr. Bundy.  Thank you.

17         All right.  We have on the agenda an issue of access

18   for defense counsel to the courthouse.  And I'm not quite clear

19   what the issue is.  I did ask the marshal, this morning, to

20   observe how long it was taking per counsel to clear security.

21   And the report I got was minutes; two to three minutes to clear

22   security today when counsel came through.  I don't know if the

23   access issue involves a place here at the courthouse where

24   lawyers want to be able to meet or store -- I just don't know

25   what the issue is.

1          So, Ms. Shipsey, would you please enlighten me.

2          MS. SHIPSEY:  I would, your Honor.  On behalf of all

3   of the defendants, defense counsel, there are two issues here.

4   One was we were requesting courthouse ID that -- to make it

5   easier to get in, not just for a hearing today but for trial,

6   anticipating that there will be -- we will have small breaks;

7   and, therefore, there will be a group of us trying to all get

8   in at the same time.

9          Also during trial, we're going to presumably have

10  carts of trial documents, just things that make it harder.  So

11  we are asking --

12         THE COURT:  I do have on my list the question of

13  finding a space in the courthouse where all defendants can

14  leave things secure -- securely and safely.

15         The issue has to do with physically where we are

16  going to conduct the trial.  The selection of the space to

17  conduct the trial drives, in part, what other spaces are

18  available.

19         But it's my expectation that a courtroom in the

20  building, of this size, will be available only to defendants

21  and their defense team to leave things, to store things, to

22  have a secure expectation.  But I have to work out access

23  issues, just with the locking and the like.

24         There are attorney rooms available on the eighth

25  floor, but they're intended for much smaller numbers of you,

1    and it doesn't seem to me feasible.

2            So I'm trying to find a space that can be dedicated

3    to all defense counsel, where you'll be assured that your work

4    can stay here; you won't have to move it in and out of the

5    building, and it will be secure.

6            So that issue is already on -- being worked on.

7            MS. SHIPSEY:  Thank you, your Honor.  And that was

8    the second point.  The first point I would just report on that

9    I did make a call on behalf of all of us whether or not we

10   could get courthouse ID, and we were told that was not

11   available.

12           THE COURT:  I understand that was the response.  I'm

13   also working on it.  I think the issue is a different issue

14   when it does comes to trial in terms of the time demands on

15   everyone and the need to respect the jury's time and to be able

16   to have everybody in and moving.  And so it's -- it's still an

17   open issue that I'm working on with the marshal.

18           But, as of today, it did not appear to me, from what

19   was reported, that any lawyer was delayed unduly at security

20   today.

21           MS. SHIPSEY:  It didn't appear so, your Honor.

22           THE COURT:  All right.  Thank you very much.

23           All right.  Let's move to the motion that is docket

24   No. 357, for a stay of the order I entered, authorizing the

25   marshal to honor the habeas corpus writs ad prosequendum for

1    some certain of the defendants.

2            I wanted first to ask whether -- and I understand,

3    Mr. Federico, you're basically the lead on behalf of defendants

4    for this issue.

5            MR. FEDERICO:  Yes, your Honor.

6            THE COURT:  I'm wondering whether -- you or

7    Mr. Knight -- you have had any direction from the Ninth Circuit

8    as to timing or its consideration of the interlocutory appeal.

9            MR. FEDERICO:  Your Honor, I'll speak first to that.

10           As part of the circuit rule, you have to alert that a

11   the motion is coming, emergency consideration.  That has been

12   done.  We've been in communication with all of the filings.  We

13   have not yet heard back, though, from the circuit as to whether

14   or not, one, they're going to grant a request for emergency

15   consideration; two, any subsequent briefing schedule or when

16   they would seek to resolve the issue.

17           THE COURT:  And you've made clear to the circuit that

18   under the existing order the marshal is authorized to start

19   transporting as of April 13?

20           MR. FEDERICO:  Yes, your Honor.

21           THE COURT:  All right.  Have you heard anything else?

22           MR. KNIGHT:  Nothing different, your Honor, no.

23           THE COURT:  All right.  Mr. Knight, Mr. Federico

24   argues the district court lost jurisdiction to even consider --

25           No, you're the one arguing that.

1          Let's go back.  Sorry.

2          MR. FEDERICO:  Yes, your Honor.

3          THE COURT:  You're arguing -- the Government was

4    arguing that the district court did not have jurisdiction to

5    stay its order because, with the interlocutory appeal, it was

6    the Government's position that substantively that matter has

7    now been divested.

