1                IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )  Case No. 3:16-CR-0051-BR
4            Plaintiff,              )
                                     )
5   v.                               )  May 4, 2016
                                     )
6   AMMON BUNDY (1),                 )
    JON RITZHEIMER (2),              )
7   JOSEPH O'SHAUGHNESSY (3),        )
    RYAN PAYNE (4),                  )
8   RYAN BUNDY (5),                  )
    BRIAN CAVALIER (6),              )
9   SHAWNA COX (7),                  )
    PETER SANTILLI (8),              )
10  JASON PATRICK (9),               )
    DUANE LEO EHMER (10),            )
11  DYLAN ANDERSON (11),             )
    SEAN ANDERSON (12),              )
12  DAVID LEE FRY (13),              )
    JEFF WAYNE BANTA (14),           )
13  SANDRA LYNN ANDERSON (15),       )
    KENNETH MEDENBACH (16),          )
14  BLAINE COOPER (17),              )
    WESLEY KJAR (18),                )
15  COREY LEQUIEU (19),              )
    NEIL WAMPLER (20),               )
16  JASON CHARLES BLOMGREN (21),     )
    DARRYL WILLIAM THORN (22),       )
17  GEOFFREY STANEK (23),            )
    TRAVIS COX (24),                 )
18  ERIC LEE FLORES (25),            )
    JAKE RYAN (26),                  )
19                                   )
             Defendants.             )
20  _____) Portland, Oregon

21

22                 TRANSCRIPT OF PROCEEDINGS
                        (Oral Argument)

23      BEFORE THE HONORABLE ANNA J. BROWN, DISTRICT JUDGE

24

25

```
 1    COURT REPORTER:            AMANDA M. LeGORE
                                 CSR, RDR, FCRR, CRR, CE
 2                               U.S. Courthouse
                                 1000 SW Third Avenue Suite 301
 3                               Portland, OR  97204
                                 (503)326-8184
 4

 5

 6    APPEARANCES:
      FOR THE PLAINTIFF:         GEOFFREY BARROW
 7                               ETHAN KNIGHT
                                 Assistant U.S. Attorneys
 8                               U.S. Attorney's Office
                                 1000 SW Third Avenue
 9                               Portland, OR  97204
                                 (503)727-1000
10
      FOR DEFENDANT AMMON
11    BUNDY:                     LISSA CASEY
                                 MICHAEL ARNOLD
12                               Arnold Law Office, LLC
                                 401 E 10th Avenue, Suite 400
13                               Eugene, OR  97401
                                 (541)338-9111
14

15    FOR DEFENDANT
      JON RITZHEIMER:            AMY BAGGIO
16                               (Appearing for Ms. Terri Wood)
                                 621 SW Morrison, Suite 1025
17                               Portland, OR  97205
                                 (503)222-9830
18

19    FOR DEFENDANT JOSEPH
      O'SHAUGHNESSY:             AMY BAGGIO
20                               621 SW Morrison, Suite 1025
                                 Portland, OR  97205
21                               (503)222-9830

22
      FOR DEFENDANT RYAN
23    PAYNE:                     RICHARD FEDERICO
                                 Assistant Federal Defender
24                               101 SW Main Street, Suite 1700
                                 Portland, OR  97204
25                               (503)326-2123
```

```
 1   APPEARANCES:  (continuing)
     FOR DEFENDANT RYAN
 2   BUNDY:                   RYAN BUNDY
                              Pro se
 3                            79400-065

 4                            LISA LUDWIG
                              Standby Counsel
 5                            811 SW Naito Parkway, Suite 500
                              Portland, OR  97204
 6                            (503)223-5570

 7
     FOR DEFENDANT BRIAN
 8   CAVALIER:                TODD BOFFERDING
                              1215 B Street
 9                            PO Box 539
                              Hood River, OR 97031
10                            (541)490-9012

11
     FOR DEFENDANT SHAWNA COX:
12   (defendant present       LISA LUDWIG
     telephonically)          (Appearing for Ms. Tiffany Harris)
13                            811 SW Naito Parkway, Suite 500
                              Portland, OR  97204
14                            (503)223-5570

15
     FOR DEFENDANT PETER
16   SANTILLI:                THOMAS COAN
     (defendant present       1000 SW Fifth Avenue, Suite 1400
17   by videoconference)      Portland, OR  97204
                              (503)221-8736
18

19   FOR DEFENDANT JASON
     PATRICK:                 ANDREW KOHLMETZ
20                            Raivio, Kohlmetz & Steen, PC
                              741 SW Lincoln Street
21                            Portland, OR  97201
                              (503)224-1104
22
     FOR DEFENDANT DUANE
23   EHMER:                   DAVID AUDET
                              249 NE Lincoln
24                            Hillsboro, OR  97124
                              (503)648-3020
25
```

```
 1   APPEARANCES:  (continuing)

 2   FOR DEFENDANT DYLAN
     ANDERSON:                SAMUEL KAUFFMAN
 3   (not present)            Kauffman Kilberg, LLC
                              1001 SW 5th Avenue, Suite 1414
 4                            Portland, OR  97204
                              (503)224-2595
 5

 6   FOR DEFENDANT SEAN
     ANDERSON:                TYL BAKKER
 7                            (Appearing for Mr. Matthew McHenry)
                              621 SW Alder Street, Suite 621
 8                            Portland, OR  97205
                              (503)721-0140
 9
     FOR DEFENDANT DAVID
10   FRY:                     PER OLSON
                              Hoevet Olson Howes, PC
11                            1000 SW Broadway, Suite 1500
                              Portland, OR  97205
12                            (503)228-0497

13   FOR DEFENDANT JEFF
     BANTA:                   ROBERT SALISBURY
14   (not present)            330 South 1st Street
                              PO Box 1272
15                            St. Helens, OR  97051
                              (503)397-9000
16
     FOR DEFENDANT SANDRA
17   ANDERSON:                TYL BAKKER
     (not present)            621 SW Alder Street, Suite 621
18                            Portland, OR  97205
                              (503)721-0140
19
     FOR DEFENDANT KENNETH
20   MEDENBACH:               KENNETH MEDENBACH
                              Pro Se
21                            25795-086

22                            MATTHEW SCHINDLER
                              Standby Counsel
23                            501 4th Street #324
                              Lake Oswego, OR  97034
24                            (503)699-7333

25
```

```
 1    APPEARANCES:  (continuing)

 2    FOR DEFENDANT BLAINE
      COOPER:                    KRISTA SHIPSEY
 3                               820 SW 2nd Avenue, Suite 275
                                 Portland, OR  97204
 4                               (503)309-9024

 5

 6    FOR DEFENDANT WESLEY
      KJAR:                      JAMES HALLEY
 7    (not present)              735 SW First Avenue, 2nd Floor
                                 Portland, OR  97204
 8                               (503)295-0301

 9    FOR DEFENDANT COREY
      LEQUIEU:                   PAUL HOOD
10                               (Appearing for Mr. Ramon Pagan)
                                 Paul Hood, Attorney at Law, LLC
11                               1001 SW 5th Avenue, Suite 1415
                                 Portland, OR  97204
12                               (541)513-7545

13    FOR DEFENDANT NEIL
      WAMPLER:                   LISA MAXFIELD
14    (not present)              Pacific Northwest Law, LLP
                                 1420 World Trade Center
15                               121 SW Salmon
                                 Portland, OR  97204
16                               (503)222-2661

17    FOR DEFENDANT JASON
      BLOMGREN:                  ROBERT RAINWATER
18    (not present)              Rainwater Law Group
                                 1327 SE Tacoma, Suite 239
19                               Portland, OR  97202
                                 (971)271-7566
20
      FOR DEFENDANT DARRYL
21    THORN:                     LAURIE SHERTZ
      (not present)              121 SW Salmon Street, 11th Floor
22                               Portland, OR  97204
                                 (503)406-2136
23
      FOR DEFENDANT GEOFFREY
24    STANEK:                    BEN ANDERSEN
      (not present)              101 SW Madison Street, #9068
25                               Portland, OR  97207
                                 (503)860-2531
```

```
 1   APPEARANCES: (continuing)
     FOR DEFENDANT TRAVIS
 2   COX:                     PAUL HOOD
                              Paul Hood, Attorney at Law, LLC
 3                            1001 SW 5th Avenue, Suite 1415
                              Portland, OR  97204
 4                            (541)513-7545

 5   FOR DEFENDANT ERIC
     FLORES:                  NEDU NWEZE
 6   (not present)            (Appearing for Mr. Ernest Warren)
                              Warren & Sugarman
 7                            838 SW First Avenue, Suite 500
                              Portland, OR  97204
 8                            (503)228-6655

 9   FOR DEFENDANT JAKE
     RYAN:                    JESSE MERRITHEW
10                            Levi Merrithew Horst, LLP
                              610 SW Alder Street, Suite 415
11                            Portland, OR  97205
                              (971)229-1241

12

13

     ALSO PRESENT:            DERRICK PETERSON
14                            KATIE BURGARD
                              KRAIG ANSPACH
15
     (by videoconference)     CHRIS RASMUSSEN
16

17

18

19

20

21

22

23

24

25
```

1              (Wednesday, May 4, 2016; 9:30 a.m.)

2

3                    P R O C E E D I N G S

4

5              THE COURT:  Good morning, everyone.  Please be

6    seated.

7              Good morning, your Honor.

8              THE COURT:  Before we begin, I want to remind

9    everyone that we have important work to do today, and it's

10   among my duties to ensure that we have an accurate record of

11   the proceedings.

12             It's very difficult for the court reporter to take a

13   record if more than one of us is speaking at a time.  So here

14   are the rules for today and every day that we're in session.

15             Only one person can be speaking at a time.  If

16   counsel or Mr. Bundy, you representing yourself, or

17   Mr. Medenbach, you representing yourself, if you're interacting

18   with me, I'll do my best not to speak on top of you.  And I

19   expect counsel will help and do the same with me.  We need a

20   very clear record.

21             Everyone else in the room, those of you observing in

22   the back, those of you who are represented by counsel, must

23   remain quiet.  Must remain quiet.  If you don't, you'll have to

24   leave the room, whether you're a defendant or an observer.

25   Things just need to be quiet in order that we can conduct the

1   proceedings.

2           I'll recognize people, so you know when to speak.

3   And, as I say, I'll do my very best not to talk on top of you,

4   if you hopefully will do the same with me.

5           Because cell phones that are powered on interfere

6   with our sound system, Counsel, please check now to be sure any

7   cell phone you brought in the room is turned off.

8           Counsel for the --

9           MR. COAN:  Pardon me, your Honor.

10          Mr. Santilli is down in Nevada.  I think the only way

11  I may be able to communicate with him or his attorney there is

12  by text messaging, so I would ask the leave of the Court to

13  allow my phone to remain on.

14          THE COURT:  Let me think about that.

15          Let me finish what I was doing.

16          For those of you who represent people who are out of

17  custody, if by chance your client has brought a cell phone into

18  the room, please take it and ensure, Counsel, personally that

19  the phone is off and keep it during the course of the

20  proceedings, and then we'll continue.

21          Counsel who have laptops on, please ensure that you

22  are not accessing the Internet in a way that your clients are

23  accessing the Internet during this court proceeding.  It's not

24  permitted.

25          Finally, I believe we have Ms. Cox, again, by

1   telephone connection.  I want to remind her not to make any

2   audio recording of the proceedings.

3          Mr. Coan, you were able to confirm that Mr. Santilli

4   is observing?

5          MR. COAN:  No, I was not.

6          THE COURT:  Not yet?

7          MR. COAN:  I have not been able to confirm that.

8          MR. NEWBY:  (Nods head.)

9          MR. RASMUSSEN:  Your Honor, can you hear us?

10          THE COURT:  Who is speaking, please?

11          MR. RASMUSSEN:  This is Chris Rasmussen.  I'm an

12   attorney in Nevada.  I'm sitting next to Peter Santilli, in a

13   courtroom in Las Vegas.

14          THE COURT:  Excellent.  Can you hear me?

15          MR. RASMUSSEN:  I can very well, Judge.  Thank you.

16          THE COURT:  Thank you, Mr. Rasmussen.

17          And good morning, Mr. Santilli.

18          DEFENDANT SANTILLI:  Good morning, your Honor.

19          THE COURT:  With respect to microphones, when you're

20   not speaking, Counsel, please ensure they're off.  Because when

21   you're whispering and conferring with your client, if the

22   microphone is on, it carries over and it disturbs the

23   proceedings.  When you speak, please turn it on, so that we can

24   go forward.

25          Now, with that, I'm going to ask Mr. Knight to call

1   the case.  And after that, I'm going to take a matter out of
2   order because I want to address -- while I have the presence of
3   Captain Derrick Peterson, from the Multnomah County jail here,
4   I want to address the issues about access and confinement
5   concerns that were raised so that we can get a dialogue
6   concluded and get those issues resolved.
7           Mr. Knight.
8           MR. KNIGHT:  Thank you, your Honor.  Good morning,
9   your Honor.
10          We're present today in the matter of the United
11  States versus Ammon Bundy, et al.
12          This is Case No. 16-CR-00051.
13          Ethan Knight and Geoff Barrow appearing today on
14  behalf of the United States.
15          Appearing today in the courtroom, in order, are as
16  follows, your Honor.
17          Defendant Ammon Bundy is present with counsel Lissa
18  Casey and Mike Arnold.
19          Defendant Jon Ritzheimer is present in the courtroom.
20  Standing by on his behalf today is counsel Amy Baggio.
21          Defendant Joseph O'Shaughnessy is present in the
22  courtroom with counsel of record Amy Baggio.
23          THE COURT:  Welcome back, sir.
24          MR. KNIGHT:  Defendant Ryan Payne is present in the
25  courtroom with counsel Rich Federico.

1             THE COURT:  Good morning.

2             MR. FEDERICO:  (Nods head.)

3             MR. KNIGHT:  Defendant Ryan Bundy is appearing on his

4 own behalf today with standby counsel Lisa Ludwig.

5             DEFENDANT RYAN BUNDY:  (Standing.)

6             MR. KNIGHT:  Defendant Brian Cavalier is present in

7 the courtroom with counsel Todd Bofferding.

