LAW OFFICE OF JAY A. NELSON
JAY A. NELSON, OSB No. 161470
1271 NE Highway 99W, No. 508
McMinnville, OR 97128
Telephone: 503.857.0873
Email: jay@jayanelson.com

Attorney for Defendant
DARRYL WILLIAM THORN

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| UNITED STATES OF AMERICA, | Case No. 3:16-CR-51-BR |
|---|---|
| Plaintiff, | SENTENCING MEMORANDUM; OBJECTIONS TO PRESENCE INVESTIGATION REPORT |
| v. | |
| DARRYL WILLIAM THORN, | |
| Defendant. | |

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENCE INVESTIGATION REPORT
Page 1

## I.  Preliminary Statement

Defendant Darryl William Thorn, by and through his counsel, respectfully submits the following Sentencing Memorandum and Objections to the Presentence Investigation Report ("PSR").  At trial, Mr. Thorn sustained convictions on counts one and two of the superseding indictment, and on counts one and five of the misdemeanor information.  *See* ECF Nos. 2011, 2046.  For the reasons set forth below, Mr. Thorn respectfully recommends a sentence of time-served plus two years of supervised release on the felony counts—to run concurrently with any sentences imposed on the misdemeanor counts—as well as $5,000 in restitution and $220 in special assessments ("the recommended sentence").

## II.  Legal Framework

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotations marks omitted).

Applying the factors set forth in 18 U.S.C. § 3553(a), this Court is empowered and required to "make an individualized assessment" of a fair and just sentence for Darryl Thorn. *Gall v. United States*, 552 U.S. 38, 50 (2007).  The Court is thus charged to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from

further crimes of the defendant." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotation marks omitted, emphases added).

Mr. Thorn addresses the section 3553(a) factors below in turn.

### III.  The Section 3553(a) Factors

**A.      Section 3553(a)(1).**

Section 3553(a)(1) directs the Court to evaluate "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"

**1.      The history and characteristics of Darryl Thorn.**

The "unique study in the human failings" in this case reflects the tragic consequences that so often result at the intersection of poverty, drug dependence, and child abuse.  *Koon*, 518 U.S. at 113.

Mr. Thorn was born to an indigent and drug-addicted mother.  PSR ¶ 74.  Shortly after his birth, his mother deprived him of all contact with his father, whose public service included work as an animal control officer and a deputy sheriff.  PSR ¶¶ 72-74.

After Mr. Thorn's mother left his father, she embarked on an itinerant life with multiple male partners before she remarried; Mr. Thorn refers to his stepfather herein as "P.B."  PSR ¶¶ 74; Evaluation of Michelle R. Guyton, Ph.D., ABPP ("Guyton Eval.") pp. 3-4.[1]  In this public filing, Mr. Thorn will not recite every disturbing detail of the abuse he suffered as a child, but he incorporates by reference all such facts from the PSR and Dr. Guyton's report.  *See generally* PSR ¶¶ 72-77, 84, 87-88; Guyton Eval. pp. 3-10.  Suffice it to say, Mr. Thorn's experiences with

---

[1]Mr. Thorn files Dr. Guyton's report, in full, under seal concurrently herewith.

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 3

adults during his formative years were characterized predominantly by (i) chronic substance abuse, and (ii) appalling patterns of domestic violence and abuse. *Id.*

It is difficult to fathom the depravity of P.B.'s conduct toward Mr. Thorn. He would beat Mr. Thorn, for example, until he wet his pants. PSR ¶ 74; Guyton Eval. p. 4. He shackled Mr. Thorn to the back porch for hours on end, securing his ankle with a heavy chain and padlock. PSR ¶ 74; Guyton Eval. p. 4. If Mr. Thorn ever slipped out of the house to escape the horrors of P.B. beating his mother, he returned only to face the wrath of P.B. himself. *See* PSR ¶ 74; Guyton Eval. p. 4. Sometimes Mr. Thorn reported suffering abuse at the hands of other people as well—conduct that gave him nightmares, anxiety, and depression—but P.B. callously shrugged it off, claiming Mr. Thorn was simply "'making it up'" for attention. PSR ¶ 75; Guyton Eval. pp. 4, 8. Finally, at the age of 12, authorities removed Mr. Thorn from his mother's home after P.B. pushed him into a doorknob, resulting in a black eye serious enough that it caught the attention of a school employee. PSR ¶ 76; Guyton Eval. p. 4.