8          You're relying on the Federal Rule of Appellate

9    Procedure 8 and its explicit contemplation that the district

10   court would consider the rule.  Right?

11         MR. FEDERICO:  Yes, your Honor.  That is certainly

12   the starting point.

13         Also, I note I had a reply that was drafted that --

14   and then I saw the Court's e-mail that replies will not

15   typically be permitted.  I only state that because I am

16   obviously prepared to orally state some case law and talk about

17   the Government's --

18         THE COURT:  Let's start about jurisdiction first.  Go

19   with that point.  Then I would like to hear from Mr. Knight on

20   the jurisdiction issues.  And then we will go to the merits, if

21   I'm persuaded I have the authority to consider this motion.

22         MR. FEDERICO:  Yes, your Honor.

23         Regarding jurisdiction, the Court is correct.

24   Primarily, relying first on Federal Rule of Appellate Procedure

25   8(a), saying the district court in fact has priority over

1    jurisdiction.  And I believe the Government's response somewhat

2    mischaracterized what the defense had filed; both in the Ninth

3    Circuit.

4        They said that we -- once we filed the notice of

5    appeal, the district court had been divested of jurisdiction

6    because we also sought a stay directly with the Ninth.

7        What we did with the Ninth was filed for a request

8    for emergency consideration and then stated, also, that we were

9    simultaneously filing for a motion to stay with the district

10   court.  Those were filed on the same day.

11       And then said to the Ninth Circuit that if the

12   circuit court determines that it requires additional time to

13   resolve the matter and the stay hasn't been issued, then we

14   would request the Ninth Circuit to stay the district court

15   order.

16       In other words, the conditions are that if the

17   district court has not stayed it, the Ninth Circuit has said

18   they need more time to resolve, then we would ask the Ninth

19   Circuit to consider a stay.

20       Which is different than what -- the Government's

21   response in saying that we had just gone to the Ninth and

22   sought a stay directly.

23       So we believe under the -- the rule of appellate

24   procedure, the district court has, in fact, then priority

25   jurisdiction.

And I think also, your Honor, the cases cited by the Government don't stand for the proposition that really what we're asking the Court here is a procedural matter and not a substantive matter.  Because the case law they provided -- for example, the **Griggs versus Provident Consumer** case from 1982. And they said that the Court is now divested of jurisdiction over, quote, the matter as being appealed.  Well, the matter being appealed is the transport order.  We haven't asked the Court for reconsideration of that order.

And -- and, likewise, other case law -- for example, there's a case **In Re Thorp**, from the Ninth Circuit, from 1981 -- the citation for that, your Honor, is 655 Federal 2d 997.  It says that the matter on appeal is a different question, and the Court can consider those matters that are, quote, in aid of the appeal, such as procedural matters.  And that's the way we view the current motion to the Court.

The other cases cited by the Government, **Ortega-Lopez**, held that the Court lacked jurisdiction -- excuse me, the district court lacks jurisdiction to correct a sentence.  Again, that's a substantive matter.

Likewise, the **Vromen** case, in that case it was the -- the Court held the district court lacked jurisdiction to consider a reconsideration of probation revocation.  Again, a substantive matter.  So we distinguish the jurisdictional questions on that ground.

1          We believe the district court retains priority
2   jurisdiction to resolve the procedural question for now.  And,
3   again, the substantive question as to whether or not the
4   transport should go forward is certainly a matter that we
5   concur with the Government is properly now left to the
6   appellate court.
7          THE COURT:  Thank you, Mr. Federico.
8          Mr. Knight, on jurisdiction.
9          MR. KNIGHT:  Thank you, your Honor.
10          With respect to jurisdiction, I think as a threshold
11   matter the parties agree what the rule is and what the cases
12   are.  The difference is an interpretation of the facts.
13          And in this instance, to say that there's a
14   procedural and substantive difference is a distinction without
15   a difference.  The procedure is the substance of the appeal.
16   The very idea that the basis of the appeal and the arguments
17   underlying the appeal relate to the transport itself and to the
18   stay and the attendant concerns about the deprivation of rights
19   with the movement of the defendants is the same as the
20   procedure.  So there's no difference.  So, to split hairs and
21   to claim that really there is a procedural issue before the
22   Court and a separate substantive issue now contained in the
23   appeal, we believe, is inaccurate.
24          And the cases that have been cited, we agree with.
25   And we would argue that their holdings do in fact bind this

1   Court and properly lay a factual and legal foundation for the

2   conclusions set forth in the brief; and that is, by virtue of

3   the arguments the defendants have made about the transport of

4   these defendants, this Court has been divested of jurisdiction

5   on this narrow issue.