8             THE COURT:  Good morning.

9             MR. KNIGHT:  Defendant Shawna Cox has waived her

10 personal appearance and is appearing by phone today.  She is

11 assisted by Ms. Ludwig in today's matter.

12           THE COURT:  Because her counsel is unavailable today.

13           MR. KNIGHT:  That's right, your Honor.

14           MS. LUDWIG:  And, your Honor, I would like to make

15 the same request that Mr. Coan made.

16           THE COURT:  Could you please turn on the microphone.

17           MS. LUDWIG:  Sure.  I would like to make the same

18 request that Mr. Coan made with regard to being able to text

19 Ms. Cox or receive a text from her if she has a question or

20 something she needs addressed.

21           THE COURT:  All right.  After we complete the

22 recitations, we'll address that issue.

23           MR. KNIGHT:  Your Honor, Defendant Peter Santilli is

24 present by videoconference in the District of Nevada today.

25           His counsel of record, Tom Coan, is present in the

1    courtroom today.

2               MR. COAN:  Morning.

3               THE COURT:  And as we noted, Mr. Rasmussen, who

4    represents Mr. Santilli in Nevada, is with him in person, in

5    Nevada.

6               MR. KNIGHT:  Thank you.

7               Defendant Jason Patrick is present in the courtroom

8    today with counsel Andrew Kohlmetz.

9               MR. KOHLMETZ:  Good morning, your Honor.

10              DEFENDANT PATRICK:  Good morning, your Honor.

11              THE COURT:  Good morning, gentlemen.

12              MR. KNIGHT:  Defendant Duane Ehmer is present in the

13   courtroom today with counsel Dave Audet.

14              THE COURT:  Good morning.

15              MR. KNIGHT:  Defendant Dylan Anderson has waived his

16   personal appearance.  Appearing on his behalf today is counsel

17   of record Sam Kauffman.

18              MR. KAUFFMAN:  Good morning, your Honor.

19              MR. KNIGHT:  Defendant Sean Anderson is in the

20   courtroom today.  Appearing on his behalf today is counsel Tyl

21   Bakker.

22              Counsel of record, Matthew McHenry, is not available

23   today.

24              THE COURT:  He's next door or upstairs, I understand,

25   in trial.

1           MR. BAKKER:  Correct, your Honor.

2           THE COURT:  All right.  Good morning, sir.

3           MR. KNIGHT:  Defendant David Fry is present in the

4    courtroom today with counsel of record Per Olson.

5           MR. OLSON:  Good morning, your Honor.

6           THE COURT:  Good morning, gentlemen.

7           MR. KNIGHT:  Defendant Jeff Banta has waived his

8    personal appearance today.  His counsel of record, Robert

9    Salisbury, is present in the courtroom.

10          MR. SALISBURY:  Good morning, your Honor.

11          MR. KNIGHT:  Defendant Sandra Anderson has waived her

12   personal appearance today.  Counsel of record, Tyl Bakker, is

13   present in the courtroom.

14          Defendant Kenneth Medenbach is present in the

15   courtroom, representing himself with standby counsel Matthew

16   Schindler.

17          THE COURT:  Good morning, gentlemen.

18          MR. KNIGHT:  Defendant Blaine Cooper is present in

19   the courtroom today with counsel of record Krista Shipsey.

20          THE COURT:  Good morning.

21          MS. SHIPSEY:  (Nods head.)

22          MR. KNIGHT:  Defendant Wesley Kjar has waived his

23   personal appearance today, your Honor.  Counsel of record James

24   Halley is present in the courtroom.

25          MR. HALLEY:  Good morning, your Honor.

1               THE COURT:  Good morning.

2               MR. KNIGHT:  Defendant Corey Lequieu is present in

3    the courtroom today.

4               DEFENDANT LEQUIEU:  (Standing.)

5               MR. KNIGHT:  Appearing on his behalf today is counsel

6    Paul Hood.  Counsel of record Ramon Pagan is not available

7    today.

8               THE COURT:  All right.  So, Mr. Lequieu, you see

9    Mr. Hood there.

10              DEFENDANT LEQUIEU:  Yeah.

11              THE COURT:  If there's an issue, just let us know if

12   you need to speak with him.  All right?

13              DEFENDANT LEQUIEU:  (Nods head.)

14              MR. HOOD:  Thank you.

15              THE COURT:  Thank you, Counsel.

16              MR. KNIGHT:  Defendant Neil Wampler has waived his

17   appearance at today's hearing.  Counsel of record Lisa Maxfield

18   is present in the courtroom.

19              THE COURT:  Counsel.

20              MR. KNIGHT:  Defendant Jason Blomgren has waived his

21   personal appearance today.

22              Counsel of record Robert Rainwater is present in the

23   courtroom.

24              THE COURT:  Good morning.

25              MR. RAINWATER:  Good morning.

1          MR. KNIGHT:  Defendant Darryl Thorn has waived his

2    personal appearance today, your Honor.  Counsel of record

3    Laurie Shertz is present in the courtroom.

4          MS. SHERTZ:  Good morning, your Honor.  My client has

5    asked that I make clear he's only waived appearance for today.

6    He would like to be present at future status conferences.

7          THE COURT:  Yes.  Well, one assumes that.  These

8    waivers are appearance specific, as I hoped I made clear

9    earlier.

10         MS. SHERTZ:  And I did, but the request was made.

11         Thank you, Judge.

12         THE COURT:  And it's noted.  Thank you, Ms. Shertz.

13         MR. KNIGHT:  Defendant Geoffrey Stanek is present in

14    the courtroom today.

15         MR. ANDERSEN:  He's actually waived his appearance.

16         MR. KNIGHT:  Okay.  Pardon me.  He has waived his

17    appearance at today's hearing.  Counsel of record Benjamin

18    Andersen is present on Mr. Stanek's behalf.

19         THE COURT:  Good morning.

20         MR. KNIGHT:  Defendant Travis Cox is present today

21    with counsel of record Paul Hood.

22         MR. HOOD:  Good morning, your Honor.

23         THE COURT:  Good morning.

24         MR. KNIGHT:  Defendant Eric Flores has waived his

25    personal appearance today.  Mr. Warren, counsel of record, is

1    not present.  Appearing on behalf is counsel Nedu Nweze.

2              THE COURT:  Thank you.

3              Good morning, sir.

4              MR. NWEZE:  Good morning.

5              MR. KNIGHT:  Defendant Jake Ryan is present in the

6    courtroom today with counsel of record Jesse Merrithew.

7              MR. MERRITHEW:  Good morning.

8              THE COURT:  Gentlemen.

9              MR. KNIGHT:  Thank you, your Honor.

10             THE COURT:  All right.  Is there any concern,

11   Mr. Knight, from the Government's perspective, with Ms. Ludwig

12   and Mr. Coan texting for the purposes they indicated?

13             I don't see that it would interfere with the audio

14   issues I was concerned about.

15             MR. KNIGHT:  No concern from the Government.

16             THE COURT:  Counsel, do what you need to do, then.

17             MR. COAN:  Thank you.

18             THE COURT:  All right.  As I noted, I wanted to take

19   out of the order, identified on the joint status report No.

20   488, a subject about which I sought input from the Multnomah

21   County corrections folks.  And, in particular, we have a

22   witness in the courtroom, Captain Derrick Peterson.

23             Item 10 on the agenda, docket -- not agenda, the

24   status report No. 488 is titled, Effective Pretrial Detention.

25   And it was subtitled, "Custodial status of the defendants and

1    the effect of transporting them between judicial districts."

2    I'll take that up, to the extent I need to, later.

3            Monitoring of attorney-client phone calls in Nevada.

4    Again, that is a matter that doesn't concern Captain Peterson.

5            But Item C and D:  In-custody defendants' access to

6    materials to assist in their defense and solitary confinement

7    as an impediment to self-representation were raised.

8            As I understand it, Ms. Ludwig, Mr. Arnold, and

9    Mr. Federico all wanted to make general comments about this.

10            Let me tell you what I've done, already.  I did meet

11    with our U.S. marshals, and impressed upon them the fact that

12    these issues must be solved.

13            I asked the marshal to invite a responsible

14    representative of the sheriff's office, and Captain Derrick

15    Peterson is here.

16            And with him are Katie Burgard, who is the program

17    administrator and is in charge of access to the law library,

18    and then one other person.

19            I understood from Captain Peterson, Mr. Arnold, that

20    there was already communication started between your office and

21    the jail to try to resolve some issues, and that there might

22    even be a meeting already planned for today between you and a

23    representative of the jail.  Is that --

24            MR. ARNOLD:  That's correct, your Honor.

25            Captain Peterson, myself, Lisa Ludwig, and possibly

1    Ryan Bundy are going to meet with him at one o'clock today.

2              THE COURT:  All right.  And so to the extent these

3    issues around self-representation might also involve

4    Mr. Medenbach's access, I don't know, Counsel, whether you're

5    free but could be available to meet with them, too.

6              What I'm hoping can happen is that there can be a

7    thorough dialogue through and potentially just solving the

8    issue -- issues around access, and the like.  And then if

9    there's a dispute that can't be resolved to the satisfaction of

10   the parties and with respect to --

11             Where did the captain go?

12             CAPTAIN PETERSON:  (Hand raised.)

13             THE COURT:  Oh, there he is.

14             With respect to the requirements of the jail, then

15   the matter could be brought to me on formal motion.

16             Are you able to participate, Counsel?

17             DEFENDANT MEDENBACH:  I --

18             MR. SCHINDLER:  Do you want to speak?

19             DEFENDANT MEDENBACH:  I tried to.

20             THE COURT:  Can you turn on your microphone,

21   Mr. Medenbach, please.

22             DEFENDANT MEDENBACH:  I tried to access the law

23   library there, and then getting time out of -- right now I'm

24   locked down.  For only two hours, I get to get out.  And it's

25   not much time to do things I want to do.  If the Court could

1    negotiate a way so I could get out more often and plus get to

2    the law library.

3              THE COURT:  Right.  So what I'm understanding -- yes,

4    Mr. Bundy.

5              DEFENDANT RYAN BUNDY:  The meeting that we're talking

6    about, you know, being that I am pro se, I do want to attend

7    that meeting personally, not my standby counsel.  She's okay to

8    be there with me, but I -- I want to be there.

9              THE COURT:  I understand you want to be there.

10             Captain, where is the meeting planned to be?

11             MR. PETERSON:  It will be at --

12             THE COURT:  Would you stand.  And we need a

13   microphone, please, for him.  Once we can turn it on.

14             It takes -- how many lawyers does it take to turn on

15   a microphone?

16             (Laughter.)

17             THE COURT:  Captain, yes, sir.

18             MR. PETERSON:  Yes, it will be at the detention

19   center.

20             If I'm able to have Ryan Bundy in the meeting, we'll

21   have to figure a place within the secure fine -- confines of

22   the facility.

23             THE COURT:  It would be very helpful if that could

24   happen, along with Mr. Medenbach, also.

25             It -- except -- hold on a minute.  One at a time.

1           MR. KOHLMETZ:  Yeah.

2           THE COURT:  Is Mr. Medenbach housed at MCDC, or not?

3           MR. SCHINDLER:  Yes, he is, your Honor.

4           THE COURT:  I'm sorry?

5           MR. SCHINDLER:  Yes, he is, your Honor.

6           THE COURT:  So let me ask this, Captain.

7           Do your best to see if those who are expressing

8    interest can all be present, including Ryan Bundy and

9    Mr. Medenbach.

10          If that can't happen, then standby counsel must do

11   their job to convey back.  But it would be best if you heard

12   from Ryan Bundy personally what his issues are and what his

13   needs are.  The same with Mr. Medenbach with respect to his.

14          And if, as I say, an issue -- the issues cannot be

15   resolved, then what I want is a joint report back from counsel.

16   Perhaps one of the prosecutors wants to attend the session,

17   too, but it's primarily between the defendants and the

18   sheriff's office about this.

19          If -- if an issue remains, then I would like a joint

20   report identifying what the issues are and what the proposed

21   solutions are and the bases for them.

22          Would that work, Mr. Arnold, from your perspective,

23   to advance the issue?

24          MR. ARNOLD:  Yes, your Honor.  Just a couple of minor

25   items.  I'm okay with being in a contact room, all cramped and

1   uncomfortable.  That's fine -- fine with me, if it's okay with
2   the jail.
3          And also one thing we didn't add was I -- I have
4   recent concerns about particularly Ammon and Ryan's rations.
5   And since I -- since they've been back from Nevada.
6          THE COURT:  I don't know what you mean by "rations."
7          MR. ARNOLD:  Food.  They look thin and emaciated.
8   Based upon -- I just want to put on the record they look
9   different than when the left for Nevada.  They look like
10  they've lost weight.  I don't know if there's a mechanism for
11  comparing their weight.  But if they could be increased
12  rations, that would be great.
13         THE COURT:  Why -- why don't you --
14         MR. ARNOLD:  I'll talk about that, too.
15         THE COURT:  Thank you, sir.
16         All right.  Mr. Federico, you haven't spoken on the
17  issue but your name was on it.  Does this address it, from your
18  perspective?
19         MR. FEDERICO:  Your Honor, Mr. Payne is actually
20  housed at the Inverness jail.  So it's a separate issue.
21         Upon from return from Nevada -- I don't know if his
22  classification status was changed, so that he and others at
23  Inverness jail have now been given keep-separate orders, such
24  that their counsel are not permitted to meet with them in
25  contact room or noncontact room paper pass at any time when

1    another counsel is there meeting with their client.  And since

2    there are a number of them there, what ends up happening is you

3    show up to meet with your client, and they just can't move them

4    because of the keep-separate order.  And I know, for example,

5    Ms. Shipsey has -- and Mr. Cooper have the same problem, where

6    the investigator will come up and spend a couple of hours

7    waiting and never get to see their client.

8           I spoke to the staff, the officer in charge at

9    Inverness yesterday about this issue.  My understanding is it's

10   not a U.S. Marshal's issue.  It is when booked in the justice

11   center.  And they were going to take a look at that

12   classification.  Because the true intent, I understand, was to

13   keep them separate in the dorms where they live but not to

14   deprive access to counsel.  So we're going to engage with the

15   jail on that issue.

16          Likewise, if the Court would allow, if it's

17   unresolved, we can put that in a joint status report.