Regrettably, Thorn's lot did not improve in foster care: he continued to live the life of a prototypical troubled youth. From approximately ages 12 through 17, he (i) bounced around between foster placements, (ii) ran away frequently to check on his mother's well being, and (iii) went though periods of homelessness. PSR ¶ 76; Guyton Eval. pp. 4-6. Like so many other young people in Mr. Thorn's situation, he found himself caught up in the juvenile justice system, and he crystallized his own cycles of substance abuse. PSR ¶¶ 54, 87; Guyton Eval. pp. 6-9. For some time, Mr. Thorn mistakenly believed he had found a promising foster placement, but that experience too ended up in a nightmare: his foster father—whom Mr. Thorn admired as a positive male role model—unexpectedly took his own life. Guyton Eval. pp. 4-5. Adding insult

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 4

to injury, the decedent—for reasons unknown, whether cowardice, panic, or otherwise—falsely implicated Mr. Thorn in his suicidal act, which required Mr. Thorn to clear his name with the authorities. *Id.*

Facing all of these challenges, Mr. Thorn never made it past the eighth grade in school, and he received a special education placement as early as elementary school. PSR ¶ 88; Guyton Eval. p. 6. One of Mr. Thorn's lowest points came at age 15, when he tried—with some success—to hang himself from a tree, only to be cut down by P.B. and reprimanded (yet again) for seeking attention. Guyton Eval. p. 9.

By the age of 17—on the verge of adulthood—Mr. Thorn had still never known the most basic comforts of a stable, supportive household free from abuse. Fortunately, when he was approximately 17 years old, his older sister fulfilled a promise she made many years before, when she was preparing to run away herself to escape their mother and stepfather: that she would come back one day to rescue him. PSR ¶ 76. After his sister made good on her promise—and thus came to retrieve Mr. Thorn in Washington—Mr. Thorn lived with his sister and brother-in-law in Hickman, Kentucky. PSR ¶ 76. During that brief period of respite, Mr. Thorn not only got his first real taste of safe and stable living, but he also found a positive male role model in his brother-in-law, who taught him, among other thing, the value of a strong work ethic. PSR ¶ 76.

In adulthood, his sister's rescue has had some lasting positive effects for Mr. Thorn. He has, for example, embraced the rewards of hard work, and forged a career in construction. PSR ¶¶ 89-91; Guyton Eval. p. 6. He is also a proud father of four—with three biological children and one *de facto*—though his difficult relationship with one daughter's mother has complicated his relationship with that child. PSR ¶¶ 78-80; Guyton Eval. pp. 5-6. Perhaps the longest stretch

of relative stability Mr. Thorn has ever achieved in adulthood was an approximately eight-year relationship with the mother of his two boys, although that relationship too crumbled under the pressures of work, child-rearing, jealousy, and physical confrontations.  Guyton Eval. pp. 5-6.

In truth, Mr. Thorn has never escaped the long shadow of his traumatic childhood, which—arithmetically speaking—still comprises more than half of his 33 years.  *See* PSR ¶ 72. Mirroring his childhood experience with striking (though unsurprising) symmetry, Mr. Thorn's adult criminal history consists overwhelmingly of controlled substance and domestic violence misdemeanors for which he has served little or no time.  PSR ¶¶ 55-65.  And, indeed, Mr. Thorn has abused substances to "'self-medicate'"—at least on and off—for virtually his entire life, so much so that Dr. Guyton has diagnosed him with alcohol and methamphetamine use disorders. PSR ¶ 87; Guyton Eval. pp. 2, 7-8, 11, 17.[2]

In addition, Dr. Guyton conducted cognitive testing with Mr. Thorn; her assessment revealed that Mr. Thorn's "Full Scale IQ"—representing his "overall intellectual functioning"—scores at the eighth percentile, "meaning that [Mr. Thorn] performed at or better than 8% of individuals in the same age range[,]" or alternatively, that "92% of individuals in the same age range scored higher[.]"  Guyton Eval. pp. 12-14 & n.1.  This rating places Mr. Thorn in the so-called "borderline" range, scarcely above a score that would suggest "mental retardation." *Id.*

////

---

[2]Dr. Guyton further reports that Mr. Thorn "presents with some features of major depressive disorder with anxious distress as well as borderline personality disorder[,]" but "his presentation is not severe enough to warrant either of these diagnoses."  Guyton Eval. p. 2; *see also id.* pp. 14-16.

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 6

With this background, Mr. Thorn traveled from Washington to join the Malheur National Wildlife Refuge ("MNWR") protest.  *See* PSR ¶ 90.

>    2.    **The nature and circumstances of the offense.**

In evaluating the nature and circumstances of his offense conduct, Mr. Thorn asks the Court to remain mindful of *Pepper*'s admonition that "the punishment should fit the *offender* and not merely the crime."  *Pepper*, 562 U.S. at 487-88 (quotations marks omitted, emphasis added). In a sprawling case such as this, it may be tempting to fall back on shorthand analyses styled, for example, in terms of what "the occupation" or "the occupiers" did in a broad, amorphous, and generalized sense.  *See generally*, *e.g.*, PSR ¶¶ 18-39b.  The Court should resist any such temptation.  Whether under the Sentencing Guidelines, 18 U.S.C. § 3553(a), or as a matter of due process and fundamental fairness, the Court should conduct a rigorous analysis that only attributes conduct to Mr. Thorn if it finds—based on competent, record evidence—that (1) Mr. Thorn personally undertook the action, or (2) it was jointly undertaken conduct that (a) fell within the scope of Mr. Thorn's agreement of conviction, (b) was in furtherance that agreement, and (c) was reasonably foreseeable to him.  *See*, *e.g.*, U.S.S.G. § 1B1.3; *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003) (in drug cases, sentencing courts "may not automatically count as relevant conduct the entire quantity of drugs distributed by the conspiracy" for purposes of the Guidelines or for "sentencing under the statute of offense"); U.S. Const., amend V.