6           THE COURT:  All right.  Well, let's move to the

7   merits argument, so that I have a full record here before I

8   have to decide this issue.

9           The Government filed its opposition on the merits.

10  Your primary grounds are ones that were actually argued in the

11  first instance, Mr. Federico, in opposition to the order.

12          So if there's something else you wanted to add or

13  emphasize, I'll hear from you and then from Mr. Knight.

14          MR. FEDERICO:  Thank you, your Honor.

15          Yes.  The starting point, I think the parties both

16  agree that the **Nken** factors from the Supreme Court would apply

17  to the motion to stay.  I won't rehash the arguments, but will

18  sort of give an oral reply to the Government's response.

19          The first factor is the likelihood of success on the

20  merits.  In fact, I don't think either party correctly -- or I

21  shouldn't say "correctly," but fully cited some case law that I

22  think gives a little more detail as to what that means.

23          For example, a case called **Leiva-Perez v. Holder**.

24  The citation for that is 640 Federal 3d 962.  That is a Ninth

25  Circuit case from 2011.  That case, the Ninth Circuit openly

1    acknowledged that there is uncertainty as to the exact degree

2    of what the likelihood of success has to be.  And it stated

3    that the test was a substantial case for relief on the merits.

4           So what is a substantial case?  I believe that in

5    this case we've easily met that threshold.  I mean, as this

6    Court acknowledged, when the issue was brought to the Court's

7    attention, this is a very unusual circumstance with these two

8    complex trials simultaneously and these are some very weighty

9    cons -- constitutional rights at issue.

10          And so I'll just stand on the briefs that have

11   already been filed, as to whether or not there is a substantial

12   case for relief.  But I just wanted to invite the Court's

13   attention to what the Ninth Circuit has said that standard

14   means.

15          As to the second factor of the irreparable injury,

16   again, the Court's order originally was that those -- any

17   injury or harm was premature.  The Government's response, they

18   called it, quote, purely speculative.

19          I would say that the same Ninth Circuit case I just

20   cited also detailed that this particular factor of irreparable

21   injury is very individualized.  It's very case specific.  And I

22   think that is important here because of the unusual nature of

23   these circumstances.  And -- and I would concur that we're

24   seeking to prevent a future infringement of rights.  So,

25   inherently, the process is forward-looking.

1          But here, I think there is also some case law that's

2     informative, that states that when you bring the matter of

3     constitutional rights infringements to the Court's attention,

4     also it's telling as to what the review is.

5          For example, if you raise constitutional issues

6     pretrial versus post-trial -- and the analogy I'll give here is

7     **Brady**.  The Ninth Circuit, in the **Price** case, at 566 Federal 3d

8     900 -- and that's a 2009 case -- said that on -- on appellate

9     review, if you claim there's been a **Brady** violation, you have

10    to make a showing of materiality.  But when you're claiming

11    that same violation before it has owe -- the trial has been

12    adjudicated, you don't have to show materiality.  I think

13    that's again -- illustrates that when you bring the matter, in

14    terms of constitutional rights and infringement, that -- a

15    decision is made as to what -- the proper showing.  Because we

16    have argued and would argue that the defendants need not show

17    prejudice at this point because it's a structural issue.

18         And I'm also going to defer to Mr. Arnold.  I think

19    he has a comment regarding prejudice, as well.

20         In the Government's response, they stated that we

21    were not resting -- or, excuse me, that the terms of the

22    irreparable injury factor, that we're resting on an

23    unreasonable assumption that this Court -- the district courts

24    are incapable of fashioning, sort of, case management

25    procedures to protect the rights.  And I think that, again,

1   sort of mischaracterizes what the harm is we're articulating.

2          In the opening brief that we have provided as an

3   attachment to the Court, we stated there is a body of case law,

4   the Sixth Amendment -- particularly, rights to effective

5   assistance of counsel -- that talks about basically breaks in

6   contact between defendants and lawyers -- and sometimes in as

7   short as 17 hours -- is found to be a violation of the Sixth

8   Amendment.

9          And so, really, as we said in the motion, we see

10  this -- or, excuse me, the opening brief in the Ninth Circuit,

11  is that the Government in the two districts within the

12  executive branch from the Department of Justice has asked the

13  Court to sort of referee and facilitate this process, which the

14  courts are capable of doing.  But, on the other hand, the

15  defendants are the ones who suffer the harm from that.