18          THE COURT:  Or earlier, if there's an issue.  But,

19   yes.  I want to -- I have conveyed, in the clearest terms I

20   know, to both the United States Marshal and to the sheriff's

21   office, the -- the need, without upsetting and without

22   infringing and without affecting the orderly operations of the

23   jail, the need of the parties to access their lawyers; to see

24   information on a computer, if that's the way to do it; to have

25   writing utensils that write.

1          I understand that if -- everyone is supposed to have

2   one in the MCDC.  They're flexible pens, I'm told.  If they're

3   used up, then the person is to ask for another.

4          I'm told that every inmate is entitled to six hours a

5   week in the law library.  But if that's not enough, there needs

6   to be some discussion, starting this afternoon, about

7   increasing that for -- on a particular showing.

8          And then I want to hear back if there's an issue that

9   the Court should address, as opposed to trying to resolve this.

10          Now, I'll get to you in just a second, Mr. Kohl --

11   oh, Mr. Kohlmetz, you were standing on this?  But -- no?

12          MR. KOHLMETZ:  Well, Mr. Federico raised my issue.

13   We've had the same experience.

14          Mr. Patrick would also like to be included in the

15   discussions.  It is his intent to file a motion with the Court

16   to go pro se.

17          THE COURT:  He's going to have to wait.  Let me just

18   address that point.

19          I did get a message, Mr. Patrick, this morning that

20   you do wish to have what's called a **Faretta** hearing to

21   determine whether you can proceed without -- as -- as your own

22   lawyer.

23          The message also indicated that you did not want

24   standby counsel, and you need to know that those two do not go

25   together.  Everyone who is representing himself will have

1    standby counsel.

2            If you wish me to engage in that colloquy with you

3    and consider it, then you and Mr. Kohlmetz should file a

4    motion, and I'll get it scheduled as soon as we can.

5            MR. KOHLMETZ:  We're just waiting for a form to come

6    back from the FPD, your Honor.  I'll file it as soon as I get

7    the form.

8            DEFENDANT PATRICK:  And I don't consent to standby

9    counsel.

10           THE COURT:  You don't have to consent, sir.  I'm just

11   telling you what the parameters are going to be so you know in

12   advance what to expect at the hearing.  You don't have to

13   consent.

14           All right.  Thank you, Mr. Kohlmetz.

15           Now, then back to this issue involving the sheriff's

16   captain and the others from the jail who are here.  They have

17   other work to do.

18           Is there anything we need to address on the record

19   right now with them?  Otherwise, I'll excuse them.  I'll --

20   I'll wait for a report back on the subject after conferral.

21           MR. ARNOLD:  And, your Honor, just by way of proffer,

22   so it's on the record, I've been writing with this --

23           THE COURT:  Slow down, please.

24           MR. ARNOLD:  Just by way of proffer, for the record,

25   this is the pen (indicating) that they get to use.  It's a

1   flexible pen.  And I've written three sentences.  And it's

2   uncomfortable, it bends, you cannot get a good angle on the

3   paper.  And I can understand and sympathize with them, why this

4   is an inadequate situation.  I just wanted to show the Court

5   the pen (indicating).

6          THE COURT:  I understand.  I also understand there's

7   a basis for the rule.  So -- I'm not going to be able to change

8   all of the jail's rules, and I'm not here to do that.

9          What I'm trying to do is to ensure there's

10  opportunity for meaningful communication to try to address some

11  of these issues, so that we -- we can proceed.

12         All right.  On this subject, then, the effect of --

13  the issues around the Multnomah County detention, is there

14  anything else we need to raise before I excuse the Multnomah

15  County representatives?  Because they do have other things to

16  do.

17         All right.  Thank you very much.

18         Mr. Arnold, I'm going to put you in charge of

19  generating any joint status report that asks the Court to make

20  a specific ruling.  And, in any event, a joint report that

21  tells me what the outcome is.

22         MR. ARNOLD:  Yes, your Honor.  Thank you.

23         THE COURT:  We'll set a deadline for that, once I get

24  to the end of process.

25         I'll just also note with respect to Items A and B on

1    this effect of pretrial detention issues, the effect of the

2    transport, and the issues of attorney-client phone calls in

3    Nevada, I believe those are concerns that -- the

4    attorney-client phone calls in Nevada are concerns.  To the

5    extent they persist, they have to be raised first with the

6    court in Nevada.  I'm not in a position to correct or monitor

7    what's going on there.  I do understand these are impacts that

8    the parties want me to keep in mind, especially as we go

9    forward and consider the motion to dismiss that particularly

10   raises the issue of the ongoing prosecution in Nevada and its

11   counterpart in Nevada.

12           So I expect you'll be telling me about those things

13   in more detail, then, in conjunction with that motion.  But I

14   don't believe they require any more discussion here.

15           I did want to note, Ms. Baggio, that this was a

16   concern of yours, the attorney-client -- monitoring of the

17   telephone conversations.  And I am glad to see your client is

18   here and you're able to interact with him personally.

19           So if there's an issue you think that pertains to the

20   Oregon situation, you'll let me know.  Otherwise, we'll move

21   on.

22           MS. BAGGIO:  Very well.

23           THE COURT:  Thank you.

24           So I did have a note -- and I did just address this

25   with Mr. Patrick -- about your wanting to have the Court

1   consider allowing you to represent yourself.  And so

2   Mr. Kohlmetz and you will file the necessary paper.  We'll get

3   a hearing scheduled for that.

4           MR. KOHLMETZ:  Yes, your Honor.

5           THE COURT:  Now, Mr. Audet.

6           I received a message, as well, that your client

7   wishes to represent himself; or wishes another lawyer, or

8   something.

9           To the extent there is an issue, a motion needs to be

10  filed.  It will be docketed for a separate hearing.

11          MR. AUDET:  Understood.

12          THE COURT:  Mr. Ehmer, does that make sense to you?

13  Do you understand?

14          DEFENDANT EHMER:  Yes, ma'am.

15          THE COURT:  Very good.

16          (Pause, referring.)

17          THE COURT:  All right.  Mr. O'Shaughnessy does need

18  to be arraigned on the Superseding Indictment, and so let's

19  proceed with that.

20          Ms. Baggio.

21          MS. BAGGIO:  Thank you, your Honor.

22          At this time we would acknowledge receipt of the

23  charging instrument, proceed as named, waive further reading

24  and advice of rights, and enter a not guilty plea.  We would

25  request and accept the trial date previously scheduled for the

1   other defendants.

2          THE COURT:  Thank you.

3          Mr. O'Shaughnessy, do you understand all of the

4   statements your lawyer made on your behalf?

5          DEFENDANT O'SHAUGHNESSY:  Yes, your Honor.

6          THE COURT:  All right.  Those representations will be

7   entered.  A not guilty plea will be entered.  The Court's

8   finding of excludable delay previously made because the case is

9   complex applies equally to Mr. O'Shaughnessy.  His jury trial

10  date, then, is 9-7-16, and I'm finding excludable delay for him

11  through that date.

12         Anything else on that point?

13         MS. BAGGIO:  (Shakes head.)  Thank you.

14         THE COURT:  Thank you very much.

15         Now, on the agenda was an issue involving Mr. Flores'

16  and Mr. Warren's conflicts with the trial date.

17         Counsel, did you want to address that, or did you

18  want to wait until Mr. Warren was available personally to do

19  that?

20         MR. NWEZE:  Yes, your Honor.

21         I would wait until Mr. Warren was personally

22  available --

23         THE COURT:  All right.

24         MR. NWEZE:  -- to handle that.

25         THE COURT:  All right.  We'll be in touch with him to

1    raise it.

2              MR. NWEZE:  Yes.  Thank you.

3              THE COURT:  All right.  And then Mr. Hood.

4              You and Mr. Cox I would like to address for a moment,

5    please.

6              With respect to the trial date, his case --

7    Mr. Cox -- can you hear me?

8              All right.  As I understand it, when Mr. Cox was

9    arraigned, there was an issue raised about the trial date I've

10   already set.  And if that needs to be addressed, I would like

11   to hear about it now, please.

12             MR. HOOD:  No, your Honor.

13             We just -- as -- Mr. Knight was present as well.  The

14   discussion was simply whether or not the Court would -- we

15   would wait for the Court's ruling -- your ruling on the

16   question of the complexity of the case.

17             My assumption is -- I've discussed with my client, is

18   that the Court would make the same ruling in this situation as

19   it has with the other defendants in the case.

20             THE COURT:  It hasn't gotten any less complex with

21   your clients joining and being here now.

22             So, yes, the same finding made with respect to the

23   other defendants -- just confirmed as to Mr. O'Shaughnessy --

24   now applies to Mr. Cox.  I am finding excludable delay, based

25   on complexity, for him and setting his trial as well for

1    9-7-16.

2            MR. HOOD:  (Nods head.)

3            THE COURT:  Thank you.

4            MR. HOOD:  Thank you, your Honor.

5            THE COURT:  All right.  The next item on the agenda.

6        Mr. Olson, you had a motion, and then I got a message

7    that you wanted to wait on my addressing it until you had

8    further conferral, or something.

9            MR. OLSON:  I believe the Government --

10           THE COURT:  Do you have your microphone on, please.

11           MR. OLSON:  I believe the Government intends to file

12   a response to that motion.

13           THE COURT:  All right.

14           MR. OLSON:  And -- by May 16th.

15           THE COURT:  Could we hear it, then, on -- at the May

16   23 time block?

17           MR. OLSON:  Yes.  If that's okay with the Court, that

18   would be good.

19           THE COURT:  We're going to fit all of this in at some

20   point.

21       So I'll ask the clerk to note, then, the Government

22   will respond in writing to Mr. Olson's motion on Mr. Fry's

23   behalf.  That's Docket 493.

24       Was it May 16, Mr. Knight?

25           MR. KNIGHT:  Yes, your Honor.  Thank you.

1          THE COURT:  All right.  May 16.  No replies.  We'll

2     fit it in for hearing in the block of time currently reserved

3     for -- beginning May 13.

4          Ms. Maxfield, with respect to a forthcoming motion,

5     as I understand it, on 404(b) issues.

6          MS. MAXFIELD:  Yes, your Honor.  We would ask the

7     Court to kick that down the road a little bit.  Maybe to the

8     next status conference.

9          THE COURT:  All right.

10          MS. MAXFIELD:  I think it really goes to a motion to

11     sever, and we don't have dates on that yet.

12          THE COURT:  Correct.

13          So this larger question -- and I think, Mr. Halley,

14     you have the **Bruton** issue.  Is that right?

15          MR. HALLEY:  Yes, your Honor.

16          THE COURT:  I think it -- it is, in terms of

17     management, a similar issue to 404(b) issues.  It has to do

18     with what evidence will be admissible against whom and in what

19     context in trial.  And the complexity of that would vary,

20     depending upon who's in the trial where the evidence is being

21     proffered.

22          Fair?

23          MR. HALLEY:  Agreed, your Honor.

24          THE COURT:  All right.  So Ms. Maxfield is suggesting

25     the 404(b) issue needs -- needs a little more time to develop.

1    I'm thinking the **Bruton** issues do too.  But part of that is

2    driven by the question as to who.  And that, in turn, is driven

3    by this question of motions to sever and potentially, for

4    example, Mr. Warren's renewed motion to continue, and -- who

5    was it?  Where's Mr. Bakker?

6              MR. BAKKER:  Here, your Honor.

7              THE COURT:  Mr. Bakker, you filed a waiver of speedy

8    trial on your client's behalf.  Didn't call it a motion to

9    continue, but it -- it felt like one.

10             And so we -- I think -- are going to be coming to a

11   place where there needs to be clarity as to whether any

12   defendant affirmatively seeks to be excluded from the September

13   17 trial date either because of severance or because of any

14   other reason leading that client to choose to waive.

15             Now, is your client still of a mind that your client

16   wants to waive speedy trial rights, consistent with what was

17   filed?

18             MR. BAKKER:  That is correct, your Honor.

19             We're also intending to file a motion to sever, and

20   requesting a different trial date on other bases.

21             I guess my concern with the 404 issue raised by

22   Ms. Maxfield is I need that information in order to

23   effectively, I think, argue my motion to sever, as well as

24   co-conspirator statements that the Government may be intending

25   to offer.  So I'm a little concerned about delaying that.  I

1   would like to get my motion to sever filed.

2           THE COURT:  Well, let me ask this.  If your client

3   moved to continue because your client wanted to continue and

4   did not want to go to trial on September 7th, and was waiving

5   speedy trial rights on September 7, I don't know how that

6   motion would be resolved until it was considered.  But if it

7   was granted, then those issues of timing would wait.

8           MR. BAKKER:  Correct.

9           THE COURT:  All right.  So that's your current

10   assessment with your client as of now?

11           MR. BAKKER:  Yes.

12           THE COURT:  Your client is out of custody?

13           MR. BAKKER:  She is.

14           THE COURT:  Are there any other lawyers who have

15   clients out of custody, whether the out-of-custody client is

16   present here or not, who presently have a view similar to

17   Mr. Bakker's with respect to the September 7th trial date?

18           Mr. Rainwater.

19           MR. RAINWATER:  I do on behalf of Mr. Blomgren, your

20   Honor.  He would be willing to waive time, and we would ask for

21   a later trial date.

22           THE COURT:  I'm not taking that as a request right

23   now.

24           MR. RAINWATER:  I understand.

25           THE COURT:  I'm trying to get a sense of how to

1    manage this, based on people's perspectives at this point.

2              So you and Mr. Bakker have a similar view in that

3    context?

4              MR. RAINWATER:  Yes.

5              THE COURT:  All right.  Is there another lawyer who

6    wants to be acknowledged on that front?

7              Ms. Baggio.

8              MS. BAGGIO:  Thank you, your Honor.

9              On behalf of Ms. Wood -- and I understand that is an

10   issue that she and her client are currently discussing, and

11   they may also seek a later trial date.

12             THE COURT:  Mr. Ritzheimer.

13             MS. BAGGIO:  Yes, that's correct.

14             THE COURT:  All right.  So that's three.

15             Is there anyone else, potentially?

16             MR. KAUFFMAN:  Your Honor, on -- there are a number

17   of out-of-custody clients who, I think, may ultimately be in

18   that position.  But are -- until recently, we're not prepared

19   to broach that because of the Court's ruling.