Without prejudice to Mr. Thorn's pursuit of post-conviction remedies, the evidence and verdicts, fairly characterized, reflect that Mr. Thorn:

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 7

- Answered Ammon Bundy's call to the MNWR on either January 3 or January 6, 2016, and left on January 26 or 27, 2016, spending at least some portion of his time there with his then-girlfriend, Christina Wright.  *See* Consecutively Paginated Reporter's Transcript of Trial II Proceedings ("Trial RT") 2970-71; Trial Exhibit ("TX") 1607; PSR ¶ 35;

- Slept in a bunkhouse at the MNWR, worshiped at religious services there, and attended educational seminars led by prominent protest figures such as Ammon Bundy.  ECF No. 2046; RT 2415; TX 1029; TX 70;

- Possessed firearms at the refuge and primarily engaged in watch duty.  ECF No. 2011; TX 47;

- Agreed with at least one other person to impede MNWR employees by force, intimidation, *or* threat (in the disjunctive).  ECF Nos. 2011, 2015;

- Drove at least one government-owned motor vehicle at the refuge, and wore military-inspired clothing.  ECF No. 2046, TX 67;

- Was identified on a seized document as a "leader" of "Team D[,]" though the record does not illuminate what those designations purport to mean.  RT 1663-65;

- Openly posted on social media about his experiences at the refuge, including an ineffectual statement of interest in returning to the refuge to support any protestors who remained in February 2016.  TX 47;

- Has agreed with the government that he is responsible for $5,000 in loss, compensable under 18 U.S.C. § 3663.  ECF Nos. 2254, 2259; and

- By his presence, along with the other protestors, had an adverse impact on certain refuge operations and on some refuge employees.  *See* PSR ¶¶ 37-39.

The record also reflects an absence of evidence that Mr. Thorn undertook any of the

following conduct:

- Participating in the 2014 Bunkerville, Nevada incident.  Trial RT 797-98;

- Organizing and/or agitating in Harney County (or elsewhere) regarding the *Hammond* case, beginning in the fall of 2015.  *See*, *e.g.*, Trial RT 1741-47;

- Participating in the so-called "blue house" meeting held December 29, 2015.  *See*, *e.g.*, Trial RT 1761-62;

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 8

- Planning or organizing any aspects of the MNWR protest.  *See*, *e.g.*, Trial RT 1765;

- Participating in the commencement of the MNWR protest on January 2, 2016.  *See*, *e.g.*, Trial RT 2443;

- Personally bringing firearms or dangerous weapons to the MNWR.  PSR ¶ 31;

- Stealing or damaging property at the MNWR.  *Cf.* PSR ¶ 27;

- Meriting recognition as a person of prominence on Ammon Bundy's internal organizational list, or indeed distinguishing himself to Ammon Bundy at all other than that Bundy noticed him at dinner and "saw him a couple of times and shook his hand and had, like, a brief . . . 'how are you doing' type of conversation."  TX 25; Trial RT 1808-10; or

- Using force against MNWR employees, communicating threats to employees, or conspiring with anyone to do either.  *Cf.* PSR ¶ 24.

Notably, Dr. Guyton's assessment casts further mitigating light on Mr. Thorn's motivations for attending the MNWR protest.  To begin, it is inconsistent with Mr. Thorn's cognitive testing results—no matter how deeply and genuinely held his personal views may be—that he possesses a deep understanding of the political, historical, and constitutional theories that animate the Bundy family's protest behavior.  *See* Guyton Eval. pp. 12-14.  Nor has Mr. Thorn ever been a rancher or landowner, nor did he have meaningful personal ties to rural America prior to the events of this case.  *See* PSR ¶¶ 72-91.