16         And there's a concern here, in terms of harm, that

17  what is likely to happen is if they're transported to Nevada,

18  there's going to be substantial litigation time spent on who is

19  where and when, and what they're going to be doing there.

20  Because, as we've been discussing all morning, this is very

21  difficult and challenging to come up with a case management

22  order here, with the number of defendants.  And I would just

23  imagine -- it's not even speculative -- that Nevada is going to

24  face the same problem.

25         Lastly, your Honor, regarding the third and fourth

1    **Nken** factors which, as the parties briefed, merge together

2    between the Government and the opposing party.  And those

3    factors are the harm to the other party and the public

4    interest.

5           The Government stated in its response that its motion

6    for stay is inconsistent, and the defendants are being

7    inconsistent with their demand for speedy trial.  And we would

8    state the opposite is true because what we are trying to do is

9    keep them here in Oregon, to keep their case on track.

10          And so that there is in fact -- trying to prevent any

11   events, such as a transport, that would interfere with their

12   case preparation in this case, here in the District of Oregon.

13          So not only do we see no inconsistency with the

14   demand for speedy trial, we believe a stay of the order in

15   seeking the appeal of the transfer order is in fact consistent

16   with the demand for speedy trial.

17          And so, your Honor, if I may also -- I just mentioned

18   a moment ago, I defer to Mr. Arnold.  I think that he had

19   some -- a point he wanted to make regarding potential

20   prejudice.

21          THE COURT:  Certainly.

22          Mr. Arnold.

23          MR. ARNOLD:  Thank you, your Honor.

24          Regarding the issue of prejudice, my client has not

25   been transported yet, so he doesn't have any actual prejudice.

1    But I do have proof that it's more likely than not that if he

2    is transferred, there is likely to be prejudice.

3            I have an affidavit that we received after hours last

4    night, and it is essentially from a woman named Deborah

5    Reynolds.  And she has been in contact with Peter Santilli --

6    who was transported previously -- on the phone.

7            And I have the affidavit.  But I was just going to

8    read portions -- or read it by way of proffer, or I could give

9    it to the Court.

10           THE COURT:  Who is Deborah Reynolds?

11           MR. ARNOLD:  Deborah Reynolds is the significant

12   other and co-host of *The Pete Santilli Show*.

13           THE COURT:  All right.

14           MR. ARNOLD:  She's in regular telephone contact with

15   Pete Santilli, and my understanding -- from speaking to her on

16   the phone -- regular contact with Pete's attorney, Tom Coan.

17           And she had received specific information from

18   Mr. Santilli, over the phone, that she conveyed to me.  And

19   then we had it reduced to a declaration, regarding his

20   deprivation of access to counsel while he is in Nevada.

21           And with the Court --

22           THE COURT:  Since the last hearing, he's been

23   transported to Nevada.  Is that what --

24           MR. COAN:  He was transported on Tuesday, your Honor.

25           THE COURT:  Thank you.  That point wasn't clear for

1    the record.

2            Go ahead.

3            MR. ARNOLD:  Sorry, your Honor.

4            THE COURT:  All right.

5            MR. ARNOLD:  Thank you.  Ms. Reynolds states that she

6    spoke to Mr. Santilli approximately three days prior to signing

7    this, which would have been the -- the -- the 2nd.

8            And he told me -- he told me that he could not

9    believe what's happened since he had been in Nevada.  The first

10   couple of days he thought he would just deal with the

11   conditions of incarceration, but found himself in a cell 23

12   hours a day.

13           And, your Honor, I'll just point out, by way of

14   proffer, this is a similar experience that they -- many of

15   defendants -- if not all of them -- saw here in Oregon.  That

16   there is a -- a jail policy at Multnomah County jail to do this

17   secluded treatment for 23 hours a day, basically, in order to

18   essentially process them.

19           I talked to Captain Peterson, at the jail.  And it

20   wasn't anything specific to these defendants.  It's just what

21   they claim they always do in order to do their intake process

22   for two weeks.