20             THE COURT:  I'm not committing anybody --

21             MR. KAUFFMAN:  Right.

22             THE COURT:  -- to any position right now.

23             I'm simply inquiring whether there is some community

24   of thought along the lines Mr. Bakker has expressed for his

25   client; and now Mr. Rainwater has expressed for his; and

1    potentially Ms. Wood is expressing for hers.

2           MR. KAUFFMAN:  Right.  And, your Honor, the Court

3    asked us to -- by e-mail, to try to reach some consensus about

4    when we think a motion deadline would be.  And I e-mailed the

5    out-of-custody group and got basically no responses on that

6    regard.  So I don't --

7           THE COURT:  Do you have an opinion when that would be

8    a viable decision to make?

9           MR. KAUFFMAN:  The most -- the best that I can do is

10   to -- is to suggest that it be made in advance of the deadline

11   for the round 2 motions because I think there's some reliance

12   on collaboration in that regard.  When that deadline would be

13   appropriate, I can't comment on that now.

14          THE COURT:  All right.  Does anyone else want to be

15   heard on that issue, just to express --

16          Mr. Anderson?

17          MR. ANDERSEN:  I'll just echo what Mr. Kauffman said.

18   I don't think that we are in the position to make a -- to

19   continue at this point, but it certainly could be an issue that

20   we would --

21          THE COURT:  I'm not inviting it.

22          MR. ANDERSEN:  Right.

23          THE COURT:  I'm simply trying to acknowledge that

24   Mr. Bakker has staked out a position on his client's behalf.

25          Mr. Warren has, in a different way.  Mr. Rainwater is

1    thinking along those lines.  And I'm trying to assess here.

2          Now, with respect to the defendants who are in

3    custody, September 7 is the date, and it will continue to be

4    the date.

5          We have to move the matter forward because those who

6    are in custody need an adjudication of the charges that are

7    brought against them.  So to the extent there are staging

8    priorities that need to be made, they have to be made in favor

9    of those who are in custody vis-a-vis those who are not.  I --

10   I just think that's a fundamentally fair approach.

11         All right.  So both the 404(b) issue and the

12   so-called **Bruton** issue, I'm simply noting, Counsel, that we

13   will carry those discussions and figure out a place to put them

14   in the general calendar of things, but they don't -- we're not

15   going to deal with them on the merits today.

16         Now we get to the motion for preservation.  This is

17   what was called dispute No. 1 on document 442.  It is also a

18   motion, document No. 456.

19         Mr. Coan, I think, is standing in for Ms. Wood on the

20   former.  And then with respect to a particular motion, a

21   version thereof on preservation with respect to Mr. Santilli.

22         MR. COAN:  That's correct, your Honor.

23         THE COURT:  All right.  Go ahead.

24         MR. COAN:  Thank you.

25         First, I'll argue the general motion that Ms. Wood

1    filed, your Honor.

2          THE COURT:  And then let's let the Government respond

3    to the general issues, first, before you get particular as to

4    Mr. Santilli.

5          MR. COAN:  Okay.  Thank you.

6          THE COURT:  Hold the microphone a little closer.

7          MR. COAN:  As the Court knows, this is an

8    unprecedented case, as the Government has characterized it as.

9    There are terabytes of information here.  We're just getting

10   the information now.  We have not been able to go through even

11   the information that we've received, and there's still more to

12   come.

13         We're not in a good position.  We, the defendants,

14   are not in a good position to evaluate what is and isn't going

15   to be relevant.  All's we're asking here, right now, with this

16   order, is not for discovery or production of the information

17   but just to hold the status quo so that it's not destroyed.

18         In fact, the Government, your Honor, has sent out

19   letters to many of the service providers -- Internet service

20   providers, social media providers such as Facebook, YouTube,

21   Twitter, and the like, to all of the defendants' accounts,

22   asking for the same from them because they think that those

23   accounts may contain potentially useful information.

24         And that's the way we're looking at this now, is this

25   information that the Government agents -- whether they're

state, local, or federal, who are participating in this

investigation -- may have potential useful information in their

e-mail accounts or their text messages, we're primarily

concerned with the loss of electronic information.  So the

burden that would be put upon the Government here is not great.

We're not asking them to store boxes and boxes of information.

This is just to keep them from deleting or destroying

information that could be potentially useful to us.

And as Ms. Wood pointed out in her motion, there is

concern about this.  The sheriff in Harney County destroyed

information from his Facebook that some of us may have found

potentially useful in this case.  So the burden isn't great for

the Government.

Under the due process standard, the Government is

supposed to retain potentially useful information.  And the due

process cases, your Honor, are looking at this from after a

conviction in the case, after the cases are all over.  And so

we're not looking at any bad faith situation.  We're not

claiming any bad faith.  We're just wanting to put the agents

on notice that this information is potentially useful to us,

please don't destroy it.

I think also that the Court's standing order here in

this district, standing order 2015-5, is broader than the due

process standard.  And Judge Aiken, who was the chief judge at

the time, issued this order.  And she said that the Government

1    is to provide in a criminal case, amongst other information,

2    any information that casts doubt on the credibility or accuracy

3    of any evidence or testimony that the Government anticipates

4    offering in its case-in-chief or which supports an argument for

5    a lesser punishment at sentencing.

6            We're looking at information that could be useful to

7    us in cross-examination; information that may go towards

8    motive, bias, and interest of these Government agents who may

9    testify.  And that's information that we may be able to find.

10   At some point we could make a more specific request, once we

11   know which particular agent or which agency is involved with

12   our client and how our case unfolds in terms of our defense.

13   But it's so early on in this case, it's very difficult to tell

14   you, right now, which agent has relevant information that we

15   need.

16           I think also, your Honor, the American Bar

17   Association model rules, the rules of professional

18   responsibility, which Oregon has a -- the same rule, 3.8D,

19   which requires production.  And we're not asking production

20   now.  But it does require production from the prosecutors of

21   all information known to the prosecutor that tends to negate

22   guilt or mitigate the offense.  And, again, this is -- we're

23   only asking for nondestruction, not production at this point.

24           As Ms. Wood pointed out, I think the authority that

25   the Court has in its equitable powers to take control of the

1    case, the Court could use that authority to issue this order.

2    Because this is such a -- a large case, with so much

3    information and it's so early on, the Court could order the

4    Government to preserve this information for the time being.

5    We're not saying that this has to last to eternity, but at

6    least for the time being, until further order of the Court or

7    until this case is concluded.  We're asking that that

8    information be preserved, so that we have the opportunity to --

9    to access it, if necessary.

10            Again, the burden here is not great.  It's very

11   similar to what the Government is asking many Internet service

12   providers and social media accounts to preserve their

13   information that they might -- may find potentially useful.

14   We're just asking for the same thing from the Government agents

15   and agencies who were involved in the investigation of this

16   case so that we have a fair opportunity to -- to try our case

17   with the information that we may need to cross-examine those

18   witnesses.

19            THE COURT:  Are you aware, Mr. Coan, of any case in

20   which such an order was required or evaluated as something a

21   defendant is entitled to under the due process clause?  Are you

22   aware of any precedent compelling such an order?

23            MR. COAN:  Ms. Wood cited a civil case, your Honor --

24            THE COURT:  I mean, in the criminal context.

25            Of course, the civil settings are what they are.  One

1   might wonder why a person would be exposed to a criminal

2   process and never be able to take a deposition.  But in a civil

3   setting, they're routine.  But the rules are quite different.

4           MR. COAN:  Um-hmm.

5           (Defendant Blaine Cooper exits courtroom.)

6           THE COURT:  Under **Jencks** and **Brady** and **Giglio** and

7   professional standards, the prosecutors have numerous

8   affirmative obligations.  I'm simply asking if there's any

9   criminal case you know of where a court also ordered

10  preservation, which is, I think, implicitly subsumed in the

11  duty that the prosecutor has to provide the kinds of

12  information you're citing within those standards.

13          I don't know of any case, and that's why I'm asking.

14          MR. COAN:  I don't know of any case either, your

15  Honor.  Because most of them look at it after there's been a

16  conviction and then there's been a complaint that information

17  wasn't preserved.  And the Court has found due process

18  violations in some circumstances.

19          The case that Ms. Wood cites that indicates that the

20  fact -- if there is an order issued, it does put the agents on

21  a higher standard of alertness for this information, so that

22  they will not destroy it.  Because even though they may be

23  aware of their duties not to destroy, if they know that there's

24  a court order not to do so, they will perform at a higher level

25  in terms of complying with that order.

1          THE COURT:  Thank you, Mr. Coan.

2          MR. COAN:  Thank you.

3          THE COURT:  Mr. Barrow.

4          MR. BARROW:  Your Honor, we will primarily rely on

5    our response to the general motion for -- we believe it

6    outlines the Government's position fully.

7          Just in brief, the Government's view is that the

8    rules of discovery are meant to deal with this very situation.

9    The case is unusual in our district for the number of

10   defendants.  There certainly is a lot of data in the case.  But

11   that doesn't mean that we can't rely on the rules of discovery

12   to deal with these issues.

13         We understand our obligation both to seek out

14   materials and produce them.  And if we fail to produce

15   something that is discoverable, there are consequences that the

16   Court and the defense attorneys in this case are very familiar

17   with.

18         There really is no precedent for the order that's

19   been requested.  I had a very frank conversation with Ms. Wood

20   because I had never heard of anything like this and I asked her

21   if she had, and she candidly admitted that the answer is no.

22         The case that -- the civil case that's cited, I

23   believe even the preservation order in that civil case was not

24   issued.  But the civil context really isn't appropriate here

25   in -- in a criminal case.

1          The nature of the materials that the defendant is

2    asking for -- the defense are asking for are virtually

3    unlimited and they're highly speculative.

4          To be frank, I don't know that the Government could

5    comply with the order as proposed because I don't think it has

6    any reasonable limits.  I used the example of employees of

7    federal agencies or state agencies, that their agency

8    participated in the investigation and they may have commented

9    on something that they saw in the media.  That would be covered

10   by the proposed order, and I don't know that we would have the

11   capability to identify everyone -- every employee who

12   communicated about this case on either Government systems or

13   personal systems.

14         And so, therefore, we think the order would be

15   extraordinarily burdensome.  And, frankly, would set the

16   Government up for failure at some point because we couldn't

17   guarantee compliance with the breadth of that order.

18         THE COURT:  All right.  Thank you.

19         Mr. Coan, anything else on the general motion before

20   you address Mr. Santilli's particular motion?

21         MR. COAN:  Just a couple of things, your Honor.

22         The rules of discovery are all geared towards

23   production of discovery.  There is no specific rule that --

24   about preservation of information.

25         So, therefore, when there isn't a rule in the rules

1    of discovery or the criminal rules of procedure, the Court has

2    its equitable powers to fill in the gaps, and that's what we're

3    asking the Court to do here.

4              If the Court needs to be -- if the order needs to be

5    limited in some way -- and Ms. Wood did try to negotiate with

6    the Government on a more limited order, if you're going to do

7    that.  If -- we talked with the Government about where they

8    think it may be impossible for them to comply with it.  We're

9    willing to negotiate that.  But we're particularly interested

10   in texts and e-mails that may name any one of these defendants

11   in particular; that information.  And if any agent who was

12   participating in the investigation of this case has a text or

13   an e-mail that named one of these defendants, it would

14   obviously be important to that defendant or the attorney for

15   that defendant to review that, to see if this agent has a

16   motive, bias, or interest in the case that may have skewed the

17   investigation at all.

18             THE COURT:  All right.  Thank you.

19             With respect to Mr. Santilli's motion?

20             MR. COAN:  Yes, your Honor.  That's more specifically

21   directed.

22             Mr. Santilli has a -- quite a long history of being

23   highly critical of government, government agencies; in

24   particular, the BLM and the FBI.

25             He's had on his show, several times, shows directed

1    at Agent Daniel P. Love from the Bureau of Land Management.

2    Agent Love was highly involved in the Bundy Ranch standoff down

3    in Nevada a couple of years ago.  And we think, based upon the

4    interactions that Mr. Santilli has had with the BLM, with

5    Daniel P. Love, that there's reason to believe that there's

6    animosity that Mr. Love may have for Mr. Santilli.

7         We are investigating a selective prosecution or

8    vindictive prosecution claim, and so the information that we

9    have asked for -- the texts and e-mails of those individuals,

10   of Daniel P. Love or Agent Bretsing (phonetic), who is the FBI

11   lead agent in Oregon at this time, we want to know if there are

12   any e-mails from or text messages from Daniel P. Love, or

13   others -- may have been intermediary -- from Daniel P. Love to

14   Agent Bretsing that name Mr. Santilli because that would be

15   directly relevant to our -- our -- our investigation in a

16   selective prosecution or vindictive prosecution claim.

17        THE COURT:  So it's not a preservation issue as much

18   as it's a discovery issue?

19        MR. COAN:  Well, we're asking to preserve at this

20   point.

21        At some point, shortly, we will be asking for

22   production, but we just don't want it to be destroyed at this

23   point.

24        THE COURT:  All right.  So, we're dealing only with

25   the preservation issue as to evidence that might yield

1    something that would otherwise be producible in any event under

2    **Brady, Giglio,** and --

3              MR. COAN:  Yes.

4              THE COURT:  -- the like.

5              All right.  Mr. Barrow, on that specific subject.

6              MR. BARROW:  Your Honor, first of all, having --

7    after the -- Mr. -- Mr. --

8              THE COURT:  Excuse me.  Just a minute.  I'm -- I

9    can't hear.

10             Start over, please.

11             MR. BARROW:  Your Honor, we have not filed a formal

12   response to Mr. Santilli's motion because it came in a little

13   bit later.  I'm comfortable dealing with it today.  I think the

14   general principles outlined in the Government's response apply.

15             I did -- because of the more specific nature of

16   Mr. Santilli's request, I did alert both BLM and the FBI to

17   this motion.

18             My understanding -- although we're still looking into

19   it -- is that these types of records are held, you know, on

20   central servers, in -- at the headquarters location.  That

21   being said, you know, I think that the request illustrates the

22   very speculative nature of what Mr. Santilli is seeking.

23             If this were framed as a discovery request, the

24   materials -- the -- the request, as framed, wouldn't be

25   discoverable because it's based on pure speculation.