Instead, as Dr. Guyton notes, Mr. Thorn suffered from a lack of "stability" after the failure of his last long-term romantic relationship "in terms of work, housing, or relationships, and this instability [] negatively affected his ability to manage himself appropriately."  Guyton Eval. p. 16.  In Dr. Guyton's view, "[i]t is at these times that [Mr. Thorn] has used illicit substances and alcohol more frequently and been in situations that can be more volatile or

otherwise problematic." *Id.* At bottom, Mr. Thorn was isolated, lonely, and disconnected prior to the events of this case, so he sought out—and found—"comfort in his identification with other members of the refuge takeover and their national support network. This has likely provided a source of pride and companionship when he may have struggled with these in recent years." *Id.*

Equally (if nor more) important is the indelible connection between Mr. Thorn's involvement in the protest and the affection he has expressed for LaVoy Finicum. As Dr. Guyton put it, Mr. Thorn "looked up to Mr. Finicum for many reasons[,]" and viewed him as "a kind, if distant, father figure to him." Guyton Eval. p. 11. For a man who (i) never had a meaningful relationship with his biological father, (ii) suffered unconscionable abuse and neglect at the hands of his stepfather, and (iii) was deserted and betrayed by his foster father, finding a "kind, if distant father figure" at the refuge presented a landmark event in Mr. Thorn's life. *See* Guyton Eval. p. 16 ("Mr. Thorn's identification with this group has been strengthened . . . through the death of Lavoy Finicum. Mr. Thorn feels significantly affected by the loss of Mr. Finicum. This loss may also trigger reminders of previous losses, such as that of his biological and foster fathers."). In other words, even if Finicum had no relationship to Mr. Thorn's initial decision to join the protest, his presence at the refuge exerted a powerful influence over Mr. Thorn's decision-making after he arrived, if for no other reason that Mr. Thorn was still searching for a father figure.

In short, Mr. Thorn joined the MNWR protest as a scarred man looking for community, not for a fight. Both section 3553(a)(1) factors support the recommended sentence.

////

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 10

**B.      Sections 3553(a)(3), 3553(a)(4), 3553(a)(5).**

Sections 3553(a)(3) through (a)(5) direct the Court to assess the kinds of sentences

available by statute and pursuant to the United States Sentencing Guidelines, as well as the

policy statements and amendments issued by the United States Sentencing Commission.

Mr. Thorn begins with uncontested matters.  First, the statutory custodial sentencing

ranges applicable to his counts of conviction are zero to six years (18 U.S.C. § 372), zero to five

years (18 U.S.C. § 930(b)), and zero to six months (16 U.S.C. § 460k-3).  *Accord* PSR ¶¶ 93-94.

In addition, under the Guidelines, Mr. Thorn does not contest Probation's application of Base

Offense Level 10 and Criminal History Category III.  PSR ¶¶ 43, 67.

Mr. Thorn does, by contrast, object to Probation's application of (1) a three-level

enhancement for threatened use of a firearm under U.S.S.G. § 2A2.4(b)(1), and (2) a five-level

upward departure under U.S.S.G. § 3A1.4, cmt. n.4.  PSR ¶¶ 43, 116-17 & Sentencing

Recommendation.

**1.      The clear and convincing standard of proof applies to Probation's proposed
         enhancements.**

As a threshold matter, the Court should apply the clear and convincing standard of proof

to the disputed enhancements.  "[F]acts found in support of Guidelines enhancements that turn

out to have a disproportionate impact on the ultimate sentence imposed [must] be established by

clear and convincing evidence[.]"  *United States v. Staten*, 466 F.3d 708, 720 (9th Cir. 2006).

Indeed, "where a severe sentencing enhancement is imposed on the basis of uncharged or

acquitted conduct, due process may require clear and convincing evidence of that conduct."

*United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).

Such is the case here.  Without the contested eight-level increase, Mr. Thorn's advisory Guidelines range is 10-16 months in custody.  With the increase, the low end of the range more than triples to 33-41 months.  *Accord* PSR ¶ 117.  Such a dramatic increase is disproportionate by any standard.  The Court should require clear and convincing evidence before imposing Probation's proposed enhancements.

**2.    The three-level enhancement for threatened use of a firearm does not apply.**

Section 2A2.4(b)(1)(B) provides for a three-level specific offense enhancement  "[i]f . . . a dangerous weapon (including a firearm) was possessed and its use was threatened[.]"  In Probation's view, this enhancement applies because "[f]irearms were possessed in this offense, as seen in multiple videos and news conferences."  PSR ¶ 43.

But Probation's analysis accounts for only one of the two elements set forth in section 2A2.4(b)(1)(B): possession.  Absent any evidence (or even an allegation) that Mr. Thorn possessed a firearm "*and its use was threatened*" within the meaning of sections 2A2.4 and 1B1.3, Mr. Thorn objected to the proposed enhancement.  *See* PSR, Addendum (attachment).

In response, Probation has studiously refused to even allege in the PSR that a qualifying threat occurred.  PSR ¶ 43.  Instead, Probation has added the following assessment to its Addendum:

> The very presence of the various types of firearms on the MNWR was threatening to the employees, visitors, and law enforcement. In addition, the defendant was seen with at least two guns, and there were pictures taken of the defendant with an AR-15 and other firearms.  No changes have been made.

PSR, Addendum p. 2.

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 12

The Court should reject this facile analysis. The relevant Guidelines do not define the term "threatened." *See* U.S.S.G. §§ 2A2.4, 1B1.1, cmt. n. 1. They do, however, define the term "brandished," as follows:

> 'Brandished' with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

U.S.S.G. § 1B1.1, cmt. n.1(C).