23           So, in essence, they're getting a solitary

24   confinement twice over.  They're being re-intaked.  Apparently

25   at least Mr. Santilli is, down there.  And the problem with

 1   that is he is essentially in lockdown.  And that this is --
 2   again, back to the proffer.  That means he is only allowed to
 3   come out of his cell when there are no other inmates present.
 4   This means that he's only allowed to come out of his cell late
 5   at night, 11:00 p.m. local time.  That means that he can only
 6   contact his attorneys during that time.  It's my understanding
 7   he eventually -- after the phone call I had with Ms. Reynolds,
 8   he was able to reach out and speak to Mr. Coan during business
 9   hours, and I don't have any other details about that.
10        At the time, it prevented him from contacting his
11   attorney in Oregon and also prevented him from having family
12   time, and everything else.
13        And we know, by way of proffer from Mr. Bundy's
14   experience in Oregon, during that one-hour time he has to
15   shave, he has to clean his cell, he has to do personal
16   business, he has to call his family.  And then, you know, he
17   can shower and then find time to, you know, do -- do all of
18   these personal things that -- you know, cleanliness, that's
19   sort of a, you know, natural right to do.  And, also, if you
20   transfer that obligation -- the personal obligations to the
21   Nevada situation, you also have to call your lawyer.
22        THE COURT:  So you're saying this exists for the
23   first 24 hours?
24        MR. ARNOLD:  No.  It was two weeks here in Oregon.
25   And apparently it was -- if it was last Tuesday through

1    Friday -- or Tuesday through Saturday.  So Tuesday, Wednesday,

2    Thursday, Friday -- five days in Nevada.

3                DEFENDANT AMMON BUNDY:  My dad and brother are

4    still --

5                MR. ARNOLD:  Yeah.  Hold on.

6                By way of proffer, my understanding, from speaking to

7    Carol Bundy and from speaking to her -- or Mr. Cliven Bundy's

8    attorney, he's been in some sort of similar conditions for over

9    a month.

10               THE COURT:  All right.

11               MR. ARNOLD:  Apparently, since -- just by way of

12   candor, also since he began raising these issues with the jail

13   guards, he's been allowed out of his cell for two hours a day;

14   apparently starting on Saturday, is my understanding.  He was

15   able to apparently talk to his Oregon attorney during that day,

16   which I believe would have been -- what day is today?  Would

17   have talked to his attorney on Monday.

18               The guards -- this is hearsay within hearsay.  But

19   the guards personally told Pete, who told Mr. Reynolds -- or

20   Mrs. Reynolds, that it was a hardship on jail staff to take the

21   efforts necessary to keep him from other inmates while in

22   custody.

23               So it appears that there's a suggestion that they're

24   doing it, you know, for the purported safety of the individual

25   defendants.

1        And what I would ask -- in addition to the stay --

2   and the Court asked what could be done in relation to

3   Mr. O'Shaughnessy.  I think all of the defendants would benefit

4   from a proactive approach to -- to protecting their rights that

5   are -- could potentially be inhibited based upon this

6   information.

7        We would ask that the Court require the Government to

8   show cause through an evidentiary hearing, where the Court can

9   actually evaluate the condition of the facilities by way of --

10  you know, we can Skype it or telephone call, or whatever.  Have

11  the warden of these jails, have the -- have the main jailer

12  that's helping with Mr. Santilli, we can flesh out factually

13  what is actually occurring and the Court can inquire, as

14  opposed to the -- you know, the executive branch, through the

15  U.S. Attorney's inquiring.

16               THE COURT:  Thank you.

17          Mr. Coan, did you want to add anything to that?

18               MR. COAN:  What I can add to that, your Honor, is I

19  will say Mr. Santilli's being held at the Anderson County

20  Detention Center, just outside of Las Vegas.

21          I cannot make any calls in to him.  He can only make

22  calls to me.  So my communications with him are, you know, not

23  good because I don't know when --

24               THE COURT:  Has he been -- I'm sorry.

25               MR. COAN:  I don't know when he's going to call.

1          THE COURT:  Has he been appointed counsel there?

2          MR. COAN:  He was appointed counsel.  That -- that

3   attorney, as of yesterday, had not visited him.

4          THE COURT:  All right.  As yet.

5          MR. COAN:  As of yet.

6          THE COURT:  All right.  And just to refresh my memory

7   of the order that is the subject of this interlocutory appeal,

8   it also anticipated that if that order was exercised according

9   to its terms, Mr. Santilli would be returned to Oregon once

10  those who were transported were returned.