1          As it relates to Mr. Love -- or SAC Love, that would

2     appear to be something related to the Nevada prosecution.  Both

3     the date range that Mr. Coan has outlined and the involvement

4     of Mr. Love relates to the Nevada prosecution.

5          As to the request as it relates to SEC Bretsing,

6     again, this is a classic sort of fishing expedition for things

7     that Mr. Santilli believes must exist because he was critical

8     of -- of Mr. Love and Mr. Bretsing.

9          As we well know from prior detention hearings

10    involving -- involving Mr. Santilli, he was highly critical of

11    a great deal of people -- a great number of people.  And if

12    criticizing someone -- a government official on his show

13    created a legitimate request for discovery, we would be

14    searching through the President's communications, the Secretary

15    of State's communications, the former Secretary of State.

16    There really would be unlimited number of people to look for,

17    if that was the basis for producing something.

18         So when a more specific request for discovery is

19    provided by Mr. Coan on behalf of Mr. Santilli, we will

20    certainly look into it.  We have a duty to investigate, a duty

21    to find things that are **Brady**, and we fully intend to comply

22    with that duty.  But based on the speculation in Mr. Santilli's

23    current motion, that -- that these materials may exist and

24    may -- may help his -- his defense, we don't believe that at

25    least preservation should be ordered.

1           If -- if there were a rule for preservation of

2    materials, I think it would hinge, as it does in the civil

3    context, on some evidence that these things are being

4    destroyed.

5           THE COURT:  Well, that's actually not the case

6    anymore.  Under the evidence -- under the new rules of civil

7    procedure, there are preservation burdens that start at the

8    beginning of a case.  ESI, in the civil context, is very much

9    the subject of this kind of action.

10          But, as was noted, civil procedure and civil

11   production rules are not and do not track the criminal ones.

12   And that's not something I have the authority to change.

13          MR. BARROW:  I agree, your Honor.  And, obviously,

14   I'm not an expert in civil discovery.

15          Ms. Wood was kind of applying that sort of analogy in

16   talking about Sheriff Ward's potential destruction of personal

17   Facebook postings.  My only point is that the defense in the

18   Santilli request has not made any argument that there's a

19   danger that the stuff will disappear.  And we just think that

20   the -- based on the request for this nature -- or the

21   preservation of this material, we would ask that the Court not

22   impose a duty to preserve.

23          Obviously, we'll deal with the discoverability of

24   those issues later.  And if the Government has failed to

25   preserve something that is discoverable, again, there are

1  consequences.  The rules of discovery are fully capable of

2  dealing with those issues.

3         THE COURT:  I'm taking both general preservation

4  motion and Mr. Santilli's specific motion under advisement on

5  the papers and the argument just made, and I'll issue a ruling

6  in due course.

7         Ms. Shipsey.

8         MS. SHIPSEY:  Yes, your Honor.

9         At the outset --

10         THE COURT:  Would you turn on the microphone, please.

11         MS. SHIPSEY:  Oh, I'm sorry.

12         At the outset of Mr. Coan's arguments, Mr. Cooper

13  began to have chest pains.  He was taken out by the marshals,

14  and is being seen by a medic right now.  So he has not been in

15  here for the last 15 minutes, or so.  I wanted the Court to

16  know that.

17         THE COURT:  All right.  Well, we trust he will be all

18  right and that you will keep him informed of what's happened.

19  And if there's an issue because of his absence, you'll let me

20  know.

21         MS. SHIPSEY:  Absolutely, your Honor.

22         THE COURT:  Thank you.

23         All right.  The next item on the agenda was described

24  as overall compliance with our district's standing order

25  2015-5, which is the very order Mr. Coan was just referencing,

1    including a deadline for production of **Brady** materials and

2    other matters.

3            Mr. Kohlmetz is identified here as the person to

4    address it.

5            Good morning.

6            MR. KOHLMETZ:  Yes, good morning.  Good morning --

7            THE COURT:  Is your microphone on?

8            MR. KOHLMETZ:  I'm sorry.  I -- I don't have a

9    microphone.  I will borrow this one.

10           THE COURT:  We need to be sure those who are

11   listening elsewhere can here you too, even if we can.

12           MR. KOHLMETZ:  Sure.

13           THE COURT:  Go ahead.

14           MR. KOHLMETZ:  Okay.  Your Honor, I have conferred

15   with Mr. Barrow and the co-defendant lawyers for some of the

16   co-defendants.  I think at this juncture, if we could just push

17   this conversation back to the next status conference, we'll

18   have some more -- potentially more specific information.

19           I don't think the Court's assistance is required as

20   of yet.

21           THE COURT:  Very well.

22           I'm simply going to observe that I know there was a

23   delay in securing the services of a third-party vendor to

24   process the discovery being provided by the Government through

25   the CJA office.  And despite my best efforts, those approvals

1    took much longer than I expected.  But I understand the final

2    approval occurred late last week.  That the vendor is in place,

3    is working.

4         And so hopefully very soon all of the defense counsel

5    who are waiting on access in that way will have -- have a much

6    better situation.  So I'm guessing this might relate to that,

7    too, just the timing there.

8         The next item is assigned to Mr. Coan, with respect

9    to transcripts of video recordings to be used as evidence --

10   again, this anticipates to be used at trial, potentially.

11        There was a -- a matter submitted to me first

12   requesting -- and it looked like there was a semantic dispute,

13   at first, about whether the request was for the Court to order

14   the Government to provide lists.

15        I don't think that's really the dispute.  The dispute

16   is to ensure that transcripts of video recordings that are

17   going to be used get produced.

18        But is there an issue right now I need to address?

19   Or is it developing still?

20        MR. COAN:  I'll still developing, your Honor.  I've

21   been in communication with Mr. Barrow.  And he expressed to me

22   that they're making a good faith effort to get to us what we're

23   calling transcripts.  And what we call transcripts and what the

24   Government calls transcripts may be two different things.

25        Their 302 reports have quotes from certain videos

1    that -- in a broad sense, the term "transcript," that would be

2    considered a transcript.  Where -- whereas with the defense,

3    your Honor, we're in the process of looking at getting

4    transcripts for a lot of these videos.  So we don't want to

5    duplicate efforts if we're just going to get the same product a

6    month down the road.  That's why I had asked for a list of the

7    transcripts, so we're not duplicating efforts and adding to

8    costs in the case.  So at this point in time we are taking the

9    Government at their word that they're producing the transcripts

10   just as quickly as they can, or the 302 reports with quotes

11   from videos and audio recordings.  And I appreciate the Court's

12   expression back to the Government to put a priority on those

13   302 reports that do contain quotes from audio or video

14   recordings.

15        THE COURT:  All right.  Ms. Baggio, you're assigned

16   to what's -- what are described as items 5 and 6.  Are those

17   issues we need to discuss, or not?

18        MS. BAGGIO:  Your Honor, as to item No. 5, I have

19   been conferring with the Government.  And when we have these

20   reports due on Thursday, a lot of times a lot can happen.

21        THE COURT:  Well, at -- resolving is a good report.

22   But I'm just trying to ensure that if there is an issue to

23   raise now, we do it now.

24        MS. BAGGIO:  I believe the only issue left to resolve

25   on this item, your Honor, is the question of when the Court

1    would like any motion filed with regard to notice and discovery

2    of national security investigative techniques on these

3    defendants.

4           And my understanding, in speaking with the

5    Government, is that I -- after I provided them with a draft of

6    my motion for notice, the Government is conferring with the

7    relevant authorities.  And the plan is to report back to me the

8    Government's position on Monday.  And -- so I think, your

9    Honor, that we would request, if a motion is necessary, that

10   the Court would allow me to file that before round 2 because

11   the fruits would be so relevant to round 2.

12          THE COURT:  Actually, it would be good to be able to

13   argue this motion in the time we have set aside on May 23.

14          MS. BAGGIO:  Yes, your Honor.

15          THE COURT:  So if the question is do you have leave

16   to file it after April 27, the answer is yes.

17          If the question is when, the answer is as soon as

18   possible, so that the motion and an opposition can be in my

19   hands ahead of May 23 so that I have an opportunity to study

20   the -- the issues and not come into court where it's being

21   argued, just reading the Government's response then.

22          So what I'll ask is -- and I'll put this in the order

23   from today, is that I get a status report back from you.  I'll

24   wait for the order.  But we'll figure out a mechanism where you

25   can let me know the timing, and -- and we'll get it done then.

1          MS. BAGGIO:  Thank you, your Honor.

2          THE COURT:  All right.

3          MS. BAGGIO:  And I believe with regard to No. 6,

4  again, lots of conferrals are happening, your Honor.  At this

5  point in time I don't believe that we need the Court's

6  intervention on that item.

7          THE COURT:  Thank you.

8          Mr. Kohlmetz was assigned item 7, discussion

9  regarding a change-of-venue motion.

10          And let me just note for the record that recently I

11  e-mailed to counsel a draft of a plan regarding jury management

12  for selection of a jury.

13          I explained in that draft the very many steps that

14  need to be taken in order, ultimately, on September 7, to have

15  jurors reporting who have a decent chance of being qualified

16  and can participate in voir dire.

17          In order to have jurors reporting on September 7, we

18  need to begin very soon.  I had indicated in the e-mail, in

19  May, we could maybe stretch that to June.  But the -- the issue

20  regarding a change-of-venue motion, its timing, the work it

21  would take to permit the defendants to have expert witness

22  opinion evidence about the likelihood of seating a fair and

23  impartial jury here is time that would otherwise preclude us

24  going to trial on September 7.  So I've expressed, already, a

25  perspective that I think the timing of the change-of-venue

1    motion ought to await the actual voir dire.

2            I do -- and I'm simply reciting this now for the

3    record because, as I say, the communication was only to counsel

4    by e-mail and not in the public record.

5            I do acknowledge there are many issues both sides --

6    the Government and the defendants -- will want a chance to

7    review with prospective jurors.

8            And, fundamentally, a robust voir dire process would

9    be, in my judgment, the best way to determine if we are able to

10   sit a fair and impartial jury.

11           And in that process, it seems to me, if it -- if that

12   voir dire process undermines the right of the defendants to

13   have a fair and impartial jury, that -- if it could be

14   established that way, then that would be the time to address a

15   change of venue and the consequences of having to change venue

16   as of September 7th.  Because if we had to change venue as of

17   September 7th, we would have to find a venue and figure out

18   what to do with it, and then more time passes and there are

19   more consequences.

20           On the other hand, if we are able, with everyone's

21   cooperation with the questionnaire formatting and all of that,

22   to ultimately get to a place where the parties have had

23   adequate access in what I have described as a robust voir dire

24   process, to evaluate each and every juror presented, to

25   exercise challenges for cause, to exercise peremptory

1  challenges in a number yet to be determined, we may be able to

2  avoid the cost and delay and the expense of a venue motion.

3        So that's my setting the stage.

4        (Defendant Blaine Cooper enters courtroom.)

5        THE COURT:  Mr. Kohlmetz.

6        MR. KOHLMETZ:  Well, your Honor, perhaps I'll just

7  start with a brief history of my funding frustration.

8        I was appointed Mr. Patrick's case February 18th, if

9  my recollection serves.  Very shortly thereafter, after

10  conferring with Mr. Patrick, I was directed to explore a

11  change-of-venue motion.  I began contacting providers.  Very

12  soon came to the conclusion that the expenses would be very

13  great in developing the data necessary, by my reading of the

14  case law, to support such a motion.

15        In March, I approached the panel office and was

16  informed that given the expense -- given the amount of expense

17  involved, it would need to be -- it would need to go through, I

18  think, what was referred to as a national litigation support

19  office, a request-for-a-proposal procedure, and so we held off.

20  Some weeks later, mid-March, I was then told this was not a

21  litigation support project.  That it was not subject to the RFP

22  rules.  And that we could then submit a regular request through

23  the CJA panel office but that we should confer with the panel

24  office before doing so.

25        I was not able to confer in the next week.  Some

1    desperation on my part, in an effort to comply with the

2    timelines in the case, I went ahead and filed, on March 29th, a

3    request for funding in the amount of 129,300 dollars.  That

4    funding would accomplish two -- both components of the

5    change-of-venue analysis; a media analysis, qualitative and

6    quantitative of all of the media coverage, particularly

7    surrounding the time of this event.  The 41 days of almost

8    constant media coverage.  And -- and after the media

9    analysis -- and in my original proposal, concurrent with it, a

10    community survey attitude in this district and two others to

11    determine the extent of exposure and subsequent attitudes

12    within the prospective venire.

13         At some point in March -- at some point in April,

14    while I was on vacation, I was then informed that in an effort

15    to get the funding passed, I should bifurcate the request.

16    Request funding for the media analysis.  And if the results of

17    the media analysis then supported further -- supported the

18    second component, the community attitude service, proceed with

19    that.

20         I expressed an absolute willingness to do that, and I

21    have done that.  But I did, at that time, express my concern

22    that bifurcating the funding and bifurcating the work would

23    cause additional delay because there would be no concurrence in

24    the work.

25         I spoke with my proposed expert earlier this week.

1    The funding request has been bifurcated.  It is still pending,

2    as of today.

3              From the moment that they receive funding, the media

4    analysis will take 60 to 90 days for full work product to be

5    produced and divulged to all counsel.

6              If at that point, after review by counsel, a decision

7    is then made to proceed with the community attitude survey,

8    then I will be required to seek funding for that.  Assuming

9    that happened on that very day, the community attitude survey

10   and its resulting data is an additional 60 to 90 days.

11   Best-case scenario, if funding were approved today, according

12   it my expert, we're looking at approximately 150 days; which

13   puts us right up to September.

14             THE COURT:  Right.  Mr. Kohlmetz, I'm aware of your

15   funding request.  It is, at the moment, an ex parte submission

16   in the CJA e-Voucher system.

17             Since you've made this full disclosure today, I would

18   like leave to file it in the docket.