The Guidelines also define what it means to "otherwise use" a firearm:

> 'Otherwise used' with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

U.S.S.G. § 1B1.1, cmt. n.1(I).

The Ninth Circuit has adopted the following distinction between "brandish" and "otherwise use"—"a weapon is 'otherwise used' once there is 'specific leveling' of the weapon at another person[,]" whereas "'[b]randishing' is a 'general display of weaponry.'" *United States v. Albritton*, 622 F.3d 1104, 1107 (9th Cir. 2010). "Threat," by contrast, appears to fall somewhere in between the two: it is "an expression of intention to inflict evil, injury, or damage[.]" *See* https://www.merriam-webster.com/dictionary/threat. The sliding scale of these three terms, therefore, proceeds as follows: "brandishing" occurs when one displays a gun for purposes of intimidation, "threatening" occurs when one affirmatively expresses an intention to

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 13

use the gun to inflict harm, and "otherwise using" occurs when one escalates to the point of actually directing the gun at another person.

This understanding finds support in the Fifth Circuit's decision in *United States v. Hooker*, 997 F.2d 67, 75 (5th Cir. 1993), which held that "§ 2A2.4 is meant to apply to possession of weapons and *verbal* threats" (emphasis added).  Furthermore, the communicated threat must be directed at the obstructed or impeded federal officers—in this case, employees of the MNWR—not uncharged "visitors" or "law enforcement."  *Compare* PSR, Addendum at 2 *with United States v. Beckner*, 983 F.2d 1380, 1388 (6th Cir. 1993) (Graham, J., dissenting) ("This characteristic focuses on and is limited to the conduct of defendant which constitutes the resisting offense, that is, conduct directed toward the officers who are being impeded or resisted, and does not take into account defendant's acts against persons who are not officers.").

Probation's analysis comes closest to "brandish," which of course appears nowhere in section 2A2.4(b)(1)(B).  But even as to "brandish," Probation's analysis—which turns on the subjective response of the alleged threat recipient(s) (including uncharged threat recipients)—falls short, *inter alia*, because "brandish" turns more appropriately on objective measures of the firearm possessor's intent to intimidate.  *See* U.S.S.G. § 1B1.1, cmt. n.1(C).

In sum, Probation has not alleged—let alone proven by clear and convincing evidence or otherwise—that Mr. Thorn should be held responsible for any "threats" within the meaning of U.S.S.G. §§ 2A2.4 and 1B1.3.  The Court should reject the proposed three-level enhancement.

////

////

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 14

**3.      The Court should decline to apply an upward departure under U.S.S.G. § 3A1.4, cmt. n.4.**

The Court should similarly decline to apply an upward departure under the Commentary to section 3A1.4, for the following reasons.

*First* is procedural impropriety.  In the Draft PSR disclosed September 11, 2017, Probation adopted the government's recommendation for a three-level departure under Application Note Four to section 3A1.4—up to an advisory Guidelines range of 27-33 months—counterbalanced (mildly) by a downward variance based on Mr. Thorn's personal history and characteristics to an overall recommended sentence of 21 months.  *See* Draft PSR ¶¶ 116-17, Sentencing Recommendation.[3]  Mr. Thorn timely objected to the upward departure in an objection letter submitted to Probation(and served on the government) under Fed. R. Crim. P. 32(f).  *See* PSR, Addendum (attachment).  The government submitted no such letter itself, and thus lodged no objections under Rule 32(f).  *Id.*

In the Final PSR, by contrast, Probation recommends a *five* level upward departure—to a Guidelines range of 33-41 months—counterbalanced (again mildly) by the equivalent of a two-level departure based on Mr. Thorn's personal history and characteristics, to an overall recommended sentence of 27 months.  PSR ¶¶ 116-17, Sentencing Recommendation.

The question arises: what happened between the Draft PSR and the Final PSR?  One answer is that Mr. Thorn submitted a lengthy and detailed objection letter contesting 40+ errors in the Draft PSR, both large and small.  *See* PSR, Addendum (attachment).  Another answer candidly appears in the PSR Addendum: "[t]he government provided *additional information* in

---

[3]Mr. Thorn files a copy of the Draft PSR under seal concurrently herewith.

support of an upward departure pursuant to USSG §3A1.4.  After further consideration of the

defendant's conduct during the occupation, and the departures applied to similarly situated

codefendants in this case, the probation office agreed that a significant upward departure should

apply."  PSR, Addendum p 1 (emphases added).

      In other words, rather than openly participate in the equitable framework established by

Rule 32, the government elected to back-channel unspecified information to Probation on an *ex

parte* basis, perhaps (if not likely) in response to Mr. Thorn's timely-lodged Rule 32(f) objection

letter.  Worse, United States Probation—charged with performing solemn and neutral duties as

an arm of this Court—has openly confessed its eagerness to play by the government's secret

rules, and has even referred to the government's cloak-and-dagger communication as a "resolved

objection[.]"  PSR, Addendum at 1.