11         MR. COAN:  There was an alternative plan, your Honor.

12  We had hoped to have a detention hearing or a review of

13  detention down in Las Vegas before the 13th.  Because it's my

14  understanding that if the Court doesn't stay this order, these

15  defendants, here, will be transported down on the 13th.  The

16  marshals may be able to transport Mr. Santilli back up here at

17  that time.  If he hasn't had his review of detention hearing at

18  that time, it will be the 23rd.

19         THE COURT:  All right.  So I understand the point

20  about prejudice, having to do with the manner of confinement in

21  Nevada; the concerns the defendants have who are the subject of

22  this order.

23         So were there any other points before I hear from the

24  Government?

25         MR. ARNOLD:  My client reminded me that -- another

1    issue that was brought to our attention was the lack of --

2    traveling with the legal documents.

3            THE COURT:  I addressed that at the last hearing.

4            MR. ARNOLD:  Right.  And I believe Mr. Coan --

5            MR. COAN:  I can also add to that, your Honor.  I

6    was -- the marshals here tried to accommodate.  Mr. Gabriel

7    told me that he -- Mr. Santilli would be able to take with him

8    up to a large envelope of documents with him.

9            I gave him an envelope to secure some discovery

10   documents, that he could look at in his travels.  When he

11   actually made the travel, he was told he couldn't take

12   anything.  So those have all been returned to me, and he

13   doesn't have any discovery materials down there.

14           THE COURT:  They are back in your possession?

15           MR. COAN:  Yes.

16           THE COURT:  Thank you.  All right.

17           Mr. Knight.

18           MR. KNIGHT:  Thank you, your Honor.

19           With respect to the merits, I'll focus only on the

20   second factor laid out in the parties' briefing, and the

21   Government will rely on its briefs for the other factors.  And

22   that factor is whether or not there is indeed irreparable

23   injury absent a stay.  And, again, I get back to the language

24   "irreparable injury."

25           What has been proffered to the Court today and what

1    already exists in the record does not amount to what would

2    constitute an irreparable injury.  It is, by and large,

3    speculative.

4            And I want to speak specifically, right now, of

5    course, to the concerns about confinement in Nevada because the

6    harm has to be attendant, of course, to the Court's order

7    itself.  Not just general confinement conditions here in the

8    District of Oregon, but really as they relate to Nevada.

9            Nothing that has been proffered would suggest there

10   is an irreparable injury or such a severe injury to the

11   defendant's Sixth Amendment rights such that his rights -- in

12   this case, Mr. Santilli's rights -- have been impaired.

13           It was conceded that Mr. Santilli had some contact

14   with Mr. Coan.  And I can't speak to the efficacy of the

15   procedures in the jail there.  But the bottom line is the

16   record, as it stands right now before this Court, suggests that

17   Mr. Santilli is still receiving representation as a result of

18   the order that's already been effectuated.  And there is

19   nothing to suggest -- going forward with these other

20   defendants -- that the District Court in Nevada or the Marshals

21   Service can't ensure that they will have access to counsel or

22   legal materials, going forward.  And that seems to be the

23   issue -- the narrow issue as presented by these new arguments

24   today.

25           And with that, your Honor, the Government will rest

1    on the existing arguments in the brief, and supplement it only

2    with the fact, again, that the arguments about harm appear to

3    be purely speculative.  And even if accepted at face value,

4    don't rise to the level of irreparable injury.

5              THE COURT:  All right.  Give me a moment, please.

6              (Pause, referring.)

7              THE COURT:  I have taken seriously the arguments

8    defendants raise on all grounds.

9              I conclude that the question the Government has

10   raised as to the Court's jurisdiction to consider the

11   defendants' motion to stay is, in any event, moot because I

12   don't find the stay as warranted when I consider all of the

13   factors that I'm required to consider.

14             It is and remains a most unusual situation the

15   defendants are facing here.  The Court's authority over this

16   prosecution does not extend to controlling the manner in which

17   a co-equal court in Nevada chooses to control a proceeding

18   involving some of the same parties.

19             I tried intentionally to make the order I did enter

20   narrow, time specific, and limited to the one anticipated

21   transport that I've authorized.  And I believe, in doing so, I

22   have rendered inarguable, really, the argument of irreparable

23   injury.  The whole format and extent of the order is that

24   defendants will be away for a period of about ten days.  And I

25   don't find under any of defendants' arguments that that in any

1   way is an injury to their constitutional rights:  The right to

2   access to counsel here; their right to speedy trial here; their

3   right to due process here.