19             MR. KOHLMETZ:  Absolutely.

20             THE COURT:  I will consider it a motion that is

21   substantive, as well.  And I still think, consistent with the

22   order I entered, which is 389, this is not the case where

23   prejudice can be presumed.  I do believe this is a case where

24   there is strong opinion on many opposing issues.  That

25   prejudice, depending on one's perspective, could be against the

1  Government vis-a-vis prejudice against the defendants'

2  positions.  And I think you should expect -- but I will review

3  it all one more time -- that I'm going to deny the funding

4  request with leave to renew it upon a showing of prejudice that

5  is developed in the context of an actual voir dire.  Primarily

6  because I think the best mechanism for everyone accused -- and

7  for the Government -- is to confront face-to-face the jurors

8  who will decide the case and to determine whether they are

9  able, despite what is prevalent knowledge of an event, to be

10  neutral in evaluating the credibility of each witness

11  testifying against him or her, the substance of the evidence

12  presented by the Government, the evidence defendants choose

13  voluntarily to present, and this question of privilege with

14  respect to First Amendment expression and the issues around the

15  firearm possessions, and the like.

16          So I'm just -- I'm just being realistic about what I

17  have in front of me, and I appreciate -- I do want your

18  permission to be able to file those ex parte submissions in the

19  public record.

20          MR. KOHLMETZ:  Absolutely, your Honor.  And --

21  because if the motion for funding is denied, I -- I would

22  obviously like an opportunity to respond and then perhaps to

23  appeal that decision.  Having those records -- I've disclosed a

24  potential provider, already, to the Government.

25          THE COURT:  Absolutely.  Absolutely.

1          MR. KOHLMETZ:  So I would simply point out, your

2    Honor, that as I understand the law, the question of actual or

3    presumed prejudice will be remote, and I will not be able to

4    properly evaluate it without both the media analysis.  Because

5    the first step in the analysis, as I understand it primarily

6    from the **Skilling** case, is that I need to demonstrate that

7    there is media saturation.

8          One of the things about the media saturation in this

9    case that I suspect is far different than most criminal cases,

10   is that the media saturation did not begin after the crime or

11   the alleged crimes were committed.

12         For 41 days, and even before, during this protest,

13   there was live-streaming media coverage that amounts to -- and

14   I would have guessed in the prosecution's eyes -- a continuous

15   and ongoing confession.  This is, I think, a very unique

16   circumstance, in comparison to many other cases, including the

17   Boston bombing case, where the nature of the media coverage and

18   the nature of the information in that saturation is so

19   fundamentally different than what we normally see.  That

20   without the subsequent -- assuming the media analysis bears out

21   what I believe I have just argued, that without the subsequent

22   community attitude survey to gauge the -- the nature of those

23   opinions and what the effect of that extreme amount and the

24   topical nature of that coverage did, I don't think I would be

25   in a position --

1          THE COURT:  Let me ask this, then, Mr. Kohlmetz.

2          You go ahead and file those motions in the record,

3    the ones you've already filed as part of the CJA matter.  All

4    right?

5          MR. KOHLMETZ:  Oh, do you want me to refile them?

6          THE COURT:  Well, they're not in the CM/ECF record.

7    They're in the e-Voucher record.  So they're not a part of the

8    record of the case at this point.

9          MR. KOHLMETZ:  Gotcha.

10          THE COURT:  And if you want leave to add a memorandum

11    with those motions about the necessity, in light of this

12    colloquy, you can do that.

13          MR. KOHLMETZ:  Sure.

14          THE COURT:  And then I won't decide the funding or

15    the general proposition of whether the motion should be

16    considered now until I get that.

17          MR. KOHLMETZ:  Okay.

18          THE COURT:  All right?

19          MR. KOHLMETZ:  (Nods head.)

20          THE COURT:  Very good.  That's how we'll deal with

21    it.  Thank you.

22          All right.  Item 8 is timing of the round 2 motions.

23          Before we get there, I do need, Counsel, your input

24    on the timing of argument on the round 1 motions.

25          We have many that were filed.  A couple that were

1   filed late.

2         Mr. Medenbach filed a motion yesterday, and the

3   Government's been directed to brief that.

4         Mr. Bundy's motion is still to be filed.  Mr. Ammon

5   Bundy's.

6         Ms. Baggio reserved the potential for a motion.

7         I want to be sure that when we convene on May 23, for

8   argument, we have a reasonable calendar to accomplish all of

9   the work.

10        And so I think the thing to do is for me to designate

11  representatives on both sides to work out a proposed argument

12  schedule for all of those currently filed and anticipated

13  motions.  And then I'll review them, and I'll issue an order

14  about how we're going to use the time so that we get the work

15  done.

16        Who wants to be the Government representative there?

17        MR. KNIGHT:  I can do that, your Honor.

18        THE COURT:  Okay.  Do we need more than --

19  Mr. Federico, you look like you're ready to volunteer.

20        MR. FEDERICO:  Yes, your Honor, I'm happy to

21  volunteer.

22        THE COURT:  You're it.

23        Okay.  So today's Wednesday.  Could you give me that

24  by next Wednesday?  That's also the day you give me updates on

25  discovery.

1          Is that enough time?

2          MR. FEDERICO:  Yes, your Honor.  I believe it would

3     be.

4          THE COURT:  Very good.  Let's do that.

5          Now, item 9 is this -- this proposal and plan for a

6     jury -- how to deal with a jury.  It also relates, in general,

7     to a motion -- I need to find the reference.

8          I think it was your motion, Mr. Bundy.  Mr. Ryan

9     Bundy's motion regarding grand jury discovery.  Because both of

10    them, in part, involve this question of the pool from whence

11    jurors are called for grand jury relative to Mr. Bundy's motion

12    and for trial.

13         I wanted to advance the inquiry just to give you all

14    some information that I secured via Ms. Glover's -- Teresa

15    Glover, the jury supervisor.  And I think what I can do is

16    through our processes here at the court, I can get a

17    declaration prepared, so that you have a reliable basis to know

18    some of the information that this motion addresses.  And I can

19    just give it to you now, so that you know what to expect.  And

20    that way we'll get -- we'll get this issue moving, and we don't

21    have to wait for a lot of other inquiry.

22         So here's what I understand.  And this is subject to

23    Ms. Glover verifying it by way of a declaration in due course.

24         The original case under which everyone is appearing

25    now, 16-51, was considered -- the original Indictment was

1    considered by the grand jury No. 1501.

2            The case originally indicted, the Cooper case, was

3    considered by grand jury No. 1502.

4            And the Superseding Indictment, by which everybody

5    was joined in this case, was considered by that original panel,

6    No. 1501.

7            Just for general information, these panels are formed

8    under the jury plan in the manner in which they're drawn.  They

9    serve for 18 months, and then they serve in alternate weeks.

10            Each panel has -- if I'm remembering correctly -- 16

11    jurors, and a minimum of 12 are needed for a quorum in any

12    grand jury setting.

13            That 1501 grand jury that returned the original

14    Indictment in Case 16-51 was drawn in a way that included one

15    juror from the Pendleton division, someone who was from

16    Hermiston.  And I don't have all of the breakdown yet, but I'm

17    trying to see if that can be accomplished.  But my own

18    understanding is corrected.  I thought the grand jury

19    Indictment was from the Portland division only, and that's not

20    true.

21            The grand jury panel did draw proportionately from

22    the District of Oregon.  So it isn't just a Portland division

23    panel from which the grand jurors were pulled.

24            And let me just be sure everybody understands.  The

25    Portland division is not Multnomah County.  It extends down to

1    the central Oregon Coast, all the way to the Pacific ocean,

2    down to the Oregon Coast, across to the Cascades, and up to

3    Hood River, or around there.  So it's the upper quadrant of the

4    state of Oregon.

5         The panel 1502, that originally indicted the Cooper

6    case, had at least two grand jurors from the Pendleton division

7    and one from Central Oregon.  And I don't know if that

8    qualified as Eugene, or what.  But they're -- so my point is,

9    there were jurors from outside of the Portland division that

10   returned those Indictments.

11        I am going to work with Ms. Glover to collect the

12   data that I think will help frame this issue, to the extent it

13   needs to be framed, so that you don't need to go through a --

14   any more discovery process, and I'll just get it done.

15        I'll get information collected.  We'll get a

16   declaration prepared on terms that I think are reasonable, and

17   filed.  And then if, Mr. Bundy, you believe a motion is

18   warranted, you're free to file it.

19        Does that work?

20        DEFENDANT RYAN BUNDY:  Yes.

21        THE COURT:  Okay.

22        DEFENDANT RYAN BUNDY:  Uh --

23        THE COURT:  Yes, sir.

24        DEFENDANT RYAN BUNDY:  When will that be?

25        THE COURT:  As soon as we can.

1          DEFENDANT RYAN BUNDY:  Okay.

2          THE COURT:  All right?

3          There are a lot of moving parts that all of you are

4    dealing with and there are 26 of you with lawyers and there's

5    one of me, with a good team of court supporters.  But I'm going

6    to do the best I can do.  We'll get it out reasonably soon.

7    All right?

8          DEFENDANT RYAN BUNDY:  Okay.  Thank you.

9          THE COURT:  All right.

10          MS. SHERTZ:  Your Honor?

11          THE COURT:  Yes, Ms. Shertz.

12          MS. SHERTZ:  Forgive me.  If you're done with that

13    piece, I'm not sure whether we actually ended up dealing with

14    No. 8, then, which was the timing of round 2 motions, which is

15    something I actually --

16          THE COURT:  We didn't.  I want to actually deal with

17    the calender, that whole list at the end.

18          MS. SHERTZ:  Okay.  I misunderstood when you called

19    No. 8 --

20          THE COURT:  No, no.  I may not be clear, but

21    there's -- there are a lot of things.

22          MS. SHERTZ:  Thank you.

23          THE COURT:  We'll catch it.  Thank you.

24          We've already addressed the pretrial detention

25    issues.

1          So now we want to get to this big calendar concern

2     and a list of what's being considered as -- as round 2 motions.

3          So on page 6 of the joint status report, there are

4     identified five different subjects.  The last three are really

5     defendant-specific subjects.  And it seems to me, maybe -- it

6     may be necessary for those to be addressed differently than a

7     group kind of motion.  Am I -- am I misreading that?

8          Who -- who is the organizer on behalf of counsel

9     around these motions?  Ms. Baggio?

10          MS. BAGGIO:  I am, your Honor.

11          THE COURT:  Thank you.

12          With respect, then, to these various motions to

13     suppress, those are defendant-specific, yes?

14          MS. BAGGIO:  That is generally true.

15          THE COURT:  All right.  Are you thinking there's any

16     global issue that would apply to every defendant?

17          I'm having a hard time conceiving what that would be.

18     Because if there's a suppression concern -- like Mr. Olson has

19     an issue specific to his client about an invocation, or another

20     lawyer thinks there wasn't a voluntary waiver of the right to

21     remain silent, those are all fact-specific to an individual.

22          MS. BAGGIO:  Your Honor, I would say that there are

23     some issues that we've identified that may be applicable to

24     more than one defendant, and we are working among ourselves --

25          THE COURT:  Okay.

1          MS. BAGGIO:  -- to find an individual to address

2     them.  For example, a Government use of a geolocation device.

3     It wasn't used on just one defendant.

4          THE COURT:  I see.

5          MS. BAGGIO:  But the same type of application might

6     be used on 17.

7          THE COURT:  I see.

8          MS. BAGGIO:  So we're working together to try to

9     efficiently address that.

10          And I think similarly, if we look at the types of

11    investigative techniques that the Government used, there were

12    clumps.  And the same means or methods were used against

13    multiple defendants.  And so that's kind of our approach.  So

14    that certainly while a **Miranda** issue would be a

15    defendant-specific, some of the Fourth Amendment items would be

16    applicable then to more than one person.

17          I think that the other type that comes to mind is

18    with the pole cameras and the All Writs Act, we're trying to

19    figure out, okay, well, where were the cameras?  Who might have

20    standing to challenge the captures that were made under those

21    cameras?

22          And so that's part of what our evolving understanding

23    of the discovery requires me to request of the Court, to say

24    I'm not really sure who might all be on some of those issues.

25          THE COURT:  So as the status report is printed out,

1   for me it all came out in black-and-white.  And I'm told, in

2   the text, that some things are highlighted in red.  So I can't

3   really tell what's agreed to and what isn't.

4            Maybe you, Ms. Baggio, could point up the issues that

5   you believe, on behalf of defendants, need to be concerned.

6   And then I'll hear from the Government.  And then we'll go

7   forward.

8            I can address the proposal about days to set aside

9   for round 2 arguments.  But I think we probably need to get set

10  when the round 2 motions will be filed.

11           MS. BAGGIO:  Your Honor, I don't believe there was

12  any dispute between the defendants and the Government as to the

13  proposed schedule.

14           THE COURT:  Okay.

15           MS. BAGGIO:  The word "proposed" appears wherever

16  that isn't a deadline already imposed by the Court.

17           THE COURT:  Okay.

18           MS. BAGGIO:  And so I believe -- and the Government

19  can correct me -- but this is the joint proposal as to round 2

20  on behalf of all of the parties.

21           THE COURT:  Is that right?

22           MR. KNIGHT:  That's right, your Honor.

23           THE COURT:  All right.  Well, I have to negotiate

24  with my team, too, in terms of being able to process all you're

25  giving me.  But I do want to address days to set aside for

1   hearing on round 2, and I need to get a calendar.

2          Do we have the hard calendar here, Ms. Boyer?

3          THE CLERK:  Yes, your Honor.

4          THE COURT:  May I see it, please.

5          I am out of the district the week of July 11.  The

6   options there are Judge Jones continues to volunteer to be of

7   assistance.  To the extent we needed to use July 11th, we could

8   enlist his help.  Otherwise, I'm available -- I have other

9   matters already scheduled but, of course, this takes priority.

10         I'm not out of the district, in other words, July 18

11  week or the week of July 26, or ahead of the week of July 11.

12         We have a status conference on July 6th, and it

13  occurred to me that perhaps it might be possible if we severed

14  one or more of these motions.  The more general ones, we could

15  potentially hear them on July 6th; that is, if they're fully

16  briefed, since we're already going to have a status conference

17  that day.

18         So I need to tell you the proposal for July 11 week

19  can't work.  And let me -- let me just give it back to you, now

20  that you know what -- where I am available.  And, Ms. Baggio,

21  you and Mr. Knight can do some more scheduling.  And include

22  Mr. Federico, too, since he's working on the allocation of

23  hearing time for May 23.  I'll just make him the hearing time

24  designator for this other one, too.

25         And then by Wednesday, maybe you can give me a

1   specific joint proposal on how to -- how to schedule out these

2   round 2 motions.