      If the government wished to object Probation's acceptance of its *own* recommendation

for a three-level departure, it should have said so under Rule 32.  Instead, the evidence suggests

that the United States waited to see what, if anything, Mr. Thorn would say on the matter before

it sought and obtained a private audience with Probation to contest it, forcing Mr. Thorn, at this

point, to respond in the dark and on a truncated timeline.  The record presents an odor of

collusion and vindictiveness—in violation of Rule 32 and due process—and the Court should

respond with a strong voice.  Mr. Thorn objects.

      *Second*, Application Note Four is invalid as a matter of law.  The Sentencing

Commission added Application Note Four to the Guidelines in 2002, in connection with "a six-

part amendment that responds to" the USA PATRIOT Act of 2001, Pub. L. 107-56.  *See*

U.S.S.G., Vol. 2, App. C, Amendment 637 ("Amendment 637").  Notably, Amendment 637 cites

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENCE INVESTIGATION REPORT
Page 16

no particular statutory authorization applicable to Application Note Four, and Mr. Thorn is aware of none.  *See id.*  As far as Mr. Thorn can discern, the only explicit directive to the Sentencing Commission in the USA PATRIOT Act relates to computer fraud and abuse under 18 U.S.C. § 1030.  *See* Pub. L. 107-56 § 814.  With the exception of Application Note Four, Amendment 637 responds, in general, to the concrete ways in which Congress expanded and strengthened the federal criminal code in the wake of the 9/11 attacks.  *See generally* Amendment 637.  By contrast, the Commission explained that it added the departure in Application Note Four "rather than a specified guideline adjustment, because of the expected infrequency of [such] terrorism offenses and to provide the court with a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis."  *See* Amendment 637.

The problem with this claim is that it cannot be entirely true.  As the Commission explained more candidly in the text of Application Note Four itself, the Commission has no statutory authority to expand the reach of section 3A1.4 beyond the list of federal crimes of terrorism set forth in 18 U.S.C. § 2332b(g)(5): "By the terms of the directive to the Commission in section 730 of the Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], the adjustment provided by this guideline applies only to federal crimes of terrorism."  U.S.S.G. § 3A1.4, cmt. n.4.  That assertion is correct.  AEDPA section 730 provides:

> The United States Sentencing Commission shall forthwith, in accordance with the procedures set forth in section 21(a) of the Sentencing Act of 1987, as though the authority under that section had not expired, amend the sentencing guidelines so that the chapter 3 adjustment relating to international terrorism ***only applies*** to Federal crimes of terrorism, as defined in section 2332b(g) of title 18, United States Code.

Pub. L. 104-132 § 730 (emphases added).  Congress did not enumerate any of Mr. Thorn's

offenses of conviction in section 2332b(g).  *See* 18 U.S.C. § 2332b(g)(5)(B).

"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is

authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a

plainly erroneous reading of, that guideline."  *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Application Note Four runs afoul of *Stinson* because—as the Commission openly

confessed—the Note cannot be squared with AEDPA's requirement that section 3A1.4 may *only*

apply to federal crimes of terrorism within the meaning of 18 U.S.C. § 2332b(g).  Pub. L. 104-

132 § 730.  Put another way, Application Note Four "violates . . . a federal statute[.]"  *Stinson*,

508 U.S. at 38.  Relatedly, because section 3A1.4 cannot apply to non-terrorism crimes such as

Mr. Thorn's—nor does it—the Application Note is inconsistent with and a plainly erroneous

reading of the Guideline itself.  *See*, *e.g.*, *United States v. Shell*, 789 F.3d 335, 345 (4th Cir.

2015) (Commentary lacks "freestanding definitional power" and instead must be linked to the

text of the Guideline) (quotation marks omitted).  Because Application Note Four impermissibly

exceeds the Sentencing Commission's statutory authority and the text of section 3A1.4, it is a

dead letter.

*Third*, even if the Court has discretion to apply the contested departure, it should decline

to do so because the conduct addressed by Application Note Four overlaps in pertinent part with

the base offense level applicable to Mr. Thorn's conspiracy conviction.  The jury convicted Mr.

Thorn of conspiring to prevent federal officers from discharging their duties by force,

intimidation, or threat.  ECF Nos. 2011, 2015.  The Guidelines provide a base offense level of

ten for that conduct.  *See* U.S.S.G. § 2A2.4(a).  If applied to Mr. Thorn, the contested departure

provision would provide a *further* increase based on the very same thing: conduct "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct[.]"  U.S.S.G. § 3A1.4, cmt. n.4.  Even if the government or Probation manages to identify one or more minor distinguishing features—though none is apparent from Probation's opaque recitation so far, PSR ¶¶ 116-17 & Addendum p. 1—it would still not merit a staggering five-level enhancement (PSR ¶ 117), nor even a three-level increase (Draft PSR ¶ 117), nor, in any case, would it outweigh the overwhelmingly mitigating features of Mr. Thorn's personal history and characteristics.  Put another way, the government's and Probation's request to apply Application Note Four is unreasonable, and the Court should reject it.  *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006).