4          The extent to which they wish to challenge -- if my

5   order stands -- in Nevada the impact of that order on them

6   there, that's a matter for the Nevada court to address.

7          It's clear that this Court does not have any

8   authority to address the arguments about the manner of

9   confinement or access to counsel when defendants are confined

10  in another judicial district.

11         It's clear the defendants who are the subject of this

12  order do not want to go to Nevada, and I have -- and I

13  certainly appreciate their need to be here and to move forward

14  on the schedule that I'm trying very hard to implement so that

15  we do commence a trial at what I believe is the earliest

16  feasible time, beginning with jury selection on September 7.

17         I don't believe there's any showing, then, of a

18  likelihood of success on the merits here because the fact that

19  it's an unusual case doesn't -- doesn't equal a substantial

20  case for relief on the merits; the narrow tailoring of the

21  order itself minimizes any risk of a constitutional violation;

22  and ten days is just that, ten days.

23         I don't believe any injury the defendants anticipate

24  is irreparable.  I don't believe that there is any significant

25  Government or public interest in not allowing the District of

1    Nevada to have the defendants for this limited period of time.

2    And more pract -- pragmatically, I believe I do need the

3    confirmation by the Ninth Circuit Court of Appeals that this

4    order should stand.

5          And if I'm wrong on these analyses, then it's

6    important that that decision get made by a higher court now for

7    the future progress of this case and the one in Nevada.  If --

8    if the Ninth Circuit Court of Appeals believes the defendant

9    should not be transported, they know now of the urgency of the

10    matter.

11          I know Mr. Federico and counsel for the affected

12    parties will be contacting the court, the Ninth Circuit Court

13    of Appeals, promptly after this session today, to let them know

14    that I did not stay the order.  And that they will need to

15    address it or the marshal will in fact transport.  The order

16    remains in effect until an authority overrules it or says it is

17    no longer in effect.  And I do not intend to do that here.

18          So, therefore, I don't need to resolve what I think

19    is an interesting theoretical question about jurisdiction.

20    Because if I did have jurisdiction, I would deny the motion to

21    stay on the matters for the reasons indicated; and if I don't

22    have jurisdiction, then the question is moot.

23          So I look forward to the Ninth Circuit providing all

24    of us with controlling direction on this problem.  I do not

25    anticipate the issue would arise again here in Oregon, as I've

1    already indicated, and so I'm denying the motion to stay.

2            Mr. Bundy.

3            DEFENDANT RYAN BUNDY:  Yes, your Honor.  I

4    respectively [sic] take exception to your ruling.  I do feel

5    that there would be irreparable -- irreparable damage.  As far

6    as I know, to date, there is no method and science to move back

7    in time the time that we would lose in transport, in -- in

8    booking in and out, et cetera, et cetera; as time that would be

9    lost on both cases, for both trials, that would not be

10   irreparable.

11           And, you know, you -- you, as a judge, do have the

12   power and the authority to -- to stay that motion, to move us.

13           THE COURT:  Well, Mr. Bundy, I didn't say I didn't

14   have the power.

15           DEFENDANT RYAN BUNDY:  I understand.

16           THE COURT:  I said, on the merits, I don't believe

17   it's warranted here.

18           DEFENDANT RYAN BUNDY:  I understand.

19           MS. LUDWIG:  Is that it?

20           DEFENDANT RYAN BUNDY:  Say that again?

21           (Pause, Ms. Ludwig and Defendant Ryan Bundy

22           conferring.  Ms. Ludwig and Defendant Bundy sit.)

23           THE COURT:  You're -- all of the defendants affected

24   by my original order have an exception to the ruling just made.

25           As I expect, Mr. Federico will be in touch with the

1    Court of Appeals promptly to see if they will provide expedited

2    guidance on whether a ruling on any issue is forthcoming before

3    the close of business on April 12.

4              For the defendants who are affected by the order,

5    remember that if it is not lifted by the Ninth Circuit, Counsel

6    should take steps to ensure that the defendants' papers are

7    safeguarded in a way that protects them while they are away, if

8    indeed they're allowed to be away.

9              Mr. Medenbach -- I wanted to address -- filed a

10   motion to reconsider.  I need to find it.