3           Would that work?

4           MS. BAGGIO:  Yes, your Honor.

5           MR. KNIGHT:  Yes, your Honor.

6           THE COURT:  And Mr. Federico?

7           MR. FEDERICO:  Yes, your Honor.

8           THE COURT:  Okay.  Now, I need to ask whether -- oh.

9           (Pause, referring.)

10          THE COURT:  Right now our next status hearing is June

11  15.  In anticipation of that, the waivers of appearance should

12  be June 1.  The joint status report should be June 8.  I'll

13  issue an order from today, reciting the additional reports I've

14  requested from all of you.

15          The two defendants who wish **Faretta** hearings will

16  file motions, and we'll get those docketed.

17          The issues around Multnomah County detention matters

18  will be developed and then reported back to me one way or the

19  other.

20          Does the Government have other matters I need to

21  address today?

22          MR. KNIGHT:  No, your Honor.  Thank you.

23          THE COURT:  Does any other defendant have a matter

24  that needs to be addressed in the public session before we

25  adjourn?

1              How about if you have a motion -- a matter, stand up.

2              Mr. Kohlmetz.

3              MR. KOHLMETZ:  Just a quick one, your Honor.  May I

4    have leave just to file Mr. Patrick's self-representation

5    request pending receipt of the form from the panel --

6              THE COURT:  Yes.

7              MR. KOHLMETZ:  -- just to get it?

8              THE COURT:  Yes, absolutely.  You can do that.

9              MR. KOHLMETZ:  Okay.

10            THE COURT:  And we'll get it docketed as soon as we

11    can fit you in.

12            MR. KOHLMETZ:  Terrific.  Thank you.

13            THE COURT:  As I understand it, Mr. Kohlmetz, this is

14    Mr. Patrick's desire?  You personally don't see there's a

15    conflict of any kind?

16            MR. KOHLMETZ:  I do not have a conflict with

17    Mr. Patrick.  I --

18            THE COURT:  He wishes to represent himself?

19            MR. KOHLMETZ:  Yes.  And he objects, as you heard, to

20    standby counsel.  I've told him, and you've told him that you

21    will be appointing standby counsel.  We can address that at the

22    hearing.

23            THE COURT:  Indeed.  I -- I respect your points, sir.

24    I just want -- wanted to figure out if Mr. Kohlmetz thought he

25    had a reason to withdraw, and he's telling me no.  So this is

1   driven by you, and we'll address it at your hearing.  Okay?

2           All right.  Yes, Mr. Arnold.

3           MR. ARNOLD:  Your Honor, your e-mail mentioned

4   bringing to your attention any concern we had regarding the

5   spacing for trial.

6           THE COURT:  Yes.  Let me just state that issue.

7           We're very crowded here, and there are many parties

8   who are not in attendance.

9           To the extent all 26 defendants go to trial at one

10  time, this -- this could not work (indicating).  And what I am

11  working on right now is -- working with GSA, who owns the

12  building, to see about a way to modify the courtroom to have a

13  meaningful space for trial.

14          For example, the way we're set out now, there's not

15  even room for a witness to approach the witness stand.  There

16  isn't a way for us to conduct a meaningful process.  So I'm

17  looking into the idea of removing the bar in this room,

18  removing the public spectator section, and having an entirely

19  separate dedicated room for observers.  So that where all of

20  the folks are sitting now and observing, there could be counsel

21  table, microphones, and more space for all of those who do go

22  to trial on September 7th, including jurors and probably a

23  larger jury box.

24          So that was the subject I wanted you to be aware I'm

25  looking into.

1          Mr. Arnold.

2          MR. ARNOLD:  Thank you, your Honor.  We have

3    objections to several of those items.  In general, we object to

4    removing live spectators from the courtroom, under the Sixth

5    Amendment.  We believe that there's a right to a public trial,

6    and we believe the term "public" is defined as having an open

7    view.

8          And I would just use by analogy that if I were to

9    book a room at the coast, and I was told that I had an open

10   view of the beach and there was a video monitor, I would ask

11   for a refund.  And I think the founders would do the same, if

12   that was the sort of setup we had in this courtroom.

13         And the due process reasons behind it are beyond just

14   the mere public observation.  There is a right to a defendant

15   to have someone who swears under oath, to have to look into a

16   courtroom of spectators, and know that there is some

17   accountability not only to their oath but to their community;

18   even though this is a very large community in the District of

19   Oregon.

20         The concerns I have about witnesses approaching, I

21   would recommend they exit the courtroom, go through the hallway

22   adjacent, and come into the side door.

23         Regarding cross-examination of witnesses, I object to

24   using a podium.  I need to be seated next to my client.

25         THE COURT:  I didn't say you couldn't have your

1    client next to you, next to a podium, did I?

2              MR. ARNOLD:  No, you did not, your Honor.  So that

3    would alleviate my concern of the podium, if I had my client

4    there.  So I appreciate that option.

5              THE COURT:  So, Mr. Arnold, those concerns are driven

6    in part just by the realities of space.  And, indeed, they may

7    be mooted, depending upon where we go and how many people we

8    have on September 7th.

9              MR. ARNOLD:  And I have suggestion regarding space as

10   well.

11             THE COURT:  I'm happy to hear it.

12             MR. ARNOLD:  I note that there is a secure Donald

13   Trump meeting on Friday in Eugene at the Lane Event Center.

14   There will be Secret Service there.  There will be other

15   security.  And I think it would probably be as great or

16   greater -- or similar to what we have in this courthouse.

17             I think that one option is to have the Government

18   rent out a conference center and have security set up there.  I

19   don't think this particular courtroom or this courthouse should

20   restrain the rights to due process and a public hearing.  I

21   think we could come up with a good plan.  And if fundings are a

22   concern, you know, we could address that as well.

23             But what I envision is if the Court thinks we can't

24   fit here comfortably, you know, a convention hall would work.

25   I believe security could be set up.  And I would be willing to

1   work with whomever to -- to assist in that.

2           THE COURT:  I understand what you're saying.

3           We have several issues.  Again, it's driven by the

4   number of people.  And as we've heard this morning, there are

5   some who want not to be part of the group going to trial on

6   September 7.  And that in fact may resolve some of these

7   concerns.  But there are issues of degree.

8           To -- Mr. Medenbach?  Yes, sir.  I'm sorry.  I didn't

9   see you.

10          DEFENDANT MEDENBACH:  Since we had our last status

11  meeting, I came across with -- with the Freedom of Information

12  Act, your oath of office that you took in 1999.

13          THE COURT:  Yes, sir.

14          DEFENDANT MEDENBACH:  And I can see how the confusion

15  could be that it's a single oath because it's a combination

16  oath; the two oaths in it.  Title 28 Section 453 and Title V

17  Section 331 of the United States Code.

18          So there's two oaths of office being taken here, and

19  I just want to put on the record that the Constitution doesn't

20  say a federal judge can take a second oath of office.  And if

21  the Constitution says that, then -- then a federal judge can't

22  take a second oath of office.

23          So I was just going to make that statement.  And if

24  anybody else on the co-defendant -- it's on my Facebook page,

25  if anybody wants to see it.

1           Thank you.

2           THE COURT:  Thank you, sir.  It's noted for the

3   record.

4           I think with respect to this question of the concept

5   I outlined here on the record and that I shared with counsel by

6   e-mail about possibly having a courtroom where only the

7   parties, the jurors, the witnesses, counsel were present and

8   all spectators were in another place is something on which

9   there will need to be briefing, if we get to that place.

10  Again, we're -- we have to get to the day by which I can

11  reasonably determine how many people will go to trial.  And I

12  appreciate your suggestion about witnesses coming in down a

13  hallway.

14          But, in the end, we've got to provide room for the

15  jurors and everyone else.  And the security issues for a

16  presidential candidate are just not the same as a case in which

17  12 or 13 people are in the marshal's custody.  So I also have

18  to take into account those -- those issues.

19          I'm going to do my best to consider all of the

20  options.  But if I get to the place where I'm ready to make a

21  decision, I'll let you know so that you all can brief quickly

22  the question; know that it's coming, so get started on it.

23          MR. ARNOLD:  And, your Honor, may I address

24  Mr. Medenbach's concern?

25          I have no doubt that your Honor has taken an oath of

1  office and I -- maybe if it would placate the concerns -- I

2  mean, I -- I have no problem with redoing my oath as a lawyer

3  at any time.  You know, I have no problem swearing under the

4  Constitution.  I don't know if -- if it would address concerns

5  if your Honor, at some point in the future, just re -- re --

6  renewed your vows.

7           THE COURT:  Mr. Arnold, please take a seat.  I've

8  taken care of this matter three times now.  I'm not going to

9  take it up again.  Mr. Medenbach was allowed to make his point

10 for the record.

11          Have a seat.

12          MR. ARNOLD:  Okay.  Thank you, your Honor.

13          THE COURT:  All right.  Are there any other matters

14 we need to do in the public record?

15          Yes, Mr. Federico?

16          MR. FEDERICO:  Your Honor, the Court provided to the

17 parties, on April 21st, the draft timeline for a jury plan.

18          THE COURT:  Yes.

19          MR. FEDERICO:  I know we've already talked about the

20 grand jury and how that was opposed.  But my understanding from

21 the --

22          THE COURT:  You're right.  I needed to get back to

23 that.

24          I -- I have received your letter on behalf of all of

25 the parties in response to my proposal, which suggested some

1    agreement and some disagreement.  And I think I'm going to have

2    to enter an order to get this process going.

3            Preliminary to that order getting started, I am going

4    to have to develop the initial questionnaire to go with jurors.

5    I am -- to jurors.  I'm going to need to decide the -- the

6    group from whence those jurors should be drawn, and so we need

7    to have that decided.

8            I understand there's an argument about whether the

9    jurors should be drawn only from the Portland division or

10   whether they should be drawn elsewhere.

11           And if you're prepared to make that argument now,

12   fine.  If not, I'll set a date to do it because we're coming

13   close to the place where we have to get summonses out to the

14   first group.

15           As I understand it, the parties are in general

16   agreement, the Government and defendants collectively, that

17   summonsing approximately 1500 jurors in the first instance is

18   reasonable.  That that first summons would be the normal

19   summons to seek the jurors' response as to statutory

20   exemptions, statutory qualification, and any hardship request,

21   including as to the length of service.

22           I appreciate the parties' suggestions that the Court

23   needs to be as open as possible regarding how long the trial

24   itself will take.  But the disclosure to the jurors has to be

25   truthful, so that they can evaluate whether in fact they could

1   serve without true hardship for the length of time given.

2            But I -- I agree that we don't want to commit in

3   advance to a firm end date because things happen.  And they

4   happen the other way, too.  Trials end sooner than expected.

5            I do understand there is a consensus with my proposal

6   that when we are in trial we will be working four business days

7   a week.  That every week there will be a dark day for the jury,

8   at least.  Now, that might mean we need to work in order that

9   when the jury comes back, we're ready to go.  But to lessen the

10  burden on the jury, it would be four days a week.

11           In those weeks that have a national holiday, like

12  Columbus Day, that's the dark day.  We would not go down to

13  three days.  Veterans Day, that would be the dark day.  We

14  would not go down to three days.

15           And I don't know, yet, whether it's going to be the

16  same day of the week, but I think people would like it to be

17  Fridays, just so that it -- it is connected with a weekend, and

18  then we can manage our time.  And that's sort of where I'm

19  headed there.

20           With respect to the Thanksgiving holiday, if we were

21  still in trial for Thanksgiving, I think it would be important

22  to alert the jurors ahead of time that there would not be court

23  on the Wednesday before Thanksgiving day, nor the Friday after

24  Thanksgiving day because it is so common for people to plan to

25  travel, and so forth.

 1          And, likewise, if we were still in trial as of around

 2   the Christmas holiday, we would have the same situation.  I

 3   don't know what day of the week the Christmas holiday is on.

 4          Anyway, but -- the Christmas Eve holiday, the day of

 5   Christmas, the year-end holidays and any others that we need to

 6   address.

 7          So I need to get to that point.  But I think the one

 8   impediment, at this point, is really the question about the

 9   draw; from where to draw.

10          The plan -- the jury plan -- I was just told

11   Christmas is a Sunday.  So maybe we would add a third day to

12   that weekend, the following Monday, since Christmas Eve is a

13   Saturday.  Heaven forbid that we're still doing this by then.

14   You know, I'm hoping the case can reasonably be resolved by

15   then.  But all I can do is hope at this point.

16          The jury plan adopted in this district calls for the

17   jury to be drawn from the Portland division because that's

18   where the case was indicted.

19          The letter response suggested that the jury be drawn

20   proportionately from the other divisions as well.  So not just

21   the Portland division, but presumably, Mr. Federico, you were

22   talking about the Eugene division and the Pendleton division

23   but in a proportional random way.  Was that right?

24          MR. FEDERICO:  Yes, your Honor.  Well, what I would

25   like to do is -- I think the only issue from the letter that is

1    time sensitive, as the Court just acknowledged, is where the

2    jury -- the initial summons are issued.  And so I am prepared

3    to speak on that.

4            Subsequent to the issuance of the letter on April

5    27th, I also had a chance to speak with Ms. Glover and

6    Mr. Minetto.  And I appreciate their assistance in informing me

7    and others on how this process really works.  Because we had

8    read the jury management plan.  Hearing the logistical side

9    from their end is very helpful.

10           Also, I tried in the letter to identify for the Court

11   generally areas in which I could represent that there was

12   basically unanimity amongst the defendants and areas where

13   there were not.  And I think I can say with confidence that the

14   defendants in this case do all desire that the jury pool be

15   beyond the Portland division.

16           And subsequent to providing the letter, I think there

17   is also now a consensus that we would ask the Court consider

18   that the jury summons be first issued exclusively to the

19   Pendleton division, as the -- all the alleged events occurred

20   in Harney County.  And, again, my understanding is the only

21   reason this case was brought to the Portland division was for

22   the logistics, the potential size of the trial.

23           THE COURT:  The grand jury never sits in the

24   Pendleton division.  It's never happened in the District of

25   Oregon.  Grand juries sit in the Portland and the Eugene

1  division.