*   *   *   *   *

Based on the foregoing, Mr. Thorn's properly-calculated Guidelines range is 10-16 months.

## C.      Section 3553(a)(2).

Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to "(A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  As *Kimbrough* made plain, the Court should fashion a "a sentence sufficient, but not greater than necessary" to meet these goals.  552 U.S. at 101.

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 19

By the time of his sentencing hearing, Mr. Thorn will have been in custody on this matter twice, as follows: (1) from February 11, 2016 to May 2, 2016 (2 months, 21 days), and (2) from August 16, 2017 to November 21, 2017 (3 months, 5 days), for a total of approximately six months.  Trial RT 1120; ECF Nos. 500, 2205.  That time frame represents four times as long as he has ever served in custody before (*see* PSR ¶ 65), and is an appropriate amount of punishment for his conduct of conviction, particularly when coupled with a term of supervised release—which Mr. Thorn addresses in greater detail below—and when the Court considers the myriad negative consequences this case has already brought upon his life.

Mr. Thorn's offense conduct is serious, and so are the consequences he has already suffered.  In addition to spending six months in jail, Mr. Thorn is now a felon who lost his rights to (1) vote and (2) bear arms.  Even more broadly, the case has upended his life for the better part of the last two years.  Mr. Thorn has lost his pre-protest job in construction, and while on pretrial release, has struggled to regain a steady footing in the labor market.  PSR ¶¶ 89-90.  Mr. Thorn is also indigent—though he remains committed to meeting his restitution and child support obligations—and he suffered an acute mental health crisis in August 2017 due, in part, to the stress of this case and his impending sentencing proceeding.  *See* PSR ¶¶ 12, 92; ECF No. 2259; Guyton Eval. p. 9-10.  Mr. Thorn has been beaten up in custody, lost weight, and developed a skin condition.  *See* PSR ¶¶ 13a, 82; Guyton Eval. p. 10.  He also sustained serious injuries during his February 2016 arrest.  TX 1617.  In short, Mr. Thorn has already suffered ample punishment for his participation in the occupation—including sufficient punishment to accomplish the goals of specific and general deterrence—and he respectfully asks for leave to begin a new chapter in his life.  *See* PSR ¶ 85 (Mr. Thorn wants "to have a happy life, to find

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 20

employment, and to have a relationship with his family"). The recommended sentence is tailored to these considerations.[4]

The government may contend Mr. Thorn is a dangerous person, and that he thus merits a lengthy custodial sentence to protect the public. The Court should reject any such argument. In fact, Dr. Guyton has provided detailed treatment recommendations, in order of priority, to address Mr. Thorn's unique needs and to "restabilize him in the community, address his mental health and substance use needs, and allow him to live prosocially." Guyton Eval. pp. 17-18. Notably, Dr. Guyton has further opined that many of the necessary treatment options "may be more limited within a correctional environment"—*viz.*, Mr. Thorn could indeed present *less* of a threat (if any) outside of custody, because he would have better access to the treatment options he needs. Dr. Guyton's most pertinent recommendations, in summary, are as follows:

- Coping skills treatment such as Dialectical Behavior Therapy;

- Individual counseling;

- Substance use treatment;

- Psychiatric medication if appropriate; and

- A gradual decreasing intensity of supervision, beginning with "high levels of structure" that reduce over time as Mr. Thorn "shows increased signs of stability in the community, stable housing, and remaining substance free."

Guyton Eval. pp. 17-18. Helpful conditions of supervised release such the treatment regimen recommended by Dr. Guyton would address Mr. Thorn's underlying risk factors much more directly than the proscriptive and blunt instruments endorsed by Probation—including, namely,

---

[4]The concurrently-filed letter from Mr. Thorn's girlfriend speaks to the warmth that awaits him upon his release from custody, notwithstanding the couple's challenges in the past.

proposed special conditions 11-13—which add nothing to mandatory condition one: that Mr. Thorn "must not commit another federal, state or local crime." PSR, Sentencing Recommendation p. 3.

For these reasons, the recommended sentence—including conditions of supervised release consistent with Dr. Guyton's recommendation—is sufficient, but not greater than necessary to satisfy the section 3553(a)(2) factors. *See also* 18 U.S.C. § 3583(d) (special conditions of supervised release must be reasonably related to the section 3553(a) factors and involve "no greater deprivation of liberty than is reasonably necessary").