11             An order I made denying his motion to dismiss.  I

12   raise it only because it came in out of the order of the joint

13   status report.  I do believe the Government should file a

14   response to it.

15             Mr. Gabriel, are you --

16             MR. GABRIEL:  Yes.

17             THE COURT:  -- on deck for that?

18             MR. GABRIEL:  Yes, your Honor, and we can do that

19   within seven days, again.

20             THE COURT:  All right.  Mr. Medenbach, good morning.

21             DEFENDANT MEDENBACH:  Good morning.

22             THE COURT:  So I'm going to get the Government's

23   response.

24             I've read all of the materials you've submitted, and

25   I'll make a ruling once I hear the Government's written

1    argument, which you'll have.  I don't need a reply because most

2    of what you've written to me is what you already said in court.

3    I understand the points.  But you've made them now.  You have

4    been clear, for the record.

5            So the motion will be taken under advisement when the

6    Government files its response.

7            DEFENDANT MEDENBACH:  Can I talk about some other

8    stuff?

9            THE COURT:  I'm talking about the motion you filed,

10   asking me to reconsider the motion to dismiss ruling that I

11   previously made.  That's what I'm addressing right now.

12           DEFENDANT MEDENBACH:  Okay.

13           THE COURT:  Do you understand what I just said about

14   that?

15           DEFENDANT MEDENBACH:  Yes.

16           THE COURT:  All right.  Was there something else you

17   wanted me to address right now?

18           DEFENDANT MEDENBACH:  Yeah.  Is this a good time to

19   do it or --

20           THE COURT:  Well, I'm asking, do you have something

21   else, yes or no?

22           DEFENDANT MEDENBACH:  Yes.  When we were in court on

23   the 11th, we had a discussion about the oaths of office.

24           And under 28 U.S.C. 453, it states:

25           Each justice or judge in the United States shall

1           take the following oath or affirmation before

2           performing their duties of his office.

3           I was wondering if I could get some verification that

4    you've taken this oath and also the one that we -- you took the

5    oath to understand -- to support and defend the Constitution of

6    the United States.

7           THE COURT:  Well, I publicly took that oath in this

8    courthouse in November of 1999, and I don't see any need to go

9    beyond that, sir.  So, no.

10          DEFENDANT MEDENBACH:  How about 28 U.S.C. --

11          THE COURT:  I'm not going to address the oath issue

12   any more.

13          DEFENDANT MEDENBACH:  Okay.  I'm just asking.

14          THE COURT:  And I'm just answering; that we've

15   covered this on many occasions now.

16          DEFENDANT MEDENBACH:  We never --

17          (Audience members speaking.)

18          THE COURT:  Quiet in the back of the room or step

19   outside.

20          Mr. Medenbach, I'm not going to reconsider this oath

21   issue.

22          I'm a judge of the United States District Court for

23   the District of Oregon.

24          You need to move on.

25          DEFENDANT MEDENBACH:  Well, if you haven't taken this

1    oath --

2                THE COURT:  Sir, if you have any other issue to

3    raise, raise it now; otherwise, take a seat.

4                DEFENDANT MEDENBACH:  (Sitting.)

5                THE COURT:  All right.  Are there any other matters

6    in the public record we need to take on before I excuse the

7    prosecutors and all of the members of the public and take up ex

8    parte issues with defense counsel and defendants?  Are there

9    any other matters?

10                For the Government?

11                MR. KNIGHT:  No, your Honor.

12                MR. GABRIEL:  Not for the Government, your Honor.

13                THE COURT:  I don't see anyone else standing on

14   behalf of the defendants.  So at this time all -- everyone

15   needs to leave the room unless you are one of the named

16   defendants or one of their assigned counsel or court staff.

17                (Conclusion of proceedings.)

18                              -0-

19

20

21

22

23

24

25

99

*Certificate*

--oOo--

1

2

3

4   I certify, by signing below, that the foregoing is a correct

5   stenographic transcript of the oral proceedings had in the

6   above-entitled matter this 16th day of June, 2016.  A

7   transcript without an original signature or conformed signature

8   is not certified.  I further certify that the transcript fees

9   and format comply with those prescribed by the Court and the

10  Judicial Conference of the United States.

11

12          /S/ Amanda M. LeGore
    _____

13          AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
              CSR No. 15-0433  EXP:  3-31-2018
14

15

16

17

18

19

20

21

22

23

24

25