2            MR. FEDERICO:  Your Honor -- and so -- but there

3  would be -- from my understanding from Ms. Glover, first of

4  all, I don't think there's a legal impediment to issuing

5  summonses to another division.  At least I'm not aware of any

6  legal authority to the contrary.

7            And, logistically, there's no impediment, either.  So

8  the only impediment is expense.  And that's because --

9            THE COURT:  Well, it's more than that.

10           The summonses have to be -- the summonses are sent to

11  jurors who are randomly selected from a qualified wheel.

12  Presently, the qualified wheel in the Portland division is just

13  shy of 17,000.  And for the Pendleton division is less than a

14  thousand.  There aren't even enough qualified jurors to

15  potentially summons.

16           So it could not only be the Pendleton division, in

17  any event.  There just isn't any way we could collect jurors

18  sufficient to try even the most routine case that way.

19           MR. FEDERICO:  Your Honor, I may have misunderstood

20  Ms. Glover.  I thought she told me there were 2500 from the

21  Pendleton division, from the master, who would have been

22  qualified.  But --

23           THE COURT:  We can't exhaust one list for one trial.

24           That's part of the entire plan is a proportionate --

25  now, I'm willing to consider the idea of a proportionate draw

1    from all the divisions if there's a reason to do that.  The

2    argument that somehow the defendants are prejudiced because

3    jurors from the Portland division are biased against them is, I

4    think, totally speculative.

5              DEFENDANT RYAN BUNDY:  (Standing.)

6              THE COURT:  Please have a seat.  Wait your turn.

7              DEFENDANT RYAN BUNDY:  (Complying.)

8              THE COURT:  I have done this work a long time.  Been

9    a trial judge here in this court since 1999.  The argument that

10   the jurors from the Portland division are liberal belies the

11   fact that they come from the entire quadrant of the upper --

12   upper northwest of the state of Oregon.  This is not a

13   Multnomah County pool.

14             Any lawyer who's tried a case in this courthouse and

15   in the one across the street repeatedly reacts that the jurors

16   here are far more conservative, drawn from the Portland

17   division.

18             Again, this notion that there is bias is a risk that

19   I think is a balanced risk.  Balanced of a risk of bias against

20   the Government for the very arguments you all are working hard

21   to develop.  That this was not a proper decision to prosecute.

22   It is not a case that should have been brought.  Those

23   arguments, I think, are as fairly considered here as elsewhere.

24             But my point is simply it's presumptuous to suggest

25   that the Portland division draw would present a jury panel

1    that's biased toward the Government because, frankly, I've

2    never seen that.  Never.

3             It's a far more conservative crowd on the -- on the

4    points you've been arguing, and on Mr. Bundy's motion itself

5    about this notion that somehow the Government has an advantage

6    here.

7             But that said, the real question is from where to

8    draw, and that is a legal question.

9             If -- since your position is only reflected in a

10   letter to me in response to a draft that I sent to you, I think

11   it would be appropriate for there to be a formal brief filed on

12   the question.  And it could be both sides filing a joint brief,

13   just to state the position.

14            I know Mr. Ryan Bundy wants to address this too, so I

15   want to be sure his position is included in it.

16            For your part, Mr. Federico, how long do you think it

17   would take to submit a joint brief on -- from where to draw the

18   jurors for the first summonsing?

19            MR. FEDERICO:  Your Honor, if I could have until a

20   week from today or next Wednesday, which is the same day we're

21   submitting the proposal for arguments, I think that would be

22   sufficient.

23            THE COURT:  Okay.  And you'll include Mr. Ryan Bundy?

24            MR. FEDERICO:  I absolutely will, yes.

25            THE COURT:  All right.  And you wanted to say, sir?

1          DEFENDANT RYAN BUNDY:  Yes, your Honor.  It doesn't

2     matter necessarily whether -- that we consider there's a

3     prejudice or not one way or the other.  It's the supremacy of

4     the law, which as the Constitution states in Article VI of

5     the -- of the amendments that -- that an impartial jury of the

6     state in the district wherein the crime shall have been

7     committed, which district shall have been previously

8     ascertained -- in other words, the accused shall enjoy the

9     right of a speedy and public trial by the impartial jury of the

10    state and district wherein the crime shall have been committed.

11         THE COURT:  It's alleged in the Indictment, sir, that

12    you committed a crime in the District of Oregon.  This is a

13    courthouse in the District of Oregon, and quite literally

14    consistent with the provision you just read.

15         DEFENDANT RYAN BUNDY:  Okay.  But does not that

16    district -- you said there's subdivisions of that district or

17    that district that we're talking about -- Pendleton or of

18    Portland, et cetera --

19         THE COURT:  There's a jury plan.  I think you've seen

20    it.  There were citations to it in the motion you filed.

21         The jury plan talks about divisions for purposes of

22    how to allocate the work.

23         DEFENDANT RYAN BUNDY:  Okay.

24         THE COURT:  As I say, I want to hear -- I want to see

25    it in writing, so that I have everybody's arguments in one

1    place.  I'll make a decision because that's the first one that

2    has to get made, so that we can then also have the next step

3    being the preparation of these initial summonses.

4           My -- and my intention in the first presentation was

5    not to name the case; simply to summons the jurors to a

6    criminal case to start on September 7th, to last an

7    undetermined number of weeks.  I haven't yet figured out how to

8    say that, to have them go through the other disqualification

9    information provided, whether they're no longer a resident of

10   the state of Oregon, they're over 70 and they get to choose

11   out, or they're exempt because they're a member of the

12   military; whatever, to go through that process.

13          But if you have arguments besides the one you want to

14   make or if you want to reiterate that argument, Mr. Federico

15   will work with you and Ms. Ludwig to be sure they're in the

16   submission.

17          DEFENDANT RYAN BUNDY:  We'll get them in there.

18   Thank you, your Honor.

19          THE COURT:  All right.  So what I do want, then, is a

20   single joint submission on the place from whence the trial

21   jurors should be drawn.

22          I understand you'll make constitutional arguments.  I

23   do want an analysis of the jury plan that is the guiding

24   standard here in Oregon.  And to the extent there's case law --

25   I know, Mr. Bundy, your motion addressed some of those issues

1    already.  So the work's started.  And I'll do my best with what

2    you give me.

3            So that will be due next Wednesday.  All right?

4            Is there anything else -- yes, Ms. Baggio.

5            MS. BAGGIO:  Your Honor, with regard to your April

6    21st message by e-mail, the Court talked about a proposed

7    message to prospective jurors and a proposed first

8    questionnaire.

9            I just wanted to make sure that we're clear, the

10   Court isn't waiting on us to provide those drafts?  Is that --

11           THE COURT:  No.  I might ask for somebody to do it,

12   but I'm going to try to help and do it myself first.

13           MS. BAGGIO:  Thank you.

14           THE COURT:  Yes, Mr. Kohlmetz.

15           MR. KOHLMETZ:  Your Honor, Mr. Patrick has asked me

16   to raise an issue with the Court and --

17           THE COURT:  Speak up, please, or turn on the mic.

18           MR. KOHLMETZ:  I apologize.

19           Mr. Patrick has asked me to raise an issue with the

20   Court, and he does want to address the Court personally.

21           Let me frame the issue for him.

22           After the status -- last status conference, as he was

23   being removed from the courtroom and transported back into

24   custody, Mr. Patrick reported to me that he had been threatened

25   and physically accosted by a member of the U.S. Marshals

1    Service and that threats were made to him regarding his family.

2    He has been making efforts to determine the identity of the

3    particular marshal but has been rebuffed.

4         And he asked that I stand, announce that, and ask

5    that he be able to address the Court briefly.

6         THE COURT:  Mr. Patrick.

7         DEFENDANT PATRICK:  Your Honor, when I left -- when I

8    left court last time and went down in the elevator, I was

9    singled out by one of the U.S. marshals, from the rest of my

10   co-defendants.  It was the first time that that had happened.

11        And he made comments to my mother would be harmed.

12   And after -- and I was very upset by it.  And I immediately

13   went in with the rest of my co-defendants, as has happened

14   every other time.  And they asked what had happened.  And I

15   said that he just basically threatened my mother.  And I was

16   instantly removed from the co-defendants and cursed at, and --

17   and things of that nature.

18        When I got back to my stall, I called a close

19   personal friend because I was in very bad shape.  My -- my --

20   my mom was widowed when she was 12 years old -- when I was 12

21   years old.  She's never remarried.  And she's a senior citizen.

22        And so I was very frustrated and not doing well with

23   that.  I then later -- I don't know if it was the next day or

24   that day -- called my mother.  And she advised that the

25   Marshals Service had made physical contact with her in the

1    courtroom and asked who she was.  And that marshal didn't

2    identify to her either.

3         I was then advised that the Marshals Service followed

4    multiple people from the -- the gallery, out to their vehicles,

5    or things of that nature.  And -- and they felt intimidated.

6    So besides the threat to my mother, it appears there's some

7    intent to keep people intimidated from even showing up to the

8    courtroom.

9         But my personal issue is my mother.  It's given me

10   anxiety in -- where I -- where I stay.  I've tried to report

11   it.  I -- I asked for the identification of the marshal that

12   pointed it out, and everybody stonewalled me.

13        I saw the same marshal today in the courtroom --

14   in -- in transport.  I was going to try to identify him in the

15   courtroom, but he is not present in the courtroom.  None of the

16   marshals wear any identification of any kind.  And so these --

17   you can't determine who's who or what's what.

18        When I went back to my cell, I reported it to the

19   county.  Said, Hey, listen, there's threats being made.  Hoping

20   some of you would address it.

21        I don't know who to contact when threats are being

22   made.  I'm just stuck in limbo with -- you know, intimidation

23   and threats is what's being claimed.  And they're being

24   perpetrated in this direction, but there's no recourse.

25        THE COURT:  Mr. Patrick, I've never had a complaint

1    like that made.  I don't know quite how to react.  So I'm going

2    to bring the issue to the attention of the United States

3    Marshal.

4            And I'll be sure -- I'll have your comments

5    transcribed, and I'll address it to the United States Marshal,

6    himself, the head marshal.

7            DEFENDANT PATRICK:  Okay.  Well --

8            THE COURT:  I don't know what else to do.

9            DEFENDANT PATRICK:  All right.

10           THE COURT:  Mr. Bundy, did you want to say something?

11           DEFENDANT RYAN BUNDY:  I just -- I just wanted to say

12   that I did witness him being separated the first time and also

13   the second time.  What was said during those points of

14   separation, I do not know.

15           THE COURT:  There are appropriate reasons for people

16   to be separated, and it's not the Court's role to manage how

17   the marshal does his job, which is a difficult job, through

18   many court security officers and sworn marshals, to ensure that

19   we have this process today; a place where we can all be in one

20   room, and quite civilly.  I appreciate everyone's participation

21   today to get through things.

22           So, Mr. Patrick, that's what I'll do.  I'll get your

23   remarks transcribed.  I'll ensure that they get to the marshal

24   himself.

25           MR. KOHLMETZ:  Your Honor, and if it's of any help, I

1   would be perfectly happy to receive any communication, if

2   anything else is necessary.

3           THE COURT:  All right.  All right.  Thank you very

4   much.

5           Mr. Arnold.

6           MR. ARNOLD:  Your Honor, I just wanted to -- as an

7   officer of the court -- let you know that I saw marshals

8   purportedly following.  I just assumed it was because there was

9   outstanding fugitives, that they were just following people.

10  But I was speaking to a witness outside of Starbucks, and a

11  gentleman in the room sat, you know, quietly around the corner

12  and didn't interfere with my conversation, and purportedly

13  followed the individuals on to their next encounter.  And

14  then --

15          THE COURT:  Mr. Arnold, you well know that there is

16  security on the perimeter of the building.  The marshals have

17  many obligations to do; not only to protect everyone here, the

18  judiciary.  Many of us have already received numerous threats

19  in the pendency of the case.  So how they do their job is for

20  them to do.

21          MR. ARNOLD:  Well, I'm not complaining.  I just

22  wanted for the record to let you know that I've witnessed that.

23  And it was, you know, kind of out -- out of the way and just

24  seemed to be part of normal routine.

25          THE COURT:  All right.  It appears we've concluded

1   the public agenda.

2           Let me ask if there is a need to have an ex parte

3   agenda, or not.

4           Does any counsel have a need to raise that?

5           If not, I'll just call -- call it for today.

6           MS. BAGGIO:  Your Honor, I don't believe we do need

7   to have an ex parte agenda.  The defendants have requested if

8   we could have a moment before the --

9           THE COURT:  Oh, the -- the defendants as a team

10  can --

11          MS. BAGGIO:  Yes.

12          THE COURT:  Yes, you can do that.

13          MS. BAGGIO:  Thank you.

14          THE COURT:  All right.  So --

15          MR. BAKKER:  Your Honor, just --

16          THE COURT:  I'm sorry.  Yes?

17          MR. BAKKER:  On behalf of Mr. Anderson, he has a one

18  o'clock hearing with Judge Jones, so I just wanted to make

19  sure --

20          THE COURT:  Right.  It's 11:20.  Pretty good timing.

21          So what I understand Ms. Baggio is asking for is the

22  Government lawyers to leave, the spectators to leave, and

23  defense counsel and defendants to have a short time to meet,

24  among yourselves, for case management purposes; but not for

25  very long.  Right?

94

1          MS. BAGGIO:  Yes.  Thank you.

2          THE COURT:  Ten minutes?

3          MS. BAGGIO:  Yes, ma'am.

4          THE COURT:  All right.  So if all of the spectators,

5    please, would leave the room; Government's lawyers please leave

6    the room.

7          As soon as -- soon as court staff is finished with

8    their duties, please leave the room.  And then the room is in

9    the hands of the United States Marshals.  And we're in recess.

10         (Conclusion of proceedings.)

11

12                          --oOo--

13

14   I certify, by signing below, that the foregoing is a correct

15   stenographic transcript of the oral proceedings had in the

16   above-entitled matter this 16th day of June, 2016.  A

17   transcript without an original signature or conformed signature

18   is not certified.  I further certify that the transcript fees

19   and format comply with those prescribed by the Court and the

20   Judicial Conference of the United States.

21         /S/ Amanda M. LeGore
22   _____

23         AMANDA M. LeGORE, CSR, RDR, CRR, FCRR, CE
           CSR No. 15-0433  EXP:  3-31-2018
24

25