**D.      Section 3553(a)(6).**

Section 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"

As of this writing, MNWR protest participants may be roughly broken down into a handful of subgroups, as follows:

(1) Higher-level participants acquitted at trial (*e.g.*, Ammon Bundy, Ryan Bundy, Shawna Cox, David Fry, Jeff Banta, Kenneth Medenbach, Neil Wampler);

(2) Higher-level participants who pled guilty to conspiracy (*e.g.*, Jon Ritzheimer, Joseph O'Shaughnessy, Ryan Payne, Brian Cavalier, Blaine Cooper, Corey Lequieu);

(3) Lower-level participants who pled guilty to conspiracy (*e.g.*, Wesley Kjar, Jason Blomgren, Geoffrey Stanek, Travis Cox, Eric Flores);

(4) Lower-level participants who pled guilty to trespassing (*e.g.*, Dylan Anderson, Sean Anderson, Sandra Anderson);

(5) Lower-level participants who were convicted at trial of depredation (*e.g.*, Duane Ehmer, Jake Ryan);

(6) A higher-level participant who was convicted at trial of conspiracy (*e.g.*, Jason Patrick); and

(7) Individuals facing no legal repercussions due to the exercise of prosecutorial discretion (*e.g.*, Peter Santilli, Christina Wright, Nathaniel Peters, Nicholas Fisher, Allyn Belangie, Preston Knodell, Carl Brammann, and more).

By standing on his right to a jury trial, Mr. Thorn forfeited his opportunity to join Group No. 4, and in his current procedural posture, none of the remaining groups presents a perfect match for him. Nonetheless, the closest fit by far is Group No. 3: lower-level participants convicted of conspiracy. Uniformly, the Court has imposed two years of probation on these defendants. *See* ECF Nos. 2152 (Stanek), 2180 (Flores), 2202 (Cox), 2255 (Blomgren).

By all appearances, there are two primary features of Mr. Thorn's case that set him apart from his peers in Group No. 3: (1) his criminal history category under the Guidelines, and (2) that he joined three of this co-defendants at trial rather than plead guilty. For the reasons set forth above and in Dr. Guyton's report, however, Mr. Thorn's criminal history is substantially mitigated by his personal history and characteristics, and in no way justifies Probation's recommendation of *2.25 years* in prison above and beyond his Group 3 peers. Second, the so-called "trial penalty"—although legal—is particularly distasteful in this case, as nine of the eleven defendants who proceeded to trial were acquitted on the conspiracy count, including the principal architects of the occupation themselves.

Taking a holistic look at the MNWR protest and the legal proceedings that ensued, it is most consonant with section 3553(a)(6) that Mr. Thorn to receive a custodial sentence of time served followed by two years of supervised release. That sentence would align him, generally

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 23

speaking, with his peers in "Group 3," while also accounting for any additional factors that support a modest custodial sentence.

**E.     Section 3553(a)(7).**

The last section 3553 factor requires the Court to consider "the need to provide restitution to any victims of the offense."  The recommended sentence includes a $5,000 restitution judgment already approved by the Court.  ECF No. 2259.

### IV.  Objections to Presentence Report

In addition to the foregoing, Mr. Thorn respectfully objects to the Presentence Report on the following grounds:

*First*, in the interest of brevity, Mr. Thorn reiterates and incorporates by reference all unresolved objections from his objection letter dated October 30, 2017, including Items 1, 10, 11, 12, 13, 14, 15, 19, 20, 22, 32, 33, 35, 36, 37, 38, and 40.  *See* PSR, Addendum (attachment).

*Second*, Mr. Thorn objects to any suggestion in Paragraph 13a that the alleged "political s\*\*t" related to the events of this case or to a broader civic discourse.  Instead, Mr. Thorn contends the dispute arose out of *jail* politics, in which Mr. Thorn resisted menacing and racially-motivated conduct thrust upon him.

*Third*, Mr. Thorn objects to the assertion in Paragraph 25 that "MNWR staff was unable to conduct any official operations" during the protest.  Refuge employees testified at trial that they were able to conduct some official duties during the protest.  *See* Trial RT 718-19, 1373.

*Fourth*, Mr. Thorn objects to Paragraphs 35a-35g, 39a, and 39b.  This material purportedly relates to counts one, four, and five of the misdemeanor information, but in fact only

////

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 24

addresses the depredation conduct charged against Mr. Thorn's co-defendants.  It does not

belong in Mr. Thorn's PSR, and the Court should strike it in full.

*Fifth*, Mr. Thorn has received the impact statements referred to in Paragraphs 37-39.

With respect to the statements and paragraphs 37-39, Mr. Thorn respectfully reiterates his

request, *supra* Section 3(A)(2), that the Court faithfully and rigorously apply settled principles of

relevant conduct regarding such matters as, *inter alia*, threats, children, property damage, theft,

and the term "militia[.]"

## V.  Conclusion

For these reasons, Mr. Thorn respectfully asks the Court to impose the recommended

sentence.

Respectfully submitted,

DATED: November 14, 2017             LAW OFFICE OF JAY A. NELSON

*/s/ Jay A. Nelson*
JAY A. NELSON
1271 NE Highway 99W, No. 508
McMinnville, OR 97128

Attorney for Defendant
DARRYL WILLIAM THORN

SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT
Page